**16-1442**

IN THE

# United States Court of Appeals

FOR THE FIRST CIRCUIT



UNITED STATES, EX REL., ANTONI NARGOL and DAVID LANGTON; STATE OF ARKANSAS, STATE OF CALIFORNIA, CITY OF CHICAGO, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF VIRGINIA, STATE OF WISCONSIN, COMMONWEALTH OF MASSACHUSETTS, CITY OF NEW YORK, STATE OF NEW HAMPSHIRE, STATE OF MISSOURI, STATE OF WASHINGTON, EX REL., ANTONI NARGOL and DAVID LANGTON,

*Plaintiffs-Appellants,*

*v.*

DEPUY ORTHOPAEDICS, INC.; DEPUY, INC.; JOHNSON & JOHNSON, SERVICES, INC.,

*Defendants-Appellees.*

———————

*On Appeal from the United States District Court*
*for the District of Massachusetts (Boston)*

## BRIEF FOR PLAINTIFFS-APPELLANTS
## RELATORS DR. ANTONI NARGOL
## AND DR. DAVID LANGTON

Kevin M. Kinne
COHEN KINNE VALICENTI & COOK, LLP
28 North Street, 3rd Floor
Pittsfield, Massachusetts 01201
413-443-9399

David W. Sanford
  (Counsel of Record)
Ross B. Brooks
Russell L. Kornblith
SANFORD HEISLER, LLP
1350 Avenue of the Americas
31st Floor
New York, New York 10019
646-402-5650

*Attorneys for Plaintiffs-Appellants*
*Relators Dr. Antoni Nargol and David Langton*

## **PLAINTIFFS-APPELLANTS' RULE 26.1 DISCLOSURE**

Plaintiffs-Appellants Dr. Antoni Nargol and Dr. David Langton are natural persons. As such, a corporate disclosure statement is not required. Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iv

STATEMENT ON ORAL ARGUMENT ...............................................1

I.   INTRODUCTION ......................................................................2

II.  JURISDICTIONAL STATEMENT ..............................................4

III. ISSUES PRESENTED FOR REVIEW .........................................5

IV.  STATEMENT OF THE CASE ....................................................6

   A. Facts ....................................................................................6

   B. Procedural History ...............................................................9

   C. The Rulings Below ..............................................................12

V.   SUMMARY OF ARGUMENT ...................................................15

VI.  ARGUMENT ...........................................................................17

   A. The SAC Satisfies Rule 9(b) ...............................................17

      1. Legal Standards................................................................17

         a. The False Claims Act Deputizes Private "Relators"
            to Combat Fraud on the Government's Behalf ...................17

         b. Rule 9(b)'s Particularity Requirement is a Practical
            and Flexible Standard that Accounts for the
            Relevant Circumstances ..................................................18

         c. *De Novo* Review Applies ...............................................21

      2. Relators'  Allegations  of  False  Claims  for
         Nonconforming Pinnacle Devices Satisfy Rule 9(b) ..............21

a. Plaintiffs Alleged That Their Indirect Claim Was for a Pinnacle MoM Device ...................................................23

b. Relators' Subsection (a)(1)(A) Allegations Satisfy Rule 9(b) ............................................................26

c. Relators' Subsection (a)(1)(B) Allegations Satisfy Rule 9(b) ............................................................29

d. Relators' Statistical Evidence Strengthens the Inference of Fraud Beyond Mere Possibility ......................................35

3. Relators' Allegations of False Claims for All Government Purchases of the Pinnacle Since 2005 Satisfy Rule 9(b)..................................................39

a. Relators Need Not Plead Details of Specific False Claims Where They Have Alleged a Fraudulent Scheme That Renders All Claims False.............................................41

b. Relators Plead the Who, What, When, Where, and How of a Theory of Liability that Would Render Claims for Pinnacle MoM Devices Fraudulent, Coupled with Indicia that the Government Purchased Pinnacle MoM Devices....................................................46

4. Relators Adequately Pleaded Their State Law Claims ..........................47

B. The District Court Abused Its Discretion in Denying Leave to File the TAC ....................................................48

1. Relators Requested Leave to Amend in Their Opposition to Defendants' Motion to Dismiss and Subsequent Pleadings ................................................49

2. Relators Timely Requested Leave to Amend...........................................51

3. Relators' Newly Discovered Evidence Warrants Leave to Amend ....................................................55

a. Relators' Newly Discovered Evidence Was "Not Previously Available" Due to Obstacles Placed on Their Investigation by the Court Seal and Defendants' Overbroad Interpretation of the MDL Protective Orders ...................................................................... 57

b. Despite Exercising Due Diligence, Relators Could Not Have Previously Gained Access to the Newly Discovered Evidence .......................................................... 59

VII.    CONCLUSION ................................................................. 61

CERTIFICATE OF COMPLIANCE ...................................... 62

CERTIFICATE OF SERVICE ............................................. 63

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Abrahamsen v. Trans-State Express, Inc.*,
    92 F.3d 425 (6th Cir. 1996) ...............................................................57

*Alicea v. Machete Music*,
    744 F.3d 773 (1st Cir. 2014)......................................................56, 60

*Artuso v. Vertex Pharms., Inc.*,
    637 F.3d 1 (1st Cir. 2011)...........................................................21, 24

*Bartlett v. Dep't of the Treasury (IRS)*,
    749 F.3d 1 (1st Cir. 2014)..................................................................25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................25, 27, 42

*Bishop v. Wells Fargo & Co.*,
    823 F.3d 35 (2d Cir. 2016) .................................................................18

*Bond Opportunity Fund II, LLC v. Heffernan*,
    340 F. Supp. 2d 146 (D.R.I. 2004) ....................................................54

*U.S. ex rel. Booker v. Pfizer*,
    9 F. Supp. 3d 34, 58 (D. Mass. 2014)................................................48

*Bos. & Me. Corp. v. Hampton*,
    987 F.2d 855 (1st Cir. 1993)..............................................................19

*Cabrera v. Esso Std. Oil Co. (P.R.), Inc.*,
    723 F.3d 82 (1st Cir. 2013)................................................................54

*Carmona v. Toledo*,
    215 F.3d 124 (1st Cir. 2000)......................................................51, 52

*U.S. ex rel. Carpenter v. Abbott Labs., Inc.*,
    723 F. Supp. 2d 395 (D. Mass. 2010)................................................48

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    751 F. Supp. 2d 277 (D. Mass. 2010)................................................32

*Cohen v. Longshore*,
  621 F.3d 1311 (10th Cir. 2010) ....................................................51–52

*Cruz-Vázquez v. Mennonite Gen. Hosp., Inc.*,
  717 F.3d 63 (1st Cir. 2013)......................................................26

*Deka Int'l S.A. v. Genzyme Corp.*,
  754 F.3d 31 (1st Cir. 2014)......................................................49

*In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability
Litigation*,
  No. 1:10-md-02197......................................................*passim*

*In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products
Liability Litigation*,
  No. 3:11-md-02244......................................................*passim*

*dpiX LLC v. Yieldboost Tech, Inc.*,
  No. 14-05382, 2015 U.S. Dist. LEXIS 117267
  (N.D. Cal. Sep. 2, 2015) ......................................................52

*U.S. ex rel. Dresser v. Qualium Corp.*,
  No. 12-1745, 2016 U.S. Dist. LEXIS 93248
  (N.D. Cal. July 18, 2016)......................................................27

*U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
  579 F.3d 13 (1st Cir. 2009)......................................................*passim*

*U.S. ex rel. Escobar v. Universal Health Servs.*,
  780 F.3d 504 (1st Cir. 2015),
  *vacated on other grounds*, 136 S. Ct. 1989 ................................29, 40

*FDIC v. Kooyomjian*,
  220 F.3d 10 (1st Cir. 2000)......................................................49

*Fisher v. Kadant, Inc.*,
  589 F.3d 505 (1st Cir. 2009)......................................................50

*Foman v. Davis*,
  371 U.S. 178 (1962)......................................................51

*U.S. ex rel. Franklin v. Parke-Davis*,
  147 F. Supp. 2d 39 (D. Mass. 2001)......................................................27

*U.S. ex rel. Ge v. Takeda Pharm. Co.*,
   737 F.3d 116 (1st Cir. 2013) ...................................................................*passim*

*U.S. ex rel. Goulden v. BAE Sys. Info. & Elec. Sys. Integration, Inc.*,
   No. 11-12017, 2014 U.S. Dist. LEXIS 109021
   (D. Mass. Aug. 7, 2014) ........................................................................44

*United States ex rel. Grubbs v. Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) .........................................................20, 35

*Hayduk v. Lanna*,
   775 F.2d 441 (1st Cir. 1985) ................................................................41

*U.S. ex rel. Heath v. AT&T, Inc.*,
   791 F.3d 112 (D.C. Cir. 2015) .............................................................41

*U.S. ex rel. Heineman-Guta v. Guidant Corp.*,
   718 F.3d 28 (1st Cir. 2013) ..................................................................41

*U.S. ex rel. Hood v. Satory Glob., Inc.*,
   946 F. Supp. 2d 69 (D.D.C. 2013) .......................................................45

*Hoyt v. Roche Bros. Supermarkets*,
   26 F. App'x 25 (1st Cir. 2002) .............................................................25

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
   647 F.3d 377 (1st Cir. 2011) .........................................................20, 28

*Karak v. Bursaw Oil Corp.*,
   288 F.3d 15 (1st Cir. 2002) ..................................................................56

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
   360 F.3d 220 (1st Cir. 2004) .....................................................19, 40, 53

*Kastigar v. United States*,
   406 U.S. 441 (1972) .............................................................................10

*U.S. ex rel. Kelly v. Novartis Pharms. Corp.*,
   No. 15-1470, 2016 U.S. App. LEXIS 11001
   (1st Cir. June 17, 2016) .............................................15, 34, 40, 47

*Kettenbach v. Demoulas*,
   901 F. Supp. 486 (D. Mass. 1995) .......................................................56

*Klunder v. Brown Univ.*,
   778 F.3d 24 (1st Cir. 2015)...............................................................51

*Krock v. Elec. Motor & Repair Co.*,
   339 F.2d 73 (1st Cir. 1964)..............................................................60

*Learjet Corp. v. Spenlinhauer*,
   901 F.2d 198 (1st Cir. 1990)............................................................31

*U.S. ex rel. Leysock v. Forest Labs., Inc.*,
   55 F. Supp. 3d 210 (D. Mass. 2014)................................................12, 53, 54, 60

*Liu v. Amerco*,
   677 F.3d 489 (1st Cir. 2012)............................................................24

*Luig v. N. Bay Enters., Inc.*,
   817 F.3d 901 (5th Cir. 2016) ...........................................................57

*Maddalone v. Okada Shosen, KK*,
   756 F.2d 886 (1st Cir. 1985).............................................................52

*McGinty v. Beranger Volkswagen. Inc.*,
   633 F.2d 226 (1st Cir. 1980).............................................................35

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010).........................................................................43

*Mudge v. Bank of Am., N.A.*,
   No. 13-421, 2014 U.S. Dist. LEXIS 151838
   (D.N.H. Oct. 24, 2014) ...................................................................57

*Nargol and Langton v. DePuy Orthopaedics, Inc.*, et al.,
   No. 1:15-dp-20117 ..........................................................................11

*Neder v. United States*,
   527 U.S. 1 (1999)............................................................................35

*New York v. Amgen Inc.*,
   652 F.3d 103 (1st Cir. 2011)............................................................47

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   MDL No. 1456, 2007 U.S. Dist. LEXIS 26242
   (D. Mass. Apr. 2, 2007) ..................................................................32

*Pruell v. Caritas Christi*,
678 F.3d 10 (1st Cir. 2012)...............................................27

*Rainwater v. United States*,
356 U.S. 590 (1958)...........................................................43

*Rivera v. M/T Fossarina*,
840 F.2d 152 (1st Cir. 1988)..............................................56

*U.S. ex rel. Rodwell v. Excelitas Techs., Corp.*,
No. 13-10963, 2015 U.S. Dist. LEXIS 78508
(D. Mass. June 16, 2015) ...................................................27

*U.S. ex rel. Rost v. Pfizer, Inc.*,
253 F.R.D. 11 (D. Mass. 2008)..........................................48

*U.S. ex rel. Rost v. Pfizer, Inc.*,
507 F.3d 720 (1st Cir. 2007)......................................*passim*

*U.S. ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235 (3d Cir. 2004) ........................................28, 34

*SEC v. Tambone*,
597 F.3d 436 (1st Cir. 2010) ..............................................24

*Sellers v. Gen. Motors Corp.*,
No. 80-1847, 1984 U.S. Dist. LEXIS 22995
(E.D. Pa. Oct. 5, 1984)........................................................57

*U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*,
No. 04-186, 2006 U.S. Dist. LEXIS 65268
(W.D. Pa. Sept. 13, 2006) ...................................................45

*U.S. ex rel. Smith v. Boeing Co.*,
505 F. Supp. 2d 974 (D. Kan. 2007)...................................27

*State Teachers Ret. Bd. v. Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981) ...............................................51

*Steiner v. Unitrode Corp.*,
834 F. Supp. 40 (D. Mass. 1993) ........................................25

*Suna v. Bailey Corp.*,
    107 F.3d 64 (1st Cir. 1997)....................................................................41

*Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No.*
    *59 v. Superline Transp. Co.*,
    953 F.2d 17 (1st Cir. 1992)....................................................................56

*United Seniors Ass'n v. Philip Morris USA*,
    500 F.3d 19 (1st Cir. 2007)....................................................................18

*United States v. Allen*,
    573 F.3d 42 (1st Cir. 2009)....................................................................56

*United States v. Bornstein*,
    423 U.S. 303 (1976)...............................................................................27

*United States v. Brodie*,
    403 F.3d 123 (3d Cir. 2005) ..................................................................25

*United States v. Díaz*,
    670 F.3d 332 (1st Cir. 2012)..................................................................25

*United States v. McNinch*,
    356 U.S. 595 (1958)...............................................................................18

*United States v. Monell*,
    801 F.3d 34 (1st Cir. 2015)....................................................................24

*United States v. Nguyen*,
    542 F.3d 275 (1st Cir. 2008)............................................................49, 54

*United States v. Rivera*,
    55 F.3d 703 (1st Cir. 1995)....................................................................28

*United States v. Triple Canopy, Inc.*,
    775 F.3d 638 (4th Cir. 2015), *vacated on other grounds*,
    No. 12-1440, 2016 U.S. LEXIS 4169 (2016)........................................47

*United States v. United Healthcare Co.*,
    No. 13-56746, 2016 U.S App. LEXIS 14687
    (9th Cir. Aug. 10, 2016).........................................................................51

*United States v. Walus,*
    616 F.2d 283 (7th Cir. 1980) ............................................................57

*Universal Health Servs. v. U.S. ex rel. Escobar,*
    136 S. Ct. 1989 (2016).................................................17–18, 26

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
    529 U.S. 765 (2000)...........................................................18

*U.S. ex rel. Westmoreland v. Amgen, Inc.,*
    738 F. Supp. 2d 267 (D. Mass. 2010)....................................20, 34, 38

*U.S. ex rel. Winkelman v. CVS Caremark Corp.,*
    No. 15-1991, 2016 U.S. App. LEXIS 12108
    (1st Cir. June 30, 2016)......................................................42

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics,*
    652 F.3d 818 (7th Cir. 2011) .............................................18

**Statutes**

28 U.S.C. § 1291 .............................................................................4

28 U.S.C. § 1331 .............................................................................4

28 U.S.C. § 1367(a) ........................................................................4

31 U.S.C. §§ 3729–30.................................................................1, 4

31 U.S.C. § 3729(a)(1).................................................................17

31 U.S.C. § 3729(a)(1)(A) ...................................................*passim*

31 U.S.C. § 3729(a)(1)(B) ...................................................*passim*

31 U.S.C. § 3730(b)(1).................................................................17

31 U.S.C. § 3730(e)(4)...............................................................44

31 U.S.C. § 3732(b) .......................................................................4

42 U.S.C. § 1395y(a)(1)(A) .....................................................7, 42

False Claims Act .................................................................*passim*

Rules Enabling Act, 28 U.S.C § 2072(b) ................................................................ 42

**Other Authorities**

Beck, *The False Claims Act and the English Eradication of False
    Claims Act Legislation*, 78 N.C. L. Rev. 539 (2000) .......................................... 44

Fed. R. App. P. 34 ................................................................................................... 1

Fed. R. Civ. P. 9 .................................................................................................... 35

Fed. R. Civ. P. 9(b) ........................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6) .................................................................................. *passim*

Fed. R. Civ. P. 12(d) ............................................................................................. 25

Fed. R. Civ. P. 15(a) ....................................................................................... 50, 51

Fed. R. Civ. P. 15(a)(2) ......................................................................................... 51

Fed. R. Civ. P. 56 ................................................................................................. 25

Fed. R. Civ. P. 59 and 60 ................................................................................. 4, 14

Fed. R. Civ. P. 59(e) ....................................................................................... 55, 57

Fed. R. Civ. P. 60(b)(2) .............................................................................. 55, 56, 57

Restatement (Second) of Torts §§ 531, 533 .......................................................... 31

## STATEMENT ON ORAL ARGUMENT

Plaintiffs-Appellants, *qui tam* relators Dr. Antoni Nargol and Dr. David Langton ("Relators") request oral argument under Federal Rule of Appellate Procedure 34. Oral argument will assist the Court in the consideration of the issues raised herein, including the proper application of Federal Rule of Civil Procedure 9(b); the relationship among Rule 9(b), Rule 12(b)(6), and the False Claims Act ("FCA" or "the Act"), 31 U.S.C. §§ 3729–30; and whether Appellants should be granted leave to file a Third Amended Complaint ("TAC").

## I.  **INTRODUCTION**

Congress enacted the FCA to encourage individuals with information about fraud on the government ("relators") to come forward on behalf of the public. But relators often do not know every detail of the effects of the defendant's fraudulent activity—especially on third parties. Hence, this Court relaxes Federal Rule of Civil Procedure 9(b) in cases where a relator pleads that the defendant caused third parties to present a false claim to the government. In such cases, relators may rely on reasonable inferences to establish that the third parties submitted claims. This rule accords with the Rule 9(b) standard applied to all civil cases: It is well-established that facts particularly within a defendant's knowledge need not be pleaded with the same degree of specificity.

Here, Plaintiffs-Relators pleaded a comprehensive scheme to market and sell defective hip-replacement medical devices to unsuspecting customers, including the government. Despite knowing that these products were defective, experienced high failure rates and were corrupted by their faulty manufacturing operation, Defendants represented to government regulators and medical providers that the devices were safe and effective. Had Defendants presented complete and accurate information, the Government would not have purchased them, and no provider would have used them.

Relators also provided detailed allegations strongly supporting an inference that medical providers submitted thousands of claims for these products through Medicare and Medicaid. Each of these claims was false within the meaning of the FCA: In seeking government reimbursement, the providers (deceived by Defendants) represented that the products were medically appropriate when they were actually unfit for use.

Yet, based on misplaced concerns about "parasitic" relators, the court below applied a heightened Rule 9(b) standard and dismissed Relators' claims. This constricted interpretation threatens to gut the FCA and leave many frauds on the government unredressed.

Further, the district court compounded its error when it refused to enter an amended complaint that would have satisfied even its own heightened version of Rule 9(b). The court relied on Relators' supposed "delay" but failed to appropriately consider mitigating factors and the lack of prejudice to Defendants. These errors warrant reversal.

## II.    <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction over this case under 28 U.S.C. § 1331, because this case arises under the FCA, 31 U.S.C. §§ 3729–30. It had jurisdiction over Relators' corresponding state-law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a).

This Court has jurisdiction over this case under 28 U.S.C. § 1291, because Relators appealed from a final judgment. (R. 184, 185, 196, Addendum 1, 58, 59.) The court below entered judgment on February 2, 2016. (R. 185, Addendum 58.) Relators filed a motion for reconsideration under Federal Rules of Civil Procedure 59 and 60 on March 1, 2016. (R. 186, J.A. 803.) The court denied Relators' motion on April 11, 2016. (R. 196, Addendum 59.) Relators timely filed a notice of appeal on April 21, 2016. (R. 198, J.A. 1212.)

### III.    <u>ISSUES PRESENTED FOR REVIEW</u>

1. Relators pleaded the who, what, when, where, and how of Defendants' fraudulent scheme to sell medical devices with defects that made them dangerously unsafe and grossly unfit for their intended purpose, offered factual and statistical evidence to strengthen the inference of fraud beyond possibility, and provided details identifying a representative false claim submitted to the government. Relators further pleaded a liability theory that renders all claims submitted during the relevant limitations period for the medical device in question false. Do Relators' pleadings satisfy Federal Rule of Civil Procedure 9(b)?

2. The district court denied Relators leave to file a TAC pleading newly discovered evidence that would have cured the purported deficiencies identified by the court. Did the district court err?

## IV.   STATEMENT OF THE CASE

### A. Facts

Relators filed this lawsuit to recover monies expended by the United States and the Plaintiff Cities and States (collectively, "the Government") on Defendants' metal-on-metal ("MoM") hip-replacement medical devices with defects that made them dangerously unsafe and grossly unfit for use. The gravamen of Relators' pleadings is simple: DePuy Orthopaedics, Inc., DePuy, Inc., and Johnson & Johnson Services, Inc. (collectively "Defendants" or "DePuy") represented to surgeons, the Food and Drug Administration (FDA), and the public that DePuy's Pinnacle Acetabular Cup System ("Pinnacle" or "Pinnacle MoM") hip-replacement devices were safe and effective, failed at acceptable rates, were manufactured within required specifications, and had not been altered so as to require disclosure to the FDA. (SAC ¶¶ 7, 9.)[1] Based on these representations, the FDA authorized DePuy to market the device in the United States, including to the government. (*Id.* ¶¶ 401–02.)

Nonetheless, since at least 2005, DePuy knew of or recklessly disregarded evidence that the device suffered from manufacturing defects that caused it to fail at alarming rates and rendered its use medically unreasonable. (*Id.* ¶¶ 381–86.) As failure rates escalated, DePuy worked to conceal defects, including by making

---

[1] Relators refer to the Corrected Second Amended Complaint ("SAC"), filed on May 14, 2016. (R. 119-1, J.A. 365.)

overt false statements to the FDA, surgeons, and patients. (*Id.* ¶¶ 201–320.) While DePuy undertook this cover-up, the Government continued to pay claims for the device, and patients implanted with the device suffered from its devastating effects.

Relators allege that DePuy: (1) caused providers to falsely certify compliance with the conditions of Forms HCFA-1450 and CMS-1500, the Medicare provider agreement, and 42 U.S.C. § 1395y(a)(1)(A) (*id.* ¶¶ 90–99); (2) misrepresented and failed to disclose complete and accurate data and information about the quality of the device as specifically directed by the FDA (*id.* ¶¶ 280–320); and (3) violated FDA's Current Good Manufacturing Practices ("cGMP"), misbranding, and adverse event reporting regulations. (*id.* ¶¶ 312–412.) This conduct denied the Government the benefit of its bargain.

Relators are world-renowned experts on MoM hip implants and were among the earliest to blow the whistle on DePuy's fraud. (*Id.* ¶ 23–25.) Dr. Nargol is an orthopedic surgeon in the United Kingdom. (*Id.* ¶ 63–64.) He learned of and began investigating defects in the Pinnacle based on his experience with the device in his own surgical practice. (*Id.* ¶ 26–30, 65–67.) Dr. Langton is a surgeon and a researcher in the United Kingdom, where he focuses on MoM anthroplasty. (*Id.* ¶ 69.) Through his research, Dr. Langton has analyzed more than 250 Pinnacle components that were either unused or explanted from injured patients. (*Id.* ¶ 70.)

7

Relator Nargol first became familiar with the problems affecting the Pinnacle through his earlier use of another DePuy MoM hip-implant device, the ASR XL. (*Id.* ¶ 24.) Dr. Nargol observed that ASR XL implants were failing at alarming rates and discharging unsafe metal ions into patients' blood. (*Id.* ¶ 30– 31.) He notified DePuy, but rather than acknowledge the issues, DePuy blamed Dr. Nargol. (*Id.* ¶¶ 32–36.) Shortly thereafter, Dr. Nargol began to observe a similar pattern in the Pinnacle and alerted DePuy again. (*Id.* ¶ 24.) DePuy continued to blame surgical technique and patient selection, while insisting that other results were positive, in an effort to prolong the Pinnacle MoM's time on the market and aid its bottom line. (*Id.* ¶¶ 49–52.) Relators alerted the FDA to all of these facts. (*Id.* ¶¶ 42–48.) Finally, in August 2013, DePuy withdrew the Pinnacle device from the market. (*Id.* ¶ 59.)

The damage was done. Around 2011, patients began filing personal injury actions against DePuy. Soon, two multi-district litigations ("MDLs") emerged. The first, *In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation*, No. 3:11-md-02244 ("Pinnacle MDL"), concerns Pinnacle MoM implants and is currently pending in the Northern District of Texas. A second MDL, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation*, No. 1:10-md-02197 ("ASR MDL"), concerns ASR MoM devices and is currently in settlement in the Northern District of Ohio. Because of their expertise

and knowledge of Defendants' conduct, plaintiffs' counsel in the two MDLs sought out Relators to serve as expert witnesses. This role would require Relators to review documents that had been produced in discovery. Accordingly, Relators agreed to be bound by the confidentiality orders in those cases, so that counsel could provide discovery documents to Relators. Drs. Nargol and Langton agreed to be bound by the ASR Confidentiality Order (R. 106-2, J.A. 92) sometime after its entry in 2011 and agreed to be bound by the Pinnacle Confidentiality Order (R. 106-2, J.A. 108) in 2013 and 2014. Relators initially sought to modify the respective confidentiality orders, but the ASR MDL court denied Relators' intervenor motion. (R. 178-2, J.A. 795.) Relators withdrew their parallel Pinnacle MDL motion thereafter.

## B. **Procedural History**

Relators filed this case under seal in May 2012 in accordance with the *qui tam* provisions of the FCA and filed an Amended Complaint in November 2013. In July 2014, the government plaintiffs informed Relators that they would not intervene in the case. On Relators' motion, the district court stayed the unsealing of the First Amended Complaint to mitigate any risk that confidential information would be publicly disclosed but nonetheless ordered service of the Amended Complaint upon Defendants. (R. 45, Order Unsealing Case.)

In February 2015, Relators moved to partially unseal a redacted version of the Amended Complaint and transfer this case to the Pinnacle MDL. (R. 84.) Defendants opposed any unsealing or transfer and asserted that, before the filing of any second amended complaint, Defendants should be permitted to test whether any allegations in the complaint were derived from confidential information produced in the MDLs through a process akin to a hearing under *Kastigar v. United States*, 406 U.S. 441 (1972). (R. 104, J.A. 62:18–63:6, 69:8–20.)

On March 18, 2015, the district court denied Relators' motion and directed that any motion for leave to file a second amended complaint be filed in the District of Massachusetts. Responding to Defendants' stated concern that a future complaint could violate the Pinnacle or ASR MDL confidentiality orders, the court ordered

> that the second-amended complaint be accompanied by affidavits from the relators, that the allegations in the second-amended complaint do not make use of those confidential documents or do not violate the three orders in question, that is, the two confidentiality orders and the January, [sic] 2015 order [in the ASR MDL], that those should be filed under sealed [sic], that is, the second-amended complaint and the affidavits.

(R. 104, J.A. 69:14–20.)

Relators thereupon began to draft the SAC. Defendants, however, asserted that the aforementioned three orders severely restricted the information that Relators could plead therein. (R. 104, J.A. 58:7–10, R. 106-2, J.A. 149.) Without

clarification from the MDL courts, Relators were forced to halt their investigation to ensure their compliance.

Seeking clarification on the orders, on April 3, 2015, Relators filed a declaratory judgment action in the Northern District of Ohio, captioned *Nargol and Langton v. DePuy Orthopaedics, Inc.*, et al., No. 1:15-dp-20117. The action sought a determination that Relators could use certain categories of information produced in the MDLs, including information previously within their own personal knowledge. The declaratory judgment action was soon transferred to the ASR MDL, which has not yet issued a ruling.

Back before the District of Massachusetts, Relators sought to stay proceedings in this case until the resolution of the declaratory judgment action. These efforts proved unsuccessful, but Relators received an extension to move for leave to amend. (R. 106, Mot. Stay and Extension; R. 109, Order Granting Mot. Extension.) In the meantime, Relators remained hamstrung by Defendants' overbroad interpretations of the Confidentiality Orders and the continuing seal on the Amended Complaint.

Nonetheless, on May 4, 2015, Relators moved under seal for leave to file the SAC and submitted the required affidavits. (R. 115, 115-2, 115-3, 115-4; J.A. 169, 189, 357, 358.) In June 2015, the district court granted Relators leave to amend and "deemed the Second Amended Complaint as the operative complaint" in this

matter. (R. 133, Clerk's Notes of Proceedings 6/5/2015, J.A. 14.) But, in an extraordinary step, the court instructed "relators to provide source information as to allegations" in the proposed SAC (*id.*; R. 139, J.A. 14) and granted DePuy "significant latitude" to test Relators' affidavits by requesting "information concerning the source of the allegations" in the SAC (R. 135, J.A. 599:16, 600:19). Relators complied. (R. 172-2, J.A. 778–94.)

At Defendants' urging, the Court also ruled that the SAC would remain sealed until Defendants assessed the sourcing information. (R. 135, J.A. 603:7–19.)

In May 2015, Relators began to prepare an amended complaint designed to satisfy the unsupported Rule 9(b) standard articulated in *U.S. ex rel. Leysock v. Forest Laboratories, Inc.*, 55 F. Supp. 3d 210 (D. Mass. 2014). In August 2015, while Defendants' Motion to Dismiss was pending, Relators moved to unseal the SAC, explaining that they were unable to effectively conduct their investigation while the case was sealed. (R. 186-1, Mem. Supp. Mot. Recons., 10.) Defendants assented to that motion on September 2, 2015. (R. 177, Opp'n Mot. Unseal.) Nevertheless, the SAC remained sealed until the Motion to Dismiss was granted and leave to amend was denied in February 2016. (R. 185, Addendum 4.)

## C. **The Rulings Below**

In February 2016, the district court granted Defendants' Motion to Dismiss under Rule 9(b). (R. 184, Addendum 3–4.) After dismissing Relators' direct

claims, the district court considered Relators' allegations of "indirect claims to the government where a defendant causes third-parties to submit false claims." (*Id.*, Addendum 39.) It reasoned that a complaint alleging indirect claims "must allege two things to satisfy Rule 9(b): (1) particular details of a scheme to cause the submission of false claims to the government; and (2) factual or statistical evidence that strengthens the inference of fraud on the government beyond a mere possibility." (*Id.*)

With regard to the first category of information, the court asserted that Relators had failed "to identify a single physician who was a target of allegedly false DePuy marketing, identify a single physician who relied on that marketing, or identify a single physician who filed a false claim for the DePuy MoM device." (*Id.*, Addendum 42.) The court acknowledged Relators' allegation that, on or about November 12, 2007, a patient, F.I., was implanted with a Pinnacle hip by a surgeon, Dr. J.N., at Stony Brook University Medical Center in New York and that New York Medicaid reimbursed the costs. (*Id.*, Addendum 22–23.) Nonetheless, the court asserted that Relators did "not identify the specific representations or materials that the doctor received and relied upon, nor does it allege the specific DePuy device for which the doctor filed a claim." (*Id.*, Addendum 42.) The court next disregarded statistical evidence pleaded by Relators supporting an inference that thousands of Medicaid and Medicare patients across the country likely

received Pinnacle MoM implants during the relevant period. (*Id.*, Addendum 42.) It concluded that this information was insufficient, because "[t]he broad statistical claims made here could be made about virtually any successful medical device or product." (*Id.*, Addendum 43.)

The court also found that Relators' claims under the various state false claims acts failed to satisfy Rule 9(b). (*Id.*, Addendum 52.) Finally, the court denied Relators leave to amend because it said Relators had sufficient time to move for leave to file the TAC and failed to do so. (*Id.*, Addendum 55.)

Relators timely filed a Motion for Reconsideration of the denial of leave to amend under Federal Rules of Civil Procedure 59 and 60, and attached the proposed TAC, containing 39 representative false claims. (R. 186, 186-2; J.A. 803, 839, 939.) Again, the court denied Relators leave to amend. (R. 196, Addendum 60.) It reasoned that the additional facts pleaded in the TAC "should have been discovered before the SAC was filed." (*Id.*)

This appeal followed. (R. 198, J.A. 1212) Relators here seek review of the district court's Opinion and Order dismissing this matter and denying leave to amend (R. 184, 185; Addendum 1–59) and its denial of reconsideration (R. 196, Addendum 59).

## V.   **SUMMARY OF ARGUMENT**

Relators satisfy this Court's Rule 9(b) pleading standard for FCA claims. Relators detailed DePuy's fraudulent scheme, factual evidence substantiating Defendants' submission of false claims to the government, and a representative indirect claim for a Pinnacle MoM device implanted into a Medicaid patient in 2007. Relators alleged that, in selecting and implanting the device, the surgeon (and many others) relied upon false statements and omissions that DePuy made directly to the surgeon, the medical community, the FDA, and the wider public. These pleadings include the who, what, when, where, and how of the Defendants' scheme and alleged false claims. The district court's attempts to inject ambiguity into these pleadings by making inferences in Defendants' favor warrants reversal.

In addition, Relators plead statistical evidence raising a strong inference that false claims for Pinnacle MoM implants were submitted to and paid by the government. This data likewise suffices to satisfy the Rule 9(b) standard set forth by this circuit. And, combined, these details go beyond the particularity requirements articulated in *U.S. ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123–24 (1st Cir. 2013), and *U.S. ex rel. Kelly v. Novartis Pharms. Corp.*, No. 15-1470, 2016 U.S. App. LEXIS 11001, at *16–20 (1st Cir. June 17, 2016).

Simply put, the district court asked far too much of Relators. A requirement to make a greater evidentiary showing at the pleading stage serves no purpose

other than to undermine the FCA. Here, Relators allege that Defendants misled and caused surgeons to file false certifications of compliance with material obligations to the Government, resulting in government purchases of substandard and nonconforming Pinnacle MoM devices. Relators further allege that, had Defendants disclosed the risks posed by their manufacturing process failures and resulting device failure rates, no reasonable surgeon or purchaser would have chosen the Pinnacle MoM device. Under the latter theory it suffices for Relators to plead facts supporting an inference that that the government purchased the relevant devices at all. They have, and therefore Relators' pleadings also satisfy Rule 9(b) under this theory.

But the Court need not reach the question of whether the SAC satisfies Rule 9(b), because the district court abused its discretion in denying Relators' motion for leave to file the TAC. In the TAC, Plaintiffs developed and pleaded evidence that meets even the district court's heightened Rule 9(b) pleading standard, which requires that Relators plead the surgeon's reliance on specific false statements made by Defendants.

16

## VI.   ARGUMENT

### A. The SAC Satisfies Rule 9(b)

Relators' pleadings thoroughly satisfy Rule 9(b). First, Relators pleaded factual and statistical allegations suggesting that Defendants' conduct resulted in the submission of false claims for nonconforming Pinnacle MoM devices. Second, Relators pleaded the details of a representative false claim. Third, Relators have pleaded the details of an additional scheme that would render all claims for Pinnacle MoM devices false, combined with facts raising an inference of government purchases of the device. These allegations exceed this Court's pleading standards. Requiring Relators to provide more would be inconsistent with the intent and requirements of Rule 9(b).

#### 1. Legal Standards

##### a.   The False Claims Act Deputizes Private "Relators" to Combat Fraud on the Government's Behalf

The FCA, 31 U.S.C. § 3729(a)(1), imposes liability on "any person who-- (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." "A person may bring a civil action for a violation of section 3729 for the person and for the United States Government" and share in the government's recovery. 31 U.S.C. § 3730(b)(1); *see also Universal Health Servs. v. U.S. ex rel. Escobar*, 136 S. Ct.

1989, 1996 (2016).

"[T]he FCA was enacted in 1863 with the principal goal of 'stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 781 (2000) (second alteration in original) (citation omitted). One of the Act's original targets was defective goods. "Testimony before the Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *United States v. McNinch*, 356 U.S. 595, 599 (1958); *see also Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016); *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 823 n.3 (7th Cir. 2011) ("The [FCA] was enacted . . . in the midst of the Civil War, in response to flagrant frauds committed against the government, such as selling defective rifles and artillery shells filled with sawdust instead of explosives."). To combat this fraud, Congress sought to "unleash[] a posse of *ad hoc* deputies to uncover and prosecute frauds against the government" through the FCA. *United Seniors Ass'n v. Philip Morris USA*, 500 F.3d 19, 24 (1st Cir. 2007) (citation omitted).

> b. Rule 9(b)'s Particularity Requirement is a Practical and Flexible Standard that Accounts for the Relevant Circumstances

Rule 9(b) requires that "[i]n alleging fraud . . . a party must state with

particularity the *circumstances constituting fraud* . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally" (emphasis added). The Rule is not, however, to be applied in a rigid, one-size-fits-all manner. For example, Plaintiffs need not plead facts that, due to the nature of the alleged fraud, are "peculiarly within defendants' control." *Bos. & Me. Corp. v. Hampton*, 987 F.2d 855, 866 (1st Cir. 1993).

"Rule 9(b) applies to claims under the FCA." *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004). Accordingly, "[r]elators are required to set forth with particularity the who, what, when, where, and how of the alleged fraud." *Ge*, 737 F.3d at 123 (citation omitted). Nonetheless, "[t]he rule may be satisfied . . . 'where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA.'" *U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732 (1st Cir. 2007).

The First Circuit distinguishes between a relator's allegations that the defendant submitted false claims to the government ("direct claims") or that it caused a third party to do so ("indirect claims"). Because the relator cannot reasonably be expected to know details of transactions between a third party and the government, the requirements for pleading indirect claims are relaxed. In cases involving "indirect claims," relators can

satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility" without necessarily providing details as to each false claim. *Rost*, 507 F.3d at 733; *see also United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (holding that FCA claims under Rule 9(b) "may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").

*U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009); *see also U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 275 (D. Mass. 2010) ("This more flexible standard is appropriate because before conducting full discovery, a plaintiff whistleblower . . . likely would not have access to provider enrollment forms submitted by third party providers.").

This Court has made clear that a relator can assert indirect claims under both 31 U.S.C. § 3729(a)(1)(A)—causing a false or fraudulent claim to be presented—*and* § 3729(a)(1)(B)—making or causing to be made a false record or statement material to a false or fraudulent claim. *Duxbury*, 579 F.3d at 29 & n.6. This clarification is critical because, unlike § 3729(a)(1)(B), § 3729(a)(1)(A) has no false statement requirement. Thus, a relator may plead an indirect claim under § 3729(a)(1)(A) without pleading that a defendant made or used a false statement and without "identify[ing] specific claims." *Id.* at 30; *see also U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 389 (1st Cir. 2011) (analyzing indirect claims under both provisions).

The district court failed to grasp this point. It stated: "The First Circuit has distinguished pleading standards for direct claims, or sales to the government, which are governed by 31 U.S.C. § 3729(a)(1)(A), from indirect claims to the government where a defendant causes third-parties to submit false claims, which are governed by 31 U.S.C. § 3729(a)(1)(B)." (R. 184, Addendum 39.) To the contrary, § 3729(a)(1)(A) also governs indirect claims against a defendant which allegedly "*causes to be presented*, a false or fraudulent claim for payment or approval" (emphasis added).

### c. *De Novo* Review Applies

This Court "review[s] de novo the district court's dismissal order for failure to comply with Rule 9(b)." *Ge*, 737 F.3d at 123. "In conducting that review, [the Court] accept[s] as true all well-pleaded facts set forth in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *Artuso v. Vertex Pharms., Inc*., 637 F.3d 1, 5 (1st Cir. 2011).

### 2. **Relators' Allegations of False Claims For Nonconforming Pinnacle Devices Satisfy Rule 9(b)**

Relators allege that all claims for nonconforming Pinnacle MoM devices that surgeons such as J.N. certified as "reasonable and medically necessary" were false, "as the implantation of a defective device is not a medically reasonable treatment." (SAC ¶¶ 326, 426.) Relators' representative indirect Medicaid claim satisfies Rule 9(b) under both § 3729(a)(1)(A) and § 3729(a)(1)(B) for this

21

allegation. Relators pleaded that Dr. J.N. implanted patient F.I. with a DePuy Pinnacle device on or about November 12, 2007. (*Id.* ¶ 414.) Further, Stony Brook University Medical Center submitted a claim to Medicaid for the surgery. (*Id.* ¶ 427.) Because of Defendants' fraudulent conduct, Defendants caused Dr. J.N. to falsely certify to the Medicaid program that the defective device was reasonable and necessary for implantation in a specific patient ("F.I."). (*Id.* ¶¶ 426, 432.)

In rejecting this allegation as insufficient to satisfy 9(b), the district court erred. *First*, the court failed to credit Relators' well-pleaded allegations by questioning whether F.I.'s failed Pinnacle hip was actually a MoM device.

*Second*, the court analyzed the claim solely under subsection (a)(1)(B) because it was an *indirect* claim. (R. 184, Addendum 39.) This was reversible error, because a relator may plead indirect claims under *either* subsection (a)(1)(A) *or* subsection (a)(1)(B). For both subsections, therefore, Relators need only plead "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *Duxbury*, 579 F.3d at 29 (citation omitted). By foreclosing Relators from pleading indirect claims in the absence of a false statement, the district court erroneously grafted a false statement requirement onto subsection (a)(1)(A).

*Third*, the court erroneously found that Relators' indirect claim did not satisfy the Rule 9(b) pleading standard for claims brought under subsection (a)(1)(B) because they failed to plead J.N.'s reliance on a specific false statement.

But Relators pleaded that Defendants made numerous direct and indirect misrepresentations to J.N. that were material to the false claim for F.I.'s device. In rejecting Relators' claim, the court further grafted an inessential requirement onto subsection (a)(1)(B): that Relators plead that the target of a misrepresentation specifically relied upon an identified misrepresentation in selecting the product. These errors warrant reversal.

a. Plaintiffs Alleged That Their Indirect Claim Was for a Pinnacle MoM Device

The district court held that Relators did not "allege that the surgeon presented a claim to Medicaid for a Pinnacle MoM device, as opposed to a Pinnacle device with a ceramic head or a polyethylene liner." (R. 184, Appendix 40.) But the SAC was clear: "Relators . . . allege that DePuy *submitted false claims for payment for one of DePuy's MoM devices*: the Pinnacle Acetablular Hip System ([hereinafter] '*Pinnacle*')." (SAC ¶ 6 (emphasis added)). During the hearing on Relators' Motion for Leave to File the SAC, Defendants even acknowledged that the SAC pleaded only the Pinnacle MoM "in the actual counts of the complaint in terms of seeking to recover the government spend." (R. 135, J.A. 593:12–17.)

The allegations about F.I.'s claim also leave little doubt that F.I. received a MoM device, not some other product. In paragraph 414, Relators plead that "F.I. was implanted with a DePuy Pinnacle hip implant." In paragraph 418, Relators

plead that "the Ultamet Technical Monograph, a Pinnacle marketing material . . . stated that the Pinnacle MoM implants experienced reduced wear as compared to competing devices." Finally, in paragraph 420, Relators plead that Dr. J.N. relied on this statement in selecting the device. These statements create at least a plausible inference that F.I.'s claim was for a MoM device. Otherwise, Relators' discussion of DePuy's MoM representations in the section on the F.I. claim—and the surrounding context of the 167-page complaint about the Pinnacle MoM—would be mere surplusage. *See Liu v. Amerco*, 677 F.3d 489, 497 (1st Cir. 2012).

The district court, however, credited Defendants' factual assertions based on a set of Pinnacle marketing materials attached to their Motion to Dismiss. Relying on these outside materials, the court determined that "[a] 'Pinnacle product' could refer to any combination of DePuy's three Pinnacle heads and three Pinnacle liners." (R. 184, Addendum 34.) This was error.

*First*, by concluding that F.I.'s implant was not a MoM device, the court failed to "indulge all reasonable inferences in favor of the pleader." *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010). The district court must "accept[] as true all well-pleaded facts set forth in the complaint and draw[] all reasonable inferences therefrom in the pleader's favor." *Artuso*, 637 F.3d at 5. An inference is reasonable "even if a competing inference is possible." *United States v. Monell*, 801 F.3d 34, 51 (1st Cir. 2015) (finding it reasonable to infer that reference to

"plan B" was reference to a witness "even if a competing inference is possible");
*see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for
plausible grounds to infer an agreement does not impose a probability requirement
at the pleading stage.").[2] Plaintiffs "are not required at this stage to foreclose all
alternative explanations of the facts supporting their allegations of fraud." *Steiner
v. Unitrode Corp.*, 834 F. Supp. 40, 45 (D. Mass. 1993). Indeed, Relators have
evidence refuting Defendants' assertions but were foreclosed from presenting it
and, more importantly, were not required to do so at the pleading stage.

*Second*, the district court's consideration of extrinsic evidence contravenes
well-established law and *sub silentio* transformed Defendants' Motion to Dismiss
into one for summary judgment. "[A] district court *must* advise the parties if, in
ruling on a motion to dismiss, it is considering materials outside the pleadings."
*Bartlett v. Dep't of the Treasury (IRS)*, 749 F.3d 1, 12 (1st Cir. 2014) (emphasis
added). Federal Rule of Civil Procedure 12(d) states:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings
> are presented to and not excluded by the court, the motion must be treated as
> one for summary judgment under Rule 56. All parties must be given a

---

[2] *Cf. United States v. Díaz*, 670 F.3d 332, 342 (1st Cir. 2012) ("Thus, taken in
context [of the reference two sentences earlier], the reasonable inference to be
drawn from this testimony is that 'the material' refers to marijuana."); *United
States v. Brodie*, 403 F.3d 123, 154–55 (3d Cir. 2005) (inferring that "Caribbean"
was code for "Cuba"); *Hoyt v. Roche Bros. Supermarkets*, 26 F. App'x 25, 29 (1st
Cir. 2002) (making the "reasonable inference that the ambiguous 'they' referred to
the truck drivers, [despite] an equally reasonable inference that 'they' referred to
other Roche Brothers employees").

reasonable opportunity to present all the material that is pertinent to the motion.

*see also Cruz-Vázquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 68 (1st Cir. 2013) (same). The court gave no such opportunity, and Relators were unable to respond to Defendants' documents, which had not previously been produced. Had such advisement been given, Relators would have resolved any ambiguities in their pleadings. This Court should grant Relators this opportunity.

        b.  <u>Relators' Subsection (a)(1)(A) Allegations Satisfy Rule 9(b)</u>

Relators' subsection (a)(1)(A) claims arise from Defendants' knowing misrepresentations of compliance with material regulatory obligations and the resulting submission of claims for defective and noncompliant Pinnacle MoM devices. FCA liability attaches "where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001[3];

---

[3]The district court acknowledged that, in order to address whether terms of the contracts underlying Relators' direct claims gave rise to a § 3729(a)(1)(A) "implied certification" claim, "the Court would need to await a decision from the Supreme Court" regarding "the theory of implied certification adopted by the First Circuit in *Escobar*." (R. 184, Addendum 49.) The Supreme Court's clarification of the pleading requirements for implied certification claims under the FCA warrants

*see also U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 51 (D. Mass. 2001) (holding off-label pharmaceutical drug promotion actionable under the FCA because defendant's "failure to abide by a rule or regulation amounts to a material misrepresentation[s] made to obtain a government benefit").[4]

The SAC satisfies this standard. For example, Defendants allegedly: (1) knew that their devices were non-compliant with FDA regulations and directives in a manner that caused them to be unfit for medical use (SAC ¶¶ 321–57); (2) continued to market the products as compliant and as safe and effective (*id.* ¶¶ 8,

---

leave to amend. *See, e.g., Pruell v. Caritas Christi*, 678 F.3d 10, 15 (1st Cir. 2012) (granting further opportunity to amend because *Twombly* and *Iqbal* left requirements for pleading specificity "in a period of transition"); *see also U.S. ex rel. Dresser v. Qualium Corp.*, No. 12-1745, 2016 U.S. Dist. LEXIS 93248, at *20, *29 (N.D. Cal. July 18, 2016) (Whether allegations of regulatory violations are "sufficient to make out an implied false certification case [under Rule 9(b)] is a separate question under *Universal Health Services*" warranting leave to amend.).

[4] Claims to the government for products that are defective or that do not meet material contractual requirements constitute false claims under the FCA. *See, e.g., United States v. Bornstein*, 423 U.S. 303 (1976) (holding that false claims include those that do not meet material inspection, testing, or other technical requirements); *U.S. ex rel. Rodwell v. Excelitas Techs. Corp.*, No. 13-10963, 2015 U.S. Dist. LEXIS 78508, at *1–2 (D. Mass. June 16, 2015) (holding that relator stated a claim where relator alleged that "a government contractor defrauded the United States and other government contractors when it sold to them electronic components . . . that were either defective or not properly tested in accordance with certain specifications and standards"); *U.S. ex rel. Smith v. Boeing Co.*, 505 F. Supp. 2d 974, 984–85 (D. Kan. 2007) (holding relator stated claim that contractor submitted false claims by failing to disclose nonconformities and deviations from contract specifications that were essential to government's payment decision).

206–79); and (3) caused physicians to submit false claims for government reimbursement for thousands of nonconforming devices (*id.* ¶¶ 325, 326, 446, 448, 462). These claims falsely certified that the devices were "medically necessary and reasonable under applicable Medicaid regulations." (*Id.* ¶¶ 99, 103–04, 203.) *See Hutcheson*, 647 F.3d at 391 ("[A]ctions of a non-submitting entity can give rise to a false or fraudulent claim" where the innocent submitting entity's false certification "implied that the defendants had not engaged in certain illicit behaviors that would disqualify them from payment."); *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 (3d Cir. 2004) (holding relator stated claim that device manufacturer caused hospital to submit false compliance certifications on hospital cost reports under subsection (a)(1)(A)); *cf. United States v. Rivera,* 55 F.3d 703, 706–07 (1st Cir. 1995) (holding that defendant caused third party to submit false claims under subsection (a)(1)(A), even where third party did not understand the claims to be false at the time).

Further, the SAC pleads details of a particular false claim Defendants caused J.N. to submit to the Medicaid program on behalf of patient F.I. (¶¶ 413–27.) The SAC pleads:

- Defendants caused the submission of a false certification that patient F.I.'s nonconforming Pinnacle device was "reasonable and necessary" (*id.* ¶ 426);

- Defendants knew they had failed to comply with several FDA regulations and directives affecting the safety and efficacy of the

implanted Pinnacle MoM device (*id.* ¶¶ 319–20, 326, 357, 360, 363–65, 374, 408–12, 425);

- the diametrical clearance of F.I.'s Pinnacle device was nonconforming (*id.* ¶ 423);

- the Pinnacle device prematurely failed in patient F.I. (*id.* ¶ 423.)

This Court has previously upheld representative claims that involved only one patient and in which relevant providers were not identified in the complaint. As this Court explained,

> We do not view the absence of more precise details pertaining to the bills for services provided to other MassHealth recipients as an impediment . . . . Given that such allegation is not particular to Yarushka's treatment, but rather arises from the . . . systematic failure to enforce supervision requirements, it stands to reason that billing for more than one MassHealth recipient has been infected by fraud. . . .
>
> [W]hile the staff members in question have not been identified by name . . . [t]hese concrete allegations . . . confirm that the basic goals of [Rule] 9(b) have been met.

*U.S. ex rel. Escobar v. Universal Health Servs.*, 780 F.3d 504, 514–17 (1st Cir. 2015) (citation omitted), *vacated on other grounds*, 136 S. Ct. 1989. This logic warrants reversal here.

### c. Relators' Subsection (a)(1)(B) Allegations Satisfy Rule 9(b)

Relators' allegations about the false Medicaid claim for F.I.'s device likewise satisfy the pleading requirement for § 3729(a)(1)(B). Under this

subsection, Relators allege that the claim resulted from DePuy's false statements "material to a false or fraudulent claim." Relators pleaded that "DePuy's surgical instructions and materials provided to Dr. J.N. regarding implantation of F.I. with the Pinnacle device represented that the device was a safe and effective hip implant device when implanted in accordance with such instructions." (SAC ¶ 415.) These representations were false because DePuy knew that the device was unsafe and medically inappropriate under any conditions. Relators further pleaded "more than two hundred paragraphs detailing misrepresentations and false statements that DePuy allegedly made to the FDA and surgeons, including the relators themselves." (R. 184, Addendum 38.)

Nonetheless, the district court found that "the SAC does not identify the specific representations or materials that the doctor received and relied upon." (*Id.*, Addendum 42.) This was reversible error: The SAC pleads numerous examples of such materials, as well as J.N.'s reliance on those materials. Further, the complaint sufficiently alleges that J.N. indirectly relied on DePuy's misrepresentations to the FDA and public. Furthermore, Relators were not required to plead reliance at all. In this sense, the SAC exceeds the FCA's statutory requirements.

*First*, Relators identify specific materials on which J.N. allegedly directly relied: the Pinnacle's product label and Instructions for Use ("IFU"). Relators allege that, but for these materials, J.N. would have selected a different device.

30

(SAC ¶¶ 416–20.) Those materials both contain direct false statements made by DePuy that induced Dr. J.N. to select and implant a Pinnacle MoM into F.I.:

- The label and IFU both included the statement physicians should "refer to the surgical technique manual on their use," in order "to assure proper fit and alignment of the prosthesis." This false statement suggested that there existed a proper "angle of inclination" for implantation into a patient. (*Id.* ¶ 416–17.)

*Second*, Relators allege that J.N. relied upon DePuy's omissions and misrepresentations to the FDA, including those concerning the Pinnacle's failure rate. This Court has held that a consumer's "indirect reliance" on certifications of quality made by a manufacturer to a federal regulatory agency can establish reliance in the fraud context. *See Learjet Corp. v. Spenlinhauer*, 901 F.2d 198, 201 (1st Cir. 1990) ("If . . . the FAA relied on [aircraft manufacturer] Learjet's fraudulent misrepresentations when it certified the Model 24F, and [plaintiff, the consumer,] purchased the Model 24F in reliance on the FAA's certification, then he has indirectly relied on Learjet's fraudulent misrepresentations.") (relying on the Restatement (Second) of Torts §§ 531, 533). Here, Relators allege surgeons relied upon DePuy's misrepresentations and omissions to the FDA regarding the Pinnacle MoM's quality (SAC ¶ 202):

- Defendants made a false statement in 2000 regarding Pinnacle MoM's diametrical clearance dimensions in documents used to obtain 510(k) clearance of the device. (*Id.* ¶¶ 280–99.)

- In 2005, Defendants failed to disclose to the FDA that they had previously consciously "change[d] or modify[ed]" their manufacturing standards in a manner that could "affect the device's safety or effectiveness and thus require" a new 510(k). (*Id.* ¶¶ 291–92, 381–85, 405–11.)

- When DePuy notified the FDA of the true dimensions, the FDA stated DePuy was responsible for determining whether they would have any effect on the device's safety or efficacy. (*Id.* ¶¶ 291, 411.) DePuy, however, failed to disclose that it did have such effect. (*Id.* ¶¶ 296, 411.)

- In order to avoid testing the true dimensions' safety and efficacy for the FDA in 2005, "DePuy represented that the device's failure rates were within industry standards." (*Id.* ¶ 400–01, 411.)

- Defendants misled the FDA about the dangers of metal ions produced from friction between the Pinnacle's metal parts. (*Id.* ¶¶ 257–68.)

*Third*, Relators allege that J.N. relied upon DePuy's representations to the public at large (of which J.N., of course, is a member). (*Id.* ¶ 203.) Such "indirect reliance" on a manufacturer's pervasive advertising campaign likewise establishes causation or reliance in a fraud case. *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 751 F. Supp. 2d 277, 288, 290 (D. Mass. 2010) (Where "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements" in order to satisfy Rule 9(b). (citation omitted)); *cf. In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, 2007 U.S. Dist. LEXIS 26242, at *120–21 (D. Mass. Apr. 2, 2007) (holding that

32

where "defendants submitted fraudulent wholesale pricing data to publishers, intending that the information would be relied on by Medicaid payors to calculate provider reimbursements," pleading of "indirect reliance" was appropriate because "the third party 'effectively acts as a proxy for both sides to an exchange'").

Relators allege that DePuy made false statements relied upon by the medical community:

- The Ultamet Technical Monograph, a Pinnacle marketing document that was widely distributed throughout the United States, "falsely stated that the Pinnacle MoM implants experienced reduced wear as compared to competing devices because of the purported benefit of their low diametrical clearances." (SAC ¶¶ 418, 280–99.) DePuy continued to make these representations even after it became "fully aware that many patients and surgeons—most notably Dr. Nargol—were complaining of high ion failure rates." (*Id.* ¶¶ 233–56.)

- DePuy misled surgeons about the causes of the Pinnacle failures, blaming surgeons instead of defects. (*Id.* ¶¶ 269–75.)

- DePuy made false statements to surgeons regarding the proper implant positioning, knowing that, in fact, there was no safe angle of implantation for the Pinnacle MoM device. (*Id.* ¶¶ 276–79.)

Relators pleaded that DePuy's false statements and fraudulent conduct collectively "caused physicians, hospitals and other providers to submit false certifications . . . concerning claims for Pinnacle hip surgery procedures." (*Id.* ¶ 99.) And "but for DePuy's false statements," Relators pleaded, "J.N. would have chosen a different available device for the hip replacement surgery he performed on Mr. F.I." (*Id.* ¶ 420.)

These allegations identify the who: Dr. J.N. and F.I.; the what: a Pinnacle MoM device; the when: November 2007; the where: Stony Brook University Medical Center, and the how: by relying on numerous false statements to select a Pinnacle MoM device and submit it to NY Medicaid. (R. 186-3, Ex. 2 Mot. Recons., at 2.) Relators have therefore satisfied Rule 9(b) by providing "factual . . . evidence to strengthen the inference of fraud beyond possibility." *Duxbury*, 579 F.3d at 29 (quoting *Rost*, 507 F.3d at 733). Defendants "knew that their actions 'would, if successful, result in the submission by [providers] of compliance certifications required by [Medicaid] that [the Defendants] knew would be false.'" *See Kelly*, 2016 U.S. App. LEXIS 11001, at *20 (quoting *Westmoreland*, 738 F. Supp. 2d at 277–78 and *Schmidt*, 386 F.3d at 244) (first and third alterations in original).

*Fourth*, although Relators adequately pleaded J.N.'s reliance, they were not required to do so. This Court has never held that § 3729(a)(1)(B) requires a relator to describe particular false statements that induced reliance. And Relators dispute that reliance is required under the FCA. Congress opted to require "materiality" rather than "reliance." Section 3729(a)(1)(B) proscribes the use of "a false record or statement material to a false or fraudulent claim," without regard to whether the record or statement ultimately influences the government's payment decision. For example, in *Duxbury*, this Court found that an FCA complaint's subsection

34

(a)(1)(B) allegations satisfied Rule 9(b) without the Court making a finding or stating a requirement of reliance. 579 F.3d at 30–31. Addition of a reliance element "would clearly be inconsistent with the statute[] Congress enacted." *Neder v. United States*, 527 U.S. 1, 24–25 (1999) (holding that "common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes," because these statutes "prohibit[] the 'scheme to defraud,' rather than the completed fraud"); *see, e.g., Grubbs*, 565 F.3d at 189 ("The False Claims Act . . . lacks the element[] of reliance.").

Moreover, even if a subjective reliance requirement exists, it is not subject to the heightened pleading requirements of Rule 9(b). Under the Rule, only the "circumstances constituting fraud" must be pleaded with particularity; "conditions of a person's mind may be alleged generally." *Cf. McGinty v. Beranger Volkswagen. Inc.*, 633 F.2d 226, 228 (1st Cir. 1980) (Rule 9 does not require specificity on "the circumstances or evidence from which fraudulent intent could be inferred."). Here, Relators have satisfied the Rule by setting forth specifics about "the time, place, and content of the alleged false representations." *Id*. It was sufficient to allege that J.N. relied on the totality of DePuy's misrepresentations.

d. Relators' Statistical Evidence Strengthens the Inference of Fraud Beyond Mere Possibility

In addition to the representative claim submitted to New York Medicaid on behalf of F.I., Relators pleaded "statistical evidence to strengthen the inference of fraud beyond possibility." *Rost*, 507 F.3d at 733.

Relators plead that "between 2005 and 2009, approximately 50,000 MoM total hip replacement devices were paid for by Medicare." (SAC ¶ 460.) Around this time, "DePuy's two MoM hip implant products . . . had captured 75% of the Metal on Metal hip replacements market." (*Id.* ¶ 444.) This suggests that DePuy's MoM implants accounted for approximately 37,500 sales to Medicare. Relators then plead that as of 2010, the Pinnacle accounted for 50% of DePuy's MoM sales to date. (*Id.* ¶ 444.) Relators deduce that DePuy's Pinnacle MoM sales accounted for approximately 18,750 devices sold to Medicare between 2005 and 2009; moreover, DePuy continued to sell these devices to Medicare after 2010. These calculations support the inference that DePuy's sales to Medicare were substantial.

Similarly, Relators plead statistical evidence that supports an inference that Medicaid paid false claims for the Pinnacle. Relators pleaded that "[b]etween 2005 and 2010, New York State Medicaid paid for an average of approximately 1280 claims each year for total hip replacement devices," or 7,680 in total. (*Id.* ¶ 438.) Further, according to the FDA, in 2010, "27% of all total hip replacement surgeries were MoM device surgeries." (*Id.* ¶ 443.) Relators therefore deduce that Medicare would have paid for approximately 346 MoM implants per year in New York

alone. Since DePuy had "captured 75% of the Metal on Metal hip replacements market" around this time. (*Id.* ¶ 444) Relators infer that approximately 259 of these Medicaid claims were for DePuy devices. And Pinnacle sales constituted roughly 50% of DePuy's MoM hip replacement sales prior to 2010 and 70% for 2010. (*Id.* ¶ 444–45.)

Accordingly, Relators deduce that from 2005 to 2009, New York Medicaid reimbursed approximately 130 Pinnacle MoM devices per year and that in 2010, New York Medicaid reimbursed approximately 181 devices. Plaintiffs further note that New York accounted for around 8% of total hip replacements nationwide; thus the number of Medicaid claims nationwide is likely 12 times as large.

Further, Relators' "statistical analysis showed that [DePuy's] manufacturing process fails to produce explant heads within specification 14.93% of the time and 50.41% of the time for the explant liner." (*Id.* ¶ 447.) This analysis was based on data "representative of the outcomes of DePuy's manufacturing process." (*Id.* ¶ 70.) Therefore, Relators' estimate of the Pinnacle MoM's nonconformance rate applies to *all* Pinnacle MoM devices manufactured by DePuy during the relevant period, including those purchased by Medicaid. Relators therefore infer that "425 Pinnacle devices bearing the diametrical clearance manufacturing defect would have been paid for by New York State Medicaid between 2005 and 2010." (*Id.* ¶ 453.)

These calculations raise a reasonable inference of substantial Pinnacle MoM sales to Medicaid. *Cf. Duxbury*, 579 F.3d at 30 ("As to St. Joseph's Hospital, Duxbury alleges that the hospital submitted 'approximately 4,800 claims a month for Medicare reimbursement' based upon OBP's unlawful kickbacks.'"). Indeed, the district court acknowledged a virtual certainty that the government purchased Pinnacle devices. It explained that "[a]s a matter of logic, any scheme that causes unreasonable or unnecessary purchase of a product or service will almost certainly result in the submission of some false claim, by someone, somewhere, to the federal government." (R. 184, Addendum 43 n.9.) Here, this inference is supported by concrete data reflecting Medicaid's actual purchases of MoM devices, distinguishing this case from cases such as *Rost*, where there was a substantial possibility that false claims were submitted exclusively to paying patients and private insurers. C*f.* 507 F.3d at 733 ("It may be that physicians prescribed Genotropin for off-label uses only where the patients paid for it themselves or when the patients' private insurers paid for it.").

Relators' well-pleaded statistical inferences reinforce the allegation of fraud in relation to F.I.'s claim. *See Westmoreland*, 738 F. Supp. 2d at 276.[5] This

_____

[5] Similar to Relators' pleadings, *Westmoreland* held that the relator had pleaded sufficient indicia of fraud to satisfy Rule 9(b) where:

> Relator has pled (1) that over half of Aranesp revenue comes from reimbursement by Medicare and Medicaid; (2) that the great majority of

combination of allegations distinguishes this case from *Ge*, where the statistical data was less precise, and the relator pleaded no representative claims. *Cf.* 737 F.3d at 124 ("Dr. Ge provided in response to the motions to dismiss, at most, aggregate expenditure data for one of the four subject drugs, with no effort to identify specific entities who submitted claims or government program payers, much less times, amounts, and circumstances."). Yet the district court glossed over this analysis. (R. 184, Addendum 42–43.) This was error and divested *Duxbury* of tangible meaning.

### 3. Relators' Allegations of False Claims for All Government Purchases of the Pinnacle Since 2005 Satisfy Rule 9(b)

Relators allege a theory that all claims for Government reimbursement of the Pinnacle MoM since 2005 are false claims because: (a) DePuy submitted or caused the submission of claims containing false certifications of compliance with material regulatory and contractual requirements concerning the safety and efficacy of the device (subsection (a)(1)(A) claims); and (b) DePuy made misrepresentations and omissions to surgeons regarding the safety and efficacy of

---

dialysis and kidney disease patients are covered by such programs (and thus their doctors are enrolled in Medicare); (3) that there are many situations where providers must submit new enrollment forms, including cases of acquisition, merger, consolidation, changes of ownership, changes to basic Medicare information and enrollment with another fee-for-service contractor; and (4) factual details regarding specific providers and clinics that were offered kickbacks.

738 F. Supp. 2d at 276.

the device that were material to claims for those devices submitted by the surgeons (subsection (a)(1)(B) claims). But for this conduct, neither medical providers, nor the Government would have purchased the Pinnacle MoM, because it would not have been a medically viable option.

The Court should use this opportunity to clarify the Rule 9(b) standards applicable to these circumstances. This Court's decisions in *Karvelas*, *Rost*, *Duxbury, Ge, Escobar,* and *Kelly* essentially hold that where a relator alleges that some subset of claims submitted for a particular product are false (e.g. because the products were not actually provided to the recipient, were put to impermissible uses, or were furnished by unlicensed personnel), the relator must plead details of claims with particularity, so that the defendant can identify the offending subset and investigate the allegations. *See, e.g., Ge*, 737 F.3d at 124 (holding that relator "made no attempt in her complaints to allege facts that would show that some subset of claims for government payment for the four subject drugs was rendered false").

But this Court has not yet addressed the application of Rule 9(b) when a relator alleges that *all* claims for a product during a particular time period are false.[6] The allegations here put DePuy on ample notice of the "circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b).

---

[6] *Ge* reserved judgment on this question. This Court explained that

40

a. Relators Need Not Plead Details of Specific False Claims Where They Have Alleged a Fraudulent Scheme That Renders All Claims False

When a relator plausibly pleads that all claims for a given product are false, pleading individual false claims serves little purpose. Instead, Rule 9(b) counsels only that a relator plead the "who, what, when, where, and how of" the scheme that rendered the claims fraudulent. *See Ge*, 737 F.3d at 123 (citation omitted).

"Rule 9(b) is intended 'to protect defendants in fraud cases from frivolous accusations and allow them to prepare an appropriate defense.'" *U.S. ex rel. Heineman-Guta v. Guidant Corp.*, 718 F.3d 28, 36 (1st Cir. 2013) (citation omitted).[7] The Rule is not meant to impose a substantive constraint on the FCA.[8] A

---

on appeal, Dr. Ge articulates three new theories purporting to support the notion that all claims submitted during the relevant period for the four subject drugs must have been rendered false by Takeda's alleged misconduct; and that allegations of falsity would per se suffice to constitute compliance with Rule 9(b). All three theories are waived, however . . . .

737 F.3d at 124.

[7] *See also Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) ("The goals of Rule 9(b) are to provide a defendant with fair notice of a plaintiff's claim, to safeguard a wrongdoing, and to protect a defendant against the institution of a strike suit." (citation omitted)); *U.S. ex rel. Heath v. AT&T, Inc*., 791 F.3d 112, 125 (D.C. Cir. 2015) ("[T]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."). To that end, Rule 9(b) aims "to apprise the defendant of fraudulent claims and of the acts that form the basis for the claim." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985).

requirement of pleading individual reimbursement claims—a subject outside of the knowledge of most relators—with particularity would contravene the Act's purpose: "to encourage suits by individuals with valuable knowledge of fraud unknown to the government." *U.S. ex rel. Winkelman v. CVS Caremark Corp*., No. 15-1991, 2016 U.S. App. LEXIS 12108, at *19 (1st Cir. June 30, 2016).

With respect to this allegation, the district court improperly deployed Rule 9(b) as a limitation on the scope of the FCA. It reasoned,

> to the extent that the relators contend that every indirect claim for reimbursement of the Pinnacle MoM device was false because the device's defects made it 'not reasonable and necessary' under 42 U.S.C. § 1395y(a)(1)(A), such an argument must fail. Surely to survive a motion to dismiss pursuant to Rule 9(b) and Rule 12(b)(6), the relators must do more than allege that a product's alleged defects automatically make it unreasonable and unnecessary.

(R. 184, Addendum 43.) And, in a footnote, the district court elaborated that "[i]f the rule were otherwise, virtually any claim of misrepresentation or a product defect involving medical devices, pharmaceuticals, or other medical products could be brought as a *qui tam* action." (*Id.* n. 9.) This was error.

*First*, Relators' complaint goes well beyond mere labels and conclusions and plausibly explains how the Pinnacle's failure rates and flawed manufacturing process render it unsuitable for medical use. *Cf. Twombly*, 550 U.S. at 556 (holding

---

[8] Under the Rules Enabling Act, 28 U.S.C § 2072(b), procedural rules "shall not abridge, enlarge or modify any substantive right."

that plaintiff must "identify[] facts [rendering unlawful conduct] plausible"). To the extent that the court below holds that the FCA itself cannot a support cause of action for all claims made for such a device, such a determination must be made under Rule 12(b)(6). "[T]o ask what conduct [a statute] reaches is to ask what conduct [the statute] prohibits, which is a merits question," and should therefore be evaluated under Rule 12(b)(6). *Morrison v. Nat'l Austl. Bank Ltd*., 561 U.S. 247, 254 (2010). But the district court explicitly "reserve[d] judgment" on Defendants' Rule 12(b)(6) challenge. (R. 184, Addendum 49.) This inconsistency warrants *vacatur* and remand for the district court to assess Relators' claims under the proper rule.

*Second,* the district court's overarching concern about "parasitic relators" turns the FCA on its head. The district court reasoned that rigorous application of Rule 9(b) would safeguard the FCA from "parasitic relators." (R. 184, Addendum 30.) But the court misunderstood this concern. With the FCA, Congress sought "broadly to protect the funds and property of the Government from fraudulent claims." *Rainwater v. United States*, 356 U.S. 590, 592 (1958). To do so, Congress sought "to provide incentives to relators to 'promptly alert[] the government to the essential facts of a fraudulent scheme.'" *Duxbury*, 579 F.3d at 32 (citation omitted) (alteration in original). The FCA does not limit recovery to whistleblowers who

43

know every detail of the *effects* of the defendant's fraudulent conduct before discovery even begins.

"Parasitic relators" are a specific creature: those "who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover." *Rost*, 507 F.3d at 727; *see also* Beck, *The False Claims Act and the English Eradication of False Claims Act Legislation*, 78 N.C. L. Rev. 539, 556–58 (2000) (discussing the origins of this concern). Relators here are not parasitic; they exposed DePuy's fraudulent scheme. Moreover, Defendants never raised a public disclosure challenge. And the public disclosure bar, 31 U.S.C. § 3730(e)(4), is a far better tool to root out parasitic relators than requiring true whistleblowers to plead detailed facts peripheral to a defendant's misconduct.[9]

This Court should reject the district court's construction of Rule 9(b) and adopt the view set forth in cases such as *U.S. ex rel. Goulden v. BAE Sys. Info. & Elec. Sys. Integration, Inc.*, No. 11-12017, 2014 U.S. Dist. LEXIS 109021 (D. Mass. Aug. 7, 2014). *Goulden* held that a relator may allege all claims under a given contract are false by pleading the details of the fraudulent scheme:

> Relator has identified several fixed-price contracts between defendants and the U.S. Army, including one by number, and has disclosed the value or approximate value of each of those contracts. At this stage of the litigation, there is no need for the relator to identify particular invoices by date or

---

[9] The flaws in the district court's approach are underscored by its suggestion that Relators *should* have supplemented their pleadings with "publicly available complaints" of "thousands of MDL plaintiffs." (R. 196, Addendum 65.)

number or to identify the particular employee who submitted them. It requires no stretch of the imagination to infer that BAE Systems sought and obtained at least some payments for the work it performed under its very lucrative contracts and, *under the theory advanced by the relator, any and every invoice submitted pursuant to the contracts would be a false claim because it would certify that testing performed in exchange for payment complied with certain conditions*.

*Id.* at \*15 (emphasis added); *see also U.S. ex rel. Hood v. Satory Glob., Inc.*, 946 F. Supp. 2d 69, 84 (D.D.C. 2013) (holding that relators satisfied Rule 9(b) where they lacked access to specific invoices, and instead "put [defendant] on notice of the nature of the alleged fraud and averred that [defendant] submitted 'false and fraudulent' certifications for 'services [that] did not conform to the contract because [defendant] billed for work that was performed for [defendant's] own benefit and not for the DOJ contract"); *cf. U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*, No. 04-186, 2006 U.S. Dist. LEXIS 65268, \*19–20 (W.D. Pa. Sept. 13, 2006) (holding that Rule 9(b) does not require individual claims where falsity "does not turn on anything unique to any individual claim or that would be revealed from an examination of any claim," and "the addition of specific identifying information of each claim adds little to complete the description of the scheme since the fraudulent conduct at issue does not rely on any specific claim").

Applied to the medical device context, Relators may show that Defendants sought and obtained—and caused others to seek and obtain—at least some

45

payments for Pinnacle MoM devices that the Government would not have purchased but for Defendants' fraudulent conduct.

        b.  <u>Relators Plead the Who, What, When, Where, and How of a Theory of Liability that Would Render Claims for Pinnacle MoM Devices Fraudulent, Coupled with Indicia that the Government Purchased Pinnacle MoM Devices</u>

Relators meet the foregoing standard. First, Relators allege false statements and omissions concerning "the specifications, manufacturing process, safety, and failure rates of" Pinnacle MoM implants. (SAC ¶¶ 201–320; R. 184, Addendum 12–18.) Second, Relators allege that Defendants caused the Government to pay for "nonconforming, nonfunctioning, and unsafe devices that would not have been purchased but for DePuy's fraudulent conduct." (*Id.* ¶ 325.) Relators explain that their research led them to repeatedly warn DePuy that it could not manufacture its Pinnacle MoM implants with the necessary precision to ensure that the devices conformed to specification and were safe for implantation. (*Id.* ¶ 327–57.) Yet, despite mounting evidence and warnings that DePuy's devices did not conform to the specifications that DePuy used to gain FDA clearance for the devices, DePuy refused to adopt an adequate validation process to ensure that only conforming devices were sold, including to government payors. (*Id.* ¶ 358–412.)

Accordingly, Relators pleaded that "all claims made to the government for costs associated with the Pinnacle device at any time from DePuy's 510(k)

application [for the ASR XL device in 2005] to the date the Pinnacle was withdrawn from the market constitute false claims under the FCA." (*Id.* ¶ 412.) Relators also pleaded that Defendants' conduct "result[ed] in the submission by [providers] of compliance certifications required by Medicare that [the defendants] knew would be false," because no reasonable physician would submit claims for devices with such high failure rates. *See Kelly*, 2016 U.S. App. LEXIS 11001, at *20 (citation omitted). Under this liability theory, Relators need only plead facts supporting an inference that the government purchased Pinnacle devices after 2005.[10]

### 4. Relators Adequately Pleaded Their State Law Claims

Relators' state law violations survive for the same reasons. This circuit holds that "given the substantive similarity of the state FCAs invoked here and the federal FCA with respect to the provisions at issue in this litigation, the state statutes may be construed consistently with the federal act." *New York v. Amgen Inc.*, 652 F.3d 103, 109 (1st Cir. 2011). Because of these similarities, pleading

---

[10] This theory accords with the Fourth Circuit's construction of Rule 9(b) in *United States v. Triple Canopy, Inc.*, 775 F.3d 638 (4th Cir. 2015), *vacated on other grounds*, No. 12-1440, 2016 U.S. LEXIS 4169 (2016). There, the court held that the plaintiff's allegations that the defendant "agreed to provide a service that met certain objective requirements, failed to provide that service, and continued to bill the Government with the knowledge that it was not providing the contract's requirements" satisfied Rule 9(b). *Id.* at 628. In other words, because the fraud infected the entirety of the task order, Rule 9(b) was satisfied.

representative claims permits an inference of a nationwide scheme. *See Duxbury*, 579 F.3d at 31 (inferring from representative claims in Washington state that relator "has alleged facts that false claims were in fact filed by the medical providers he identified, which further supports a strong inference that such claims were also filed nationwide"); *see also U.S. ex rel. Booker v. Pfizer*, 9 F. Supp. 3d 34, 58 (D. Mass. 2014) ("Relators have adequately pled that [the] claims extend over a wide geographic scope" even though relators pleaded Medicaid claims for just one state.); *U.S. ex rel. Carpenter v. Abbott Labs., Inc*., 723 F. Supp. 2d 395, 409 (D. Mass. 2010) (holding that the pleading of false claims in Massachusetts combined with allegations of a nationwide scheme satisfied pleading obligations for claims in other states); *U.S. ex rel. Rost v. Pfizer, Inc*., 253 F.R.D. 11, 17 (D. Mass. 2008) (holding that pleading of representative claims in Indiana met Rule 9(b) requirements for the pleading of FCA counts under state law of other states).[11]

The district court, however, appears to have believed that Relators "must allege some specificity with respect to each asserted state." (R. 184, Addendum 52.) The district court's ruling was in error and conflicts with the weight of authority.

### B. The District Court Abused Its Discretion in Denying Leave to File the TAC

---

[11]Again, New York constitutes just 8% of the total hip replacements performed nationwide (SAC ¶ 468), implying more claims in the other Plaintiff States. *See Duxbury*, 579 F.3d at 31.

Alternatively, the Court should reverse the district court's denial of leave to file the TAC. The proposed TAC satisfies the district court's heightened Rule 9(b) test. Hence, reversing on this ground would obviate the need to rule on the dismissal of the SAC.

This court reviews the denial of a motion to amend and of a motion to alter a judgment for abuse of discretion. *See FDIC v. Kooyomjian*, 220 F.3d 10, 15 (1st Cir. 2000) (motion for leave to amend); *Deka Int'l S.A. v. Genzyme Corp.*, 754 F.3d 31, 46 (1st Cir. 2014) (motion to alter judgment). A district court abuses its discretion "when a relevant factor . . . is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." *United States v. Nguyen*, 542 F.3d 275, 281 (1st Cir. 2008) (citation omitted).

The district court abused its discretion in denying Relators leave to amend, both in its initial decision and upon Relators' Motion for Reconsideration. Relators timely moved for leave to amend. And Relators plead facts in the proposed TAC which were not previously available to them, despite Relators' diligence, and that would satisfy both this Court's and the district court's Rule 9(b) standards.

1. **Relators Requested Leave to Amend in Their Opposition to Defendants' Motion to Dismiss and Subsequent Pleadings**

"[P]assing reference[s]" are "sufficient invocations for leave to amend under Rule 15(a)." *Rost*, 507 F.3d at 734; *see also Fisher v. Kadant, Inc.*, 589 F.3d 505, 510 (1st Cir. 2009) (same). This is so even where a party appeals from the granting of a motion to dismiss. In such cases "the court of appeals may, in its discretion and in the interests of justice, affirm the dismissal of the complaint, yet nonetheless permit further amendment of it." *Id.* (collecting cases).

Relators requested leave to amend four times pre-judgment: first in their Opposition to Defendants' Motion to Dismiss, (R. 153-1, at 34); second, in their Sur-Reply on that Motion, (R. 166, at 12); third, in their Memorandum in Support of the Motion to Unseal, (R. 172-1, at 7 n. 5); and fourth, in their Notice of Supplemental Authority (R. 179, at 2). The third request specifically sought "leave to amend insofar as it may be necessary for Relators to plead additional facts in their possession or through further investigation to meet the standards of Rule 12(b)(6) and/or Rule 9(b)."[12] Defendants neither opposed nor otherwise responded to Relators' various requests.

---

[12] The unsealing motion referred to examples of patients who suffered injury when their Pinnacle devices failed. As explained herein, Relators were able to obtain the information necessary to fully satisfy the district court's standard only after it unsealed the SAC and Defendants confirmed that Relators' investigation would not violate any MDL court orders.

This circuit holds such invocations should be treated as motions to amend pursuant to Rule 15(a). The district court, however, stated that Plaintiffs had not requested leave to amend. This was error.

### 2. **Relators Timely Requested Leave to Amend**

Leave to amend should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). Amendment should be allowed absent "undue delay, bad faith or dilatory motive." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Prejudice is the touchstone of the inquiry; thus, "[c]ourts may not deny an amendment solely because of delay and without consideration of the prejudice to the opposing party." *Klunder v. Brown Univ.*, 778 F.3d 24, 34 (1st Cir. 2015) (citation omitted); *see also Carmona v. Toledo*, 215 F.3d 124, 136 (1st Cir. 2000) ("Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading." (citation omitted)).[13]

Even where considerable time has passed between a complaint and motion for leave to amend, leave should be granted unless "the party filing the motion has no adequate explanation for the delay." *Cohen v. Longshore*, 621 F.3d 1311, 1313

---

[13] *See further, e.g., United States v. United Healthcare Co.*, No. 13-56746, 2016 U.S App. LEXIS 14687, at *46–47 (9th Cir. Aug. 10, 2016); *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981), among cases from other circuits holding that undue delay is not sufficient grounds to deny leave absent prejudice or bad faith.

(10th Cir. 2010) (citation omitted); *see Maddalone v. Okada Shosen, KK*, 756 F.2d 886, 887 (1st Cir. 1985) (reversing denial of leave to amend where defendant bore responsibility for delay); *Carmona*, 215 F.3d at 136 (holding that district court abused its discretion in denying motion for leave to amend predicated on discovery of new information over 3.5 years into the litigation).

The district court here abused its discretion in denying leave to amend on the basis of undue delay.

*First*, there is no discernible prejudice to Defendants. The proposed TAC would not have altered the claims against DePuy; the alleged fraudulent conduct and scheme, theories of liability, and relief sought were exactly the same in the SAC and TAC. The primary difference is that Relators supplemented and solidified their allegations on claims presentment by detailing 38 additional false claims. The district court provided no support for its proposition that the potential need to make a revised motion to dismiss (if defendants believed that these allegations were still insufficient) qualified as prejudice.[14] DePuy did not in fact claim that the amendments were insufficient under 9(b) and that amendment would

---

[14] *See dpiX LLC v. Yieldboost Tech, Inc.*, No. 14-05382, 2015 U.S. Dist. LEXIS 117267, at *7 (N.D. Cal. Sep. 2, 2015) ("Defendants cite no case law for the proposition that being required to engage in additional briefing as the result of amendment of a complaint constitutes 'severe prejudice,' and this Court has located only authority to the contrary.") (collecting cases).

be futile. Its opposition to the TAC rested solely on purported delay. Accordingly, it is unlikely that amendment would have triggered a revamped motion to dismiss.

*Second*, any delay is justified. Although Relators filed their original complaint in 2012, they could not continue their investigation while the case remained under seal and the Government led the investigation.[15] And Relators' factual and statistical evidence and representative false claim were not tested until Defendants' Motion to Dismiss.

Moreover, any delay was primarily caused by Defendants' litigation gamesmanship. Defendants' insistence that Relators could not plead information contained in documents produced in the MDLs, even where that information was generated by them, obstructed Relators from developing the TAC. (R. 106-2, J.A. 149.)

Furthermore, Relators could not have anticipated the district court's novel October 2014 ruling in *Leysock*, 55 F. Supp. 3d at 219, which imposed a requirement that they "identify the specific representations or materials that the

---

[15] Relators understood before they filed their original complaint that Rule 9(b) would not impede Government intervention because "the information needed to fill the gaps of an inadequately pleaded complaint"— details regarding the submission of false claims to the Government—would be "in the government's hands." *See Karvelas*, 360 F.3d at 230.

doctor received and relied upon." (R. 184, Addendum 42.)[16] Had Relators sought to amend prior to securing this information and then the district court followed *Leysock*, yet another, still later, motion for leave to amend would have been necessary. Where, as here, "the Court's decision on the motions to dismiss could have affected the manner in which the amendment was framed, there [is] some justification for waiting until the motion to dismiss was decided." *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 156 (D.R.I. 2004).

*Third*, the district court improperly accorded weight to its own post-hoc interpretation of the MDL Confidentiality Orders. An abuse of discretion occurs "when a relevant factor . . . is overlooked, or when an improper factor is accorded significant weight." *Nguyen*, 542 F.3d at 281 (citation omitted); *see e.g. Cabrera v. Esso Std. Oil Co. (P.R.), Inc.*, 723 F.3d 82, 89 (1st Cir. 2013) (finding abuse of discretion where district court "intruded too heavily into a decision-making process that should have been left to the parties" in dismissing action with prejudice).

Here, even though the court had previously stated that it would not interpret the MDL Confidentiality Orders (R. 104, J.A. 67:1–3 ("I'm not comfortable interpreting it and think that [the ASR MDL court] ought to be the appropriate one to interpret it."); *id.* at 65:14–24), it appeared to do just that, reasoning:

---

[16] In December 2014, shortly after the *Leysock* decision, Relators retained an investigator to help them satisfy the heightened Rule 9(b) standard of set forth in *Leysock*. (R. 197, J.A. 1209–10.)

54

> The confidentiality orders prevent the relators from using confidential DePuy documents that they obtain through the MDL; they do not prevent the use of any underlying facts. Furthermore, the relators could have used basic investigative tactics to obtain those underlying facts without violating the confidentiality orders.

(R. 196, Addendum 65.)

This interpretation is reasonable, but its retroactive imposition deprived Relators of any meaningful benefit. At this stage of the action, the court's interpretation served only to thwart valid claims of fraud. Had the district court issued its ruling earlier in this litigation, Relators would have conducted their investigation accordingly. But Defendants' argument that the Orders broadly prohibited Relators' use of facts contained in confidential documents was sufficient reason for Plaintiffs to err on the side of caution. Relators therefore pursued a declaratory judgment action on these questions but did not receive a timely answer. (R. 106-2, J.A. 76.)

### 3.  Relators' Newly Discovered Evidence Warrants Leave to Amend

On March 1, 2016, on the basis of newly discovered evidence, Plaintiffs moved for reconsideration of the denial of leave to amend under Rules 59(e) and 60(b)(2). (R. 186.) The court denied Relators' motion on grounds that this evidence "should have . . . been discovered and presented earlier in the proceeding." (R. 196, Addendum 65.) This ruling failed to give proper weight to the seal on the SAC, and to Defendants' use of the MDL Confidentiality Orders to thwart

Relators' investigation.

Motions for reconsideration are appropriate "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009). Newly discovered evidence refers to "evidence of facts [previously] in existence . . . of which the aggrieved party was excusably ignorant." *Rivera v. M/T Fossarina*, 840 F.2d 152, 156 (1st Cir. 1988) (citations omitted); *see also Alicea v. Machete Music*, 744 F.3d 773, 782 (1st Cir. 2014). A party should "offer a convincing explanation as to why he could not have proffered the crucial evidence at an earlier stage of the proceedings." *Karak v. Bursaw Oil Corp.*, 288 F.3d 15, 19–20 (1st Cir. 2002).[17] But "failure to pursue discovery to the utmost limit does not preclude a successful Rule 60(b)(2) motion." *Kettenbach v. Demoulas*, 901 F. Supp. 486, 495 (D. Mass. 1995). Overall, "[t]he due diligence requirement of Rule

---

[17] "[W]hile a movant, in order to set aside a judgment, need not establish that it possesses an ironclad claim or defense which will guarantee success at trial, it must at least establish that it possesses a potentially meritorious claim or defense which, if proven, will bring success in its wake." *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir. 1992). Relators' proposed TAC pleads claim examples that include all of the identifiers required by the district court in its opinion dismissing the SAC. (R. 186-3, Ex. 2 Mot. For Recons., at 2.) Defendants did not argue that the newly discovered evidence would fail to satisfy 9(b), and the district court did not address the sufficiency of the newly discovered evidence. Accordingly, Relators' TAC satisfies the *Teamsters* standard.

60(b)(2) is circumscribed by a rule of reason." *United States v. Walus*, 616 F.2d 283, 303–04 (7th Cir. 1980).

> a. Relators' Newly Discovered Evidence Was "Not Previously Available" Due to Obstacles Placed on Their Investigation by the Court Seal and Defendants' Overbroad Interpretation of the MDL Protective Orders

A district court abuses its discretion where it fails to consider whether prior rulings prevented a party from presenting newly emergent evidence. *Luig v. N. Bay Enters., Inc.*, 817 F.3d 901, 907 (5th Cir. 2016) (finding abuse of discretion in denying a 59(e) motion because "the district court did not give North Bay the opportunity to present [certain] evidence before granting summary judgment"). The conduct of non-movants is relevant to this inquiry. *See, e.g.*, *Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 428–29 (6th Cir. 1996) (upholding an order granting motion for relief from judgment because non-movant withheld crucial information); *Mudge v. Bank of Am., N.A.*, No. 13-421, 2014 U.S. Dist. LEXIS 151838, at *2–5 (D.N.H. Oct. 24, 2014) (granting motion to reconsider because defendant did not comply with discovery obligations); *Sellers v. Gen. Motors Corp.*, No. 80-1847, 1984 U.S. Dist. LEXIS 22995, at *8 (E.D. Pa. Oct. 5, 1984) (holding non-movant's counsel partially at fault for previous unavailability of evidence "for adhering to an extremely rigorous interpretation of plaintiff's discovery request").

Relators have consistently sought to ensure that the litigation could proceed without infringing upon Defendants' confidentiality interests. Defendants moved for the Court to require Plaintiffs to file the SAC with an affidavit stating that none of the information in the Complaint violated any protective order. (R. 104, J.A. 67:5–8.) Relators filed affidavits so affirming and agreed to provide Defendants with sourcing information of the SAC. (R. 172-2, J.A. 778–94.) Nonetheless, Defendants requested that the SAC remain sealed, erecting an additional obstacle to Plaintiffs' attempts to investigate the subject matter of the SAC. (R. 135, J.A. 603:7–19.) In addition, Defendants contended that the January 5, 2016 ruling in the ASR MDL (R. 178-2, J.A. 795), is "a very broad order prohibiting the relators from making use of any information derived from the ASR products liability MDL in this False Claims Act *qui tam* matter." (R. 104, J.A. 58:8–10.) Plaintiffs produced discovery on the sourcing of their Complaint to Defendants after filing the SAC. (R. 172-2, J.A. 778–94.) Thereafter, Defendants confirmed their overbroad interpretation, even suggesting that Relators' reference to any information produced in the Pinnacle MDL that was derived from Relators' analysis would violate the three MDL orders. (R. 106-2, J.A. 149.)

On August 24, 2015, while the Motion to Dismiss was pending, Plaintiffs moved to unseal the SAC. (R. 172.) Plaintiffs argued that they were unable to conduct effective interviews of physicians and their staff without disclosing the

58

SAC and the allegations therein. (R. 172-1, Mot. Unseal, at 8–9.) Defendants assented to that motion on September 2, 2015. (R. 177, Opp'n Mot. Unseal.) Thus, Relators expected to gain an opportunity to deploy the SAC in their investigation. The district court's delay of that unsealing until February 2, 2016, however, when it dismissed the case and denied leave to amend, foreclosed such opportunity. The district court largely ignored the above obstacles.

                  **b.** <u>Despite Exercising Due Diligence, Relators Could Not Have Previously Gained Access to the Newly Discovered Evidence</u>

The district court also failed to consider Relators' efforts to find new evidence. From November 7, 2014 to December 10, 2014, Relators contacted plaintiffs' counsel in the MDLs seeking information. MDL plaintiffs' counsel, however, advised that they were unable to provide requested information relating to the Pinnacle MDL. (R. 197, J.A. 1204–05.)

Further, in May 2015, Relators hired an experienced private investigator and licensed physician to contact orthopedic surgeons in search of false claims examples. (*Id.* J.A., 1205–06.) Despite 63 hours of work and contact with 38 physicians, no physician who had implanted a government-insured patient confirmed reliance upon a *specific* DePuy statement. (*Id.*) Relators, upon a good faith understanding, did not believe any of the indirect claims identified in the investigation would satisfy the heightened Rule 9(b) standard articulated by the

district court in *Leysock*. Meanwhile, numerous surgeons identified in Pinnacle MDL complaints were unwilling to disclose information crucial to satisfy *Leysock*'s gloss on Rule 9(b) without seeing the SAC.

The district court abused its discretion by not considering these efforts. Relators' exhaustive search suggests that they were "excusably ignorant of the facts despite using due diligence to learn about them." *Alicea*, 744 F.3d at 781 (quoting 11 Wright & Miller, *Federal Practice and Procedure* § 2808 in explanatory parenthetical). In light of the meritorious claims in this case and the availability of new evidence secured after the district courts entry of judgment, affirmance of the decision would amount to acceptance of "an evil far graver than waste of the court's or litigant's time." *Krock v. Elec. Motor & Repair Co.*, 339 F.2d 73, 74 (1st Cir. 1964) (holding that failure to make full use of discovery does not require finding lack of due diligence). The FCA, a powerful fraud-fighting tool, would be left on the shelf and DePuy will have successfully reaped the fruits of its fraud on taxpayers.

## VII.    Conclusion

Relators' allegations should be resolved on the merits. The operative SAC pleads the "circumstances constituting [DePuy's] fraud" on the Government with particularity and thereby satisfies Rule 9(b). Alternatively, the court below erred in rejecting a proposed TAC that would have cured any pleading deficiencies.

Accordingly, the Court should reverse and remand the judgment of the district court.

Dated: August 22, 2016                    Respectfully submitted,

*/s/ David W. Sanford*
David W. Sanford
Ross B. Brooks
Russell L. Kornblith
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rbrooks@sanfordheisler.com
rkornblith@sanfordheisler.com

Kevin M. Kinne
**COHEN KINNE VALICENTI & COOK, LLP**
28 North Street, 3rd Floor
Pittsfield, MA 01201
Telephone: (413) 443-9399
Facsimile: (413) 553-0331
Email: kkinne@cohenkinne.com

***Attorneys for Relators Antoni Nargol and David Langton***

61

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 13,987 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Times New Roman, 14 point font.


Dated:  August 22, 2016                     Respectfully submitted,

                                            */s/ Ross B. Brooks*
                                            Ross B. Brooks

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2016, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Hannah R. Bornstein

Dina Michael Chaitowitz

George Bunker Henderson, II

Christopher M. Hennessey

Kevin M. Kinne

Russell L. Kornblith

Denise Danielle Pelot

David W. Sanford

Mark D. Seltzer


Dated: August 22, 2016                     Respectfully submitted,

                                           */s/ Ross B. Brooks*
                                           Ross B. Brooks

ADDENDUM

## **Table of Contents**

**Page**

Memorandum and Order of the Honorable F. Dennis Saylor
    on the Motion to Dismiss, dated February 2, 2016 ........................ Add.1

Order of Dismissal, dated February 2, 2016 ........................................ Add.58

Memorandum and Order of the Honorable F. Dennis Saylor
    on the Motion for Reconsideration, dated April 11, 2016 ............ Add.59

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** *et al. ex rel.* **ANTONI NARGOL and DAVID LANGTON,**<br><br>      **Plaintiffs,**<br><br>      **v.**<br><br>**DEPUY ORTHOPAEDICS, INC., DEPUY, INC., and JOHNSON & JOHNSON SERVICES, INC.,**<br><br>      **Defendants.** | **Civil Action No. 12-10896-FDS** |

## <u>MEMORANDUM AND ORDER ON MOTION TO DISMISS</u>

**SAYLOR, J.**

This is a *qui tam* action alleging the submission of false claims to government health-care programs for a defective hip-replacement device. Relators Dr. Antoni Nargol and Dr. David Langton, who are expert witnesses in a related products-liability case involving the same device, have brought suit against defendants DePuy Orthopaedics, Inc., DePuy, Inc., and Johnson & Johnson Services, Inc.[1] DePuy manufactured and sold, among other hip-replacement devices, the Pinnacle metal-on-metal total hip-replacement device ("Pinnacle MoM"). The second amended complaint alleges that DePuy directly submitted and indirectly caused third parties to submit false claims for payments to government health-care programs for the Pinnacle MoM. According to the second amended complaint, the claims were false because DePuy made

---

[1] For clarity, the defendants will be referred to collectively as "DePuy."

numerous misrepresentations to the FDA and surgeons concerning, among other things, the

Pinnacle MoM's failure rates.

The relators filed the original complaint in this action under seal on May 18, 2012.  On

December 2, 2013, the relators filed a first amended complaint.  The government declined to

intervene on July 29, 2014.  On June 5, 2015, the Court granted the relators' request to file a

second amended complaint ("SAC").  Although the 168-page SAC alleges that DePuy made

numerous misrepresentations about two of their devices—the ASR device and the Pinnacle MoM

device—the specific counts in the SAC seek damages only as to the latter device.  The SAC

alleges claims of (1) causing false or fraudulent claims for payment to be presented to the United

States in violation of 31 U.S.C. § 3729(a)(1)(A) (Count One); (2) knowingly making, using, or

causing to be made or used false records or statements material to a false or fraudulent claim

paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(B) (Count Two); (3) conspiracy

to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C) (Count Three); and (4) violations of

various state and municipal analogues to the Federal FCA (Counts Four through Thirty-Seven).

DePuy has moved to dismiss the SAC under Fed. R. Civ. P. 12(b)(6) for failure to state a

claim upon which relief can be granted and under Fed. R. Civ. P. 9(b) for failure to satisfy the

heightened pleading requirements for fraud.  The relators have since moved to unseal the SAC,

and DePuy has assented to that motion while requesting that documents concerning the motion to

dismiss also be unsealed.  Finally, while they have not formally filed a motion to amend the

SAC, the relators contend in the conclusion of their opposition memorandum, sur-reply, and a

post-hearing supplemental filing that they should be granted leave to amend and file a third

amended complaint.

The essence of a False Claims Act violation is making, or causing the making, of one or more false claims—that is, claims for payment—against the United States.  The statute provides large awards to *qui tam* relators as an incentive to bring such cases.  The prospect of such an award may also, however, provide an incentive for individuals to try to convert virtually any set of allegations arising out of a defective product or faulty service into an FCA case.  That is particularly true in the medical field, where the government purchases medical supplies and services on a large scale through Medicare, Medicaid, the VA, and other health-care programs.  Normally, it requires no great leap of logic to conclude that if a medical device or a pharmaceutical is defective, the government must have purchased that product in great quantities, and therefore the manufacturer must have caused, directly or indirectly, the submission of false claims.

In order to avoid so-called "parasitic" claims, and to try to guard against misuse of the FCA, the First Circuit has construed the statute fairly strictly.  In doing so, the court has emphasized that the statute "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment."  *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).  Among other things, FCA complaints must satisfy the particularity requirements of Fed. R. Civ. P. 9(b).  The law requires relatively specific allegations of false claims, rather than generalized allegations based on supposition and logic; the relator must set forth with particularity the "who, what, when, where, and how" of actual claims that are alleged to be false.  *United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123 (1st Cir. 2013).

Here, the SAC includes hundreds of paragraphs of allegations, covering dozens of pages, of claimed fraudulent activity by DePuy.  That satisfies one of the components of an FCA claim, but it does not satisfy them all.  As set forth below, the allegations as to specific claims for

3

payment for the specific device actually at issue in this case are sparse indeed.  For that reason, and the other reasons set forth below, DePuy's motion to dismiss will be granted.

The relators' request for leave to amend the SAC and file a third amended complaint will be denied.  The present case is nearly four years old, has had three iterations of the complaint, and has seen the desks of three judges in this district.  The relators have had ample opportunity to file a complaint that complies with the requirements of Rule 9(b), and have failed to do so.  Finally, the parties' motions to unseal the SAC and other filings related to the motion to dismiss will be granted.

## I.   Background

The facts summarized below are set forth in the SAC unless otherwise noted.

### A.   Factual Background

#### 1.   The Parties

Relator Dr. Antoni Nargol is an orthopedic surgeon residing in the United Kingdom.  (SAC ¶ 63).  In 2003 he became one of the earliest British adopters of the Pinnacle MoM device, and DePuy invited him to be on its "Pinnacle user group team."  (SAC ¶ 66).  Dr. Nargol served as a testifying expert for the plaintiffs in *Strum v. DePuy Orthopaedics, Inc. and Premier Orthopaedic Sales, Inc.*, No. 2011 L 009352 2404 (Cook Cty., Ill., Cir. Ct.) ("*Strum* litigation").  (SAC ¶ 68).  Dr. Nargol also provided expert assistance to the plaintiffs' executive committee in *Kransky v. DePuy, Inc.*, No. BC 456086 (Cal. Sup. Ct.), in which the plaintiffs' allegations focused on perceived design defects in the "ASR," a device that is similar to the one at issue in this case, the Pinnacle MoM.  (SAC ¶ 68).  Dr. Nargol also served as a fact witness in *Herlihy-Paoli v. DePuy Orthopaedics, Inc.*, No. 3:11-CV-04975-K (N.D. Tex.) ("*Herlihy-Paoli* litigation").  (SAC ¶ 68).

Relator Dr. David Langton is an orthopedic surgeon residing in the United Kingdom. (SAC ¶ 69). Dr. Langton has performed research on failed hip-replacement surgeries and devices, including the Pinnacle MoM device. (SAC ¶ 70). The United States Food and Drug Administration ("FDA") has retained Dr. Langton as a consultant regarding "failure rates and dimensions of MoM products sold in the United States, including the Pinnacle." (SAC ¶ 72). Dr. Langton served as an expert witness in the *Strum* litigation and as a fact witness in the *Herlihy-Paoli* litigation. (SAC ¶ 72). According to the SAC, both the relators had personal experience in implanting the Pinnacle MoM device in their patients and began to alert defendants of the device's defects in 2009. (SAC ¶ 24).

Defendant DePuy Orthopaedics, Inc. is a designer, manufacturer, and distributor of orthopedic products that is based in Warsaw, Indiana. (SAC ¶ 73). DePuy Orthopaedics manufactured the Pinnacle MoM device. (SAC ¶ 73). DePuy Orthopaedics is a wholly-owned subsidiary of Delaware-based DePuy, Inc., which in turn is a subsidiary of New Jersey-based Johnson & Johnson Services, Inc. (SAC ¶¶ 75-77).

## 2. Government Health-Care Programs

Medicare is a health-insurance program administered by the United States Department of Health and Human Services ("HHS"). (SAC ¶ 85). Medicare provides payment for, among other things, medical services and equipment to persons over 65 years of age and those who are 18 years of age or older and are eligible for disability benefits. (SAC ¶ 82). For inpatient treatment, Medicare reimburses hospitals and other treating facilities through Medicare Part A. (SAC ¶ 83). For outpatient treatment, Medicare reimburses physicians and health-care providers through Medicare Part B. (SAC ¶ 83).

Under the Medicare program, "no payment may be made under Part A or Part B for any

expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of the malformed body member." (SAC ¶ 84) (citing 42 U.S.C. § 1395y(a)(l)(A)). To satisfy that standard, providers must provide, among other things, economical medical services, along with evidence that the service will be of a quality that meets professionally recognized standards of healthcare and will be supported by evidence of medical necessity and quality. (SAC ¶ 84) (citing 42 U.S.C. § 1320c-5(a)(1-3)). The SAC alleges that Medicare reimbursed qualified individuals for the purchase of the Pinnacle MoM device and the surgical procedures necessary to implant the device. (SAC ¶ 99).

Medicaid is a health-insurance program administered by HHS jointly with agencies in each state. (SAC ¶ 100). It is designed to assist states in providing medical services, medical equipment, and prescription drugs for low-income persons who qualify for the program. (SAC ¶ 100). The SAC alleges that Medicaid, like Medicare, reimbursed qualified individuals for the purchases of the Pinnacle MoM device and the surgical procedures necessary to implant the device. (SAC ¶ 104).

The United States Department of Veterans Affairs ("VA") provides medical assistance, including comprehensive coverage for hip replacement, to military veterans. (SAC ¶ 105). The SAC alleges that DePuy "sold its Pinnacle hip implants directly to the VA." (SAC ¶ 106). The National Contract Service ("NCS") provides the VA with acquisition support for medical equipment and pharmaceuticals. (SAC ¶ 112). According to the SAC, "NCS is also responsible for national committed-use contracts and standardized blanket purchase agreements established against the Federal Supply Schedule Program." (SAC ¶ 112). Medical equipment and supplies contracts are governed by the Federal Supply Schedule Group 65 Part II Section A. (SAC

¶ 115).  That contract states that a "[c]ontractor warrants and implies that the items delivered hereunder are merchantable and fit for use of the particular purpose described in this contract," and that "[a]ll offerors must be in compliance with Section 510(k) of the Federal Food, Drug, and Cosmetic Act for those medical device products intended to be delivered to the Government."  (SAC ¶¶ 116-17).[2]  The 65 II A contract also requires the contractor to notify the Assistant Director of the National Acquisition Center and various other officials if it sells a VA facility a product that "(1) requires modification, (2) is removed or recalled by the contractor or manufacturer due to defects in the product or potential dangers to patients, or (3) is subject to a suggested or mandatory modification, removal, or recall by a regulatory or official agency." (SAC ¶ 120).

The Civilian Health and Medical Program of the United States, now known as TRICARE, provides benefits for health-care services furnished to members of the U.S. military and their family members.  (SAC ¶ 124).  TRICARE pays for medical devices and surgeries for its beneficiaries, including total hip-replacement devices like the Pinnacle MoM.  (SAC ¶ 125).

### 3.     FDA Regulations Governing Medical Devices

The SAC contains significant detail concerning the FDA regulations governing medical devices that need not be fully detailed here.  (*See generally* SAC ¶¶ 127-66).  The FDA, which protects and promotes the public health through regulation of medical devices and pharmaceuticals, has three risk-based regulatory classifications for medical devices.  (SAC ¶¶ 127-28).  The Pinnacle MoM device was a Class III device and subject to the most stringent level of regulation imposed by the FDA.  (SAC ¶¶ 129-30).  There are only two ways by which a

---

[2] The 65 II A contract further states that the general controls of the FD&C Act controlling medical devices "are the baseline requirements that apply to all medical devices necessary for marketing, proper labeling and monitoring [ ] performance once the device is on the market."  (SAC ¶ 119).

manufacturer can seek FDA approval for a new Class III medical device:  the premarket approval ("PMA") process and the "510(k)" clearance process.  (SAC ¶ 131).  The "more onerous" PMA process requires, among other things, a full report of all information known to the manufacturer concerning investigations into the device's safety.  (SAC ¶ 131).  In contrast, under the 510(k) process, the manufacturer is required to demonstrate only that the device is "substantially equivalent in terms of safety and effectiveness to an existing FDA-approved device."  (SAC ¶ 131) (citing 21 C.F.R. § 807.92(a)(3)).  A device is substantially equivalent if, when comparing it to the predicate, it has both the same intended use and the same technological characteristics as the predicate.  (SAC ¶ 133).  A device with different technological characteristics can be considered substantially equivalent only if the information submitted to the FDA does not raise new questions of safety and demonstrates that the device is at least as safe and effective as the predicate device.  (SAC ¶ 133).

### 4.    The Pinnacle MoM Device

Before the alleged defects in DePuy's Pinnacle MoM device came to light, another DePuy hip-replacement device, the ASR, suffered from alleged defects and was the subject of many products-liability lawsuits.  (SAC ¶¶ 56-57).  Those actions were ultimately the subject of an MDL proceeding in the Northern District of Ohio.  (SAC ¶¶ 56-57).  The SAC includes numerous references to ASR defects and allegedly fraudulent behavior by DePuy in connection with that device.  (*See, e.g.*, SAC ¶¶ 15, 24, 31-33, 35, 37-39, 42, 45, 47, 54-58, 64-66, 68, 71-72, 130, 184, 189, 190-91, 199, 238, 246, 262, 327).  Those allegations, however, are not particularly relevant to the relators' claims in this case, which is solely focused on the Pinnacle

device—and more specifically, the Pinnacle MoM device comprised of a metal head and metal liner, as explained below.

Hip-replacement devices replace the bone components of a hip joint, including the ball (femoral head) and socket (acetabulum).  (SAC ¶¶ 167-69).  A hip-replacement device generally includes four components:  (1) a femoral stem; (2) a femoral head; (3) an acetabular cup; and (4) a liner that fits inside the cup and interacts with the head.  (SAC ¶ 170).  In metal-on-metal hip-replacement devices, the head, cup, and liner are all metal; MoM devices are expected to last longer than devices comprised of ceramic or polyethylene.  (SAC ¶ 169).  The space between the head and cup is referred to as "diametrical clearance."  (SAC ¶ 179).  Bodily fluid fills in the diametrical clearance between the head and cup to prevent friction and wear caused by the two pieces rubbing together.  (SAC ¶ 180).

Under the brand of "DePuy Orthopaedics Pinnacle Hip Solutions," DePuy marketed three head-on-liner categories of Pinnacle devices:  "metal-on-metal, ceramic-on-polyethylene, and metal-on-polyethylene."  (SAC ¶ 176; Def. Mem. Ex. C at 5).[3]  DePuy offered three types of Pinnacle heads:  (1) aSphere M-Spec and M-Spec (both metal); (2) Standard Metal (metal); and (3) BIOLOX delta (ceramic).  (Def. Mem. Ex. C at 3).  DePuy offered three types of Pinnacle

---

[3] The Court will consider two sets of DePuy marketing materials along with the facts as alleged in the SAC.  First, it will consider Exhibit C attached to DePuy's motion to dismiss:  the 2011 "Pinnacle Hip Solutions Compatibility Guide," a marketing document that DePuy provided to health-care providers.  Second, the Court will consider Exhibit D attached to DePuy's motion to dismiss:  the 2008 "Design Rationale" for Pinnacle products.  On motions to dismiss, courts can properly take into account (1) documents the authenticity of which are not disputed by the parties; (2) documents that are official public records; (3) documents central to plaintiffs' claim; or (4) documents sufficiently referred to in the complaint.  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *see also Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n.3 (1st Cir. 1991) (considering securities-offering documents submitted by defendants with motion to dismiss for claim of securities fraud); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1014-15 (1st Cir. 1988) (considering allegedly libelous article submitted by defendants with motion to dismiss).

Here, the SAC refers to DePuy's "marketing materials" and other documents that it provided to health-care providers numerous times.  (*See, e.g.*, SAC ¶¶ 9, 165, 183, 232, 252, 419).  Moreover, the documents were publicly-distributed marketing materials.  Accordingly, Exhibits C and D are documents whose authenticity is not disputed, are central to the relators' claims, and are sufficiently referred to in the SAC.

liners:  (1) Ultamet and Ultamet XL (both metal); (2) Marathon (polyethylene); and (3) AltrX

(polyethylene).  (Def. Mem. Ex. C at 3).  The Standard Metal head was not compatible with

Pinnacle metal liners; it could be used only with polyethylene liners.  (*Compare* Def. Mem. Ex.

C at 8, *with* Def. Mem. Ex. C at 10, 16).  Thus, there was one combination of Pinnacle

components that combined to create a Pinnacle MoM device:  an aSphere M-Spec or M-Spec

metal head with an Ultamet or Ultamet XL metal liner.  (SAC ¶ 176; Def. Mem. Ex. C at 3).  The

Pinnacle device—consisting of a head, cup, and liner—could be used with a variety of separate

DePuy femoral stems, including the CORAIL stem, the SUMMIT stem, the AML stem, the TRI-

LOCK stem, and the S-ROM stem.  (*See* Def. Mem. Ex. D at 29).  But those stems were not part

of the Pinnacle MoM device, as they could be used with other DePuy hip-replacement devices,

such as the ASR.  (*Id.*).

    As alleged in Counts One through Thirty-Seven of the SAC, the relators seek recovery

under 31 U.S.C. § 3729(a)(1)(A)-(C) for claims involving only DePuy's Pinnacle MoM device

(which must use an M-Spec head and an Ultamet liner).

    On December 13, 2000, the FDA approved the Pinnacle Ultamet 36mm metal liner as

part of the 510(k) approval process, based on "substantial equivalence with the DePuy Ultima

Unipolar Adapter Sleeves ("Ultima"), cited as the Ultamet's predicate device."  (SAC ¶ 177).

The diametrical clearance set forth in the Ultamet's 510(k) application was in the "40-80 micron

tolerance band."  (SAC ¶ 181).[4]  According to the SAC, DePuy purposely manufactured the

Pinnacle MoM device with a lower diametrical clearance than other devices.  (SAC ¶ 183).  It

---

    [4] DePuy manufactured liners and heads at a specified "nominal" size.  (SAC ¶ 182).  Along with a nominal
size, each component was assigned an upper and lower tolerance, representing the "permissible diametrical
clearance measurements of the manufactured component."  (SAC ¶ 182).  The acceptable range of diameter
measurements for each component is plus or minus 10 microns (0.010 millimeters) from the nominal size;
accordingly, "the complete range of acceptable deviation [for a device] is 20 microns for each component."  (SAC
¶ 182).

marketed the Pinnacle MoM's lower diametrical clearance under the theory that as diametrical clearance decreases, the volume of fluid lubricating the joint increases. (SAC ¶ 183). The SAC alleges that when diametrical clearance is small, "the consequences of any deformation of the cup, even if slight, are dire for the patient." (SAC ¶ 183). When DePuy added the 36mm Ultamet liner to its Pinnacle product line in 2005, DePuy advised the FDA that the diametrical clearance dimension was not 40-80 microns, but was in fact 80-120 microns. (SAC ¶ 186). The SAC alleges that the FDA, upon learning of the inaccuracy, "specifically advised DePuy that, had it known that the 36mm liner's dimensions were not as DePuy had represented, the device would not have been granted a 'substantial equivalence' waiver . . . . Instead, DePuy would have had to make a full application for PMA." (SAC ¶ 187).

### 5. DePuy's Allegedly Fraudulent Acts Involving the Pinnacle Device

The relators allegedly learned of the defects in the ASR and Pinnacle MoM devices through their own work with the hip implants. (SAC ¶¶ 24, 47). They began reporting those defects to DePuy in 2007, and continued to do so through 2011. (SAC ¶¶ 24, 47). Those defects included (1) surface wear resulting in metal ion exposure causing patient necrosis (tissue death), metallosis (metallic staining of tissues), and osteolysis (degradation of the bone) (SAC ¶ 29); (2) "diametrical clearance" and "taper trunnion" defects causing high device-failure rates (SAC ¶ 42); and (3) femoral neck fractures at high rates. (SAC ¶ 45).

The SAC includes nearly fifty pages detailing DePuy's allegedly fraudulent actions in concealing those defects while pursuing FDA approval for the Pinnacle MoM device, marketing the device to surgeons, and selling the device to government health-care programs. (*See generally* SAC ¶¶ 201-412). The Court will not detail every allegation of DePuy's claimed improper conduct, many of which are irrelevant to the Pinnacle MoM device and the present

11

FCA claims. The Court will, however, attempt to summarize the allegations, which fall into two broad categories.

First, the SAC alleges that DePuy knowingly made material false statements and omissions to the FDA and to medical providers about the "specifications, manufacturing process, safety, and failure rates" of its Pinnacle MoM device. (SAC ¶ 201). Those false statements, according to the SAC, "armed and induced surgeons to make similar certifications when seeking reimbursement from the [g]overnment" and "had a natural tendency to influence the [g]overnment's payment for the Pinnacle devices." (SAC ¶ 203). The SAC identifies nine sub-categories of materially false statements that DePuy made to the FDA and surgeons. The SAC alleges that but for those false statements, the FDA would not have approved the device and "surgeons would not have utilized Pinnacle hip replacements or certified them to government health programs as reasonable and medically necessary." (SAC ¶ 256).

1. The SAC alleges that "in official communications with the FDA, DePuy falsely represented that Pinnacle implants had a 96 percent to 96.5 percent success rate." (SAC ¶ 204). Specifically, it alleges that on June 27, 2012, a DePuy director gave a presentation to the FDA's Orthopedic and Rehabilitation Devices Panel of the Medical Devices Advisory Committee. (SAC ¶ 205). The purpose of that meeting was to "seek expert scientific and clinical opinion on the risks and benefits of these types of devices based on available scientific data." (SAC ¶ 205). At the meeting, the DePuy director told the panel that "Ultamet metal-on-metal articulation is performing consistent with or better than other metal-on-metal products: 4 to 4.5 percent cumulative revision rate at five years, regardless of head size." (SAC ¶ 206). According to the SAC, as of February 29, 2012,

DePuy's own internal database showed that "metal Pinnacle hips" had a

cumulative revision rate of 15 percent after five years of use.  (SAC ¶ 207).  The

SAC alleges that "had DePuy truthfully stated its internal results indicating a 15

percent revision rate at five years, the FDA would likely not have continued to

clear the product for the market . . . [and] the government would likely have

discontinued use of the Pinnacle device for government health-care recipients."

(SAC ¶ 210).  When the FDA approved the Pinnacle for implantation in patients,

the FDA stated "[i]t is, however, [DePuy's] responsibility to determine if the

change [or] modification to the device or its labeling could significantly affect the

device's safety or effectiveness and thus require submission of a new 510(k)."

(SAC ¶ 211).

2. The SAC alleges that "DePuy made false statements to surgeons claiming that

   Pinnacle boasted a 99.9 percent success rate" and that those statements caused

   surgeons to submit false claims to the government.  (SAC ¶ 212).  Specifically, it

   alleges that DePuy began circulating marketing materials in 2007 that touted a

   99.9 percent success rate for "Pinnacle products" based on data and research that

   was "conducted and written up by DePuy itself and funneled to a third-party

   author to create the appearance of impartiality."  (SAC ¶¶ 212-13).  It alleges that

   DePuy continued to advertise this false figure until 2013, even though its internal

   data showed a 15 percent cumulative revision rate as early as February 29, 2012.

   (SAC ¶¶ 228-29).

3.  The SAC alleges that DePuy made false statements to surgeons "claim[ing] that

    the Pinnacle device's low diametrical clearances created a benefit to patients that

distinguished the devices from competing products." (SAC ¶ 233). Beginning in early 2010, the relators conducted research on a "large volume of failed Pinnacle . . . implants" and concluded that the device suffered from a "diametrical clearance defect" such that "the diametrical clearance of the [ ] device was considerably lower than the specification required by the FDA." (SAC ¶ 238). After the research, the relators repeatedly alerted DePuy executives about the improper clearances. (SAC ¶¶ 245-48). DePuy, in apparently undated marketing materials to surgeons, touted that the Pinnacle's "cup-to-head bearing clearance, enhances the potential for fluid lubrication and minimizes wear to maximize survivorship." (SAC ¶ 250). According to the SAC, "DePuy knew that patients were not obtaining the purported benefits of Pinnacle's low diametrical clearances" and "was fully aware that many patients and surgeons—most notably Dr. Nargol—were complaining of high ion rates and high failure rates." (SAC ¶ 255).

4. The SAC alleges that even though "DePuy knew that its devices were responsible for dangerous concentrations of metal ions in the bloodstreams of patients," it told the FDA that "metal ions were not a source of concern for metal-on-metal patients." (SAC ¶ 257). In the June 2012 presentation to the FDA, the DePuy director said that the Pinnacle generated "metal wear debris" in patients' bloodstreams in "low amounts." (SAC ¶ 258). The SAC alleges that surgeons began notifying DePuy "as early as 2001 that metal ions generated by metal-on-metal implants were a cause for concern." (SAC ¶ 260).

5.  The SAC alleges that DePuy made false statements to surgeons about the causes of the Pinnacle MoM's high failure rates.  Specifically, "[b]eginning in 2009, Dr. Nargol repeatedly contacted DePuy to warn it of explosive growth in the number of Pinnacle hip revision surgeries he was performing."  (SAC ¶ 269).  According to the SAC, DePuy told Dr. Nargol that the "problems resulted from his implantation technique."  (SAC ¶ 270).  At the time, "DePuy knew . . . that the problems in Dr. Nargol's patients stemmed from device defects, not from [his] surgical methods" because, in part, other surgeons were "experiencing and notifying DePuy of widespread failures with the Pinnacle implant."  (SAC ¶¶ 271-72).

6.  The SAC alleges that DePuy made false statements to surgeons about the Pinnacle MoM's angle of inclination in its use instructions.  (SAC ¶ 276).  It cites an internal DePuy e-mail written by an engineer expressing confusion about the proper angle of inclination for the Pinnacle's cup positioning.  (SAC ¶ 277).  Accordingly, the SAC alleges, "DePuy did not know the proper angle of implantation for Pinnacle hips, and [ ] any recommendation it made in its manuals disseminated to hospitals and surgeons was therefore false."  (SAC ¶ 278).

7.  The SAC alleges that DePuy "intentionally withheld disclosure of the Pinnacle's diametrical clearance manufacturing defects to [the] FDA, contrary to its FDA-mandated obligation to report them in an updated 510(k) application."  (SAC ¶ 280).  In 2000, DePuy submitted its 510(k) application along with various certifications that it "conducted a reasonable search of all information known or otherwise available about the types and causes of safety and effectiveness

problems that have been reported for metal-on-metal hip systems."  (SAC ¶ 282).

On July 26, 2005, a DePuy regulatory-affairs associate wrote to the FDA

attaching a chart "replac[ing] the chart originally included as Exhibit 4 of the

submission, which contained a miscalculation."  (SAC ¶ 286).  The SAC alleges

"[o]n information and belief, the 'corrected' 2005 table contained measurements

or analysis of measurements of DePuy's devices that DePuy learned were not

accurate."  (SAC ¶ 287).[5]  On August 5, 2005, a member of the FDA cautioned

DePuy that it would be the company's "responsibility to determine if the change

or modification to the device or its labeling could significantly affect the device's

safety or effectiveness and thus require submission of a new 510(k)."  (SAC

¶ 291).  According to the SAC, that notification "imposed an affirmative

obligation on DePuy to provide the FDA with updated information," and even

when the relators notified DePuy of the Pinnacle diametrical clearance issues

beginning in 2008, "[o]n information and belief, DePuy never corrected its July

26, 2005 submissions to reflect Relator Langton's measurements."  (SAC ¶¶ 292-

96).

8.   The SAC alleges that DePuy "intentionally withheld disclosures of the Pinnacle

device's taper trunnion and surface roughness defects in presentations to the

FDA."  (SAC ¶ 300).  The alleged "taper trunnion" defect concerns the area

where the end of the femoral stem (the trunnion) is inserted into the area of the

---

[5] Also in 2005, DePuy's director of regulatory affairs wrote an e-mail to DePuy's global vice president of clinical research, indicating that the regulatory submission "stretch[ed] the 510(k) idea to its limits" and further elaborated, "I can see how the FDA looked at it.  They want clinical data for metal-on-metal, and we changed the material, the size and 'diametrical clearance,' then tested a device that is different than the subject of the 510(k)." (SAC ¶ 288).

head (the taper); that taper trunnion "is not meant to move and thus should not generate any wear." (SAC ¶¶ 188-89). However, the SAC alleges that the relators discovered a defect in the Pinnacle device where, due in part to the large head size of the Pinnacle, the "taper toggles against the trunnion, causing the release of metal debris." (SAC ¶ 190). The alleged "surface roughness" defect also concerns the taper trunnion area of the device, but involves friction between the trunnion, which is designed to be rough, and the taper, which is designed to be smooth. (SAC ¶ 195). The SAC alleges that the relators discovered a defect in many Pinnacle devices where the surface of the taper was rough and created friction with the trunnion, which in turn caused friction and release of metal debris. (SAC ¶ 197). The relators allege that they notified DePuy of the two defects beginning in 2011 and continued to do so into 2012. (SAC ¶¶ 305-06). The SAC alleges that DePuy willfully omitted any discussion of the reported taper trunnion and surface roughness defects during the June 2012 meeting with the FDA. (SAC ¶¶ 307-10).

9. The SAC alleges that "DePuy intentionally failed to disclose adverse events to the FDA." (SAC ¶ 312). On June 7, 2011, following an Establishment Inspection of DePuy's Indiana facility, the FDA issued a report concluding that DePuy had "delayed reporting adverse [Pinnacle] MoM events by five months to three-and-a-half years, well beyond the acceptable timeframe under FDA regulations." (SAC ¶ 314). The report also noted that DePuy failed to investigate complaints involving the possible failure of its device to meet production specifications; a DePuy employee stated that the company received approximately 450 complaints

per month about hip-replacement devices but that DePuy assigned only one employee to investigate them.  (SAC ¶ 315).

Second, the SAC alleges that DePuy knowingly caused the submission of direct claims for "medical devices with dimensions materially different than those the government bargained for."  (SAC ¶ 201).  The SAC identifies three sub-categories of DePuy's allegedly materially false statements or omissions that caused the government to pay for "nonconforming, nonfunctioning, and unsafe devices that would not have been purchased but for DePuy's fraudulent conduct."  (SAC ¶ 325).

1. As detailed above, the SAC alleges that DePuy knowingly or recklessly disregarded evidence, allegedly first provided to it by the relators, that the Pinnacle MoM's nonconforming diametrical clearances were causing device failures.  (SAC ¶¶ 327-32).  It alleges that DePuy was on notice of the Pinnacle MoM's improper measurement testing procedures as early as 2009, when it acquired a competitor and began to use its own "state-of-the-art measuring equipment."  (SAC ¶ 335).  In June 2010, after the relators notified DePuy of the Pinnacle's improper clearance measurements, a DePuy employee e-mailed Dr. Langton, stating that if DePuy concluded from the relators' research that its MoM parts "were out of specification," the company would "need to notify patients if [DePuy] had made a serious manufacturing error."  (SAC ¶ 338).  In its 2011 report, the FDA found that "33 Pinnacle metal liners were out of conformance" because they "fell below the lower specification limit" for diametrical clearance. (SAC ¶ 342).  The FDA report notified DePuy that "[t]he production capabilities for the Pinnacle MoM liners and MoM femoral heads at the Leeds facility should

be reviewed."  (SAC ¶ 343).  According to the SAC, "DePuy continued to

manufacture Pinnacle components with full knowledge that the manufacturing

process was producing yet more parts with the same conformance issues."  (SAC

¶ 343).  The SAC also alleges "on information and belief" that DePuy provided

the FDA with statistical analyses about the failure rates of its Pinnacle device that

excluded "critical analyses [that] relators provided to DePuy."  (SAC ¶ 345).

After the FDA expanded the scope of its request to include data back to January

2007, the SAC alleges that DePuy "responded by producing very little data."

(SAC ¶ 348).  According to the SAC, "DePuy's failure to conduct and report such

statistical analyses violated 21 C.F.R. § 820.250, which requires statistical

analysis to assess trending."  (SAC ¶ 350).  It also alleges that because DePuy

employed only one person to "review and analyze the approximately 450

complaints received per month," it "willfully ignored and mischaracterized the

causes of the[ ] complaints in order to avoid its obligation to adequately verify

and validate its manufacturing processes."  (SAC ¶¶ 355-56).  It alleges that

DePuy's "failure to respond to relators' complaints regarding the clearance

deformities" violated 21 C.F.R. § 820.198(a), which establishes a duty to

"maintain adequate procedures for receiving, reviewing, and evaluating

complaints."  (SAC ¶ 357).

2.  The SAC alleges that beginning in 2005, DePuy "knowingly or recklessly failed

to adopt adequate process validation methods" that were "necessary to

consistently manufacture [ ] Pinnacle devices within specification."  (SAC ¶ 358).

It alleges that the "relators, with additional expert assistance, have determined that

DePuy's inspection and testing procedures were unable to verify whether DePuy's Pinnacle devices [were] manufactured within their required specifications," both for diametrical clearance and surface roughness.  (SAC ¶¶ 359-60).  It alleges that DePuy, by failing to ensure that its manufacturing process was capable of producing devices within required specifications, "produced, marketed, and sold . . . a device that [was] different than the subject of the 510(k)" and caused the government to purchase devices that it would not have otherwise purchased without 510(k) approval.  (SAC ¶¶ 363-65).

3.   The SAC alleges that "DePuy's failure to implement validation procedures necessary to ensure consistent manufacture of products confirming to their specifications was material to the government's purchase of DePuy's Pinnacle devices."  (SAC ¶ 397).  Specifically, it alleges that the "FDA premised its post-market approval of the Pinnacle's diametrical clearance dimensions upon DePuy's representation that the Pinnacle's failure rates were comparable to those of its competitors," and without that approval, the government would not have approved the device for reimbursement.  (SAC ¶ 397).  When the FDA learned in 2005 that DePuy's 510(k) application in 2000 for the Ultamet 36mm liner contained incorrect diametrical clearance dimensions, it stated that "given this new information, the Pinnacle 36mm system would not have been cleared in 2000."  (SAC ¶¶ 399-400).  According to the SAC, the FDA "nevertheless did not require DePuy to file a supplemental 510(k), much less obtain PMA, expressly because DePuy represented that the device's failure rates were within industry standards."  (SAC ¶ 401).  But the SAC alleges that DePuy "was aware [at that

time] that the Pinnacle substantially deviated from specifications and had

disproportionately high failure rates," and "[i]n order to maintain FDA approval

and continue to sell the Pinnacle, DePuy obscured this information from the FDA,

medical providers, and the public for several years."  (SAC ¶ 403).

In May 2013, DePuy announced that it would stop selling the Pinnacle MoM device as of

August 2013.  (SAC ¶ 55).  More than 5,000 personal injury lawsuits involving the Pinnacle

MoM device were eventually transferred to an MDL proceeding in the Northern District of

Texas.  (SAC ¶ 58).

The SAC alleges that "all claims made to the government for costs associated with the

Pinnacle device at any time from DePuy's 510(k) application to the date the Pinnacle was

withdrawn from the market constitute false claims under the FDA."  (SAC ¶ 412).

Finally, the SAC twice refers to 42 U.S.C. § 1395y(a)(1)(A), which prohibits Medicare

payments for treatments that are not "reasonable and necessary."  The SAC alleges:

> Hospital certifications involving claims for Pinnacle hip implants were false
> because claim reimbursements for these products constituted payment for services
> which were "not reasonable and necessary for the diagnosis and treatment of
> illness or injury," in violation of 42 U.S.C. § 1395y(a)(l)(A).  By marketing these
> products as safe, effective, and medically appropriate, and concealing
> overwhelming evidence to the contrary, DePuy willfully caused hospitals to file
> such false certifications when seeking Medicare reimbursement.
>
> . . . .
>
> DePuy caused physicians, hospitals and other providers to submit false
> certifications on all these forms concerning claims for Pinnacle hip surgery
> procedures.  Surgeries to implant these irredeemably faulty devices were not
> "reasonable and necessary for the diagnosis and treatment of illness or injury,"
> within the meaning of 42 U.S.C. § 1395y(a)(l)(A).

(SAC ¶¶ 88, 99).

6.      **Alleged False Claims**

The SAC alleges that "the government directly purchased or reimbursed hundreds of

thousands of Pinnacle products."  (SAC ¶ 7).  It alleges that DePuy made false statements that

caused health-care providers to submit indirect false claims for the Pinnacle MoM to Medicare

and Medicaid, and that DePuy itself also submitted direct false claims to the VA.

a.      **Alleged Indirect False Claims**

The SAC alleges one representative indirect false claim and then supports that claim with

statistical evidence of the Pinnacle sales to Medicare and Medicaid patients.  (*See* SAC ¶¶ 413-

72).  As to the indirect claim, the SAC alleges:

> One such device was implanted into patient "F.I.".  On or about November 12,
> 2007, patient F.I. was implanted with a DePuy Pinnacle hip implant by a surgeon
> at Stony Brook University Medical Center, 10 I Nicolls Road, Stony Brook, New
> York 11794.  The surgeon was, upon information and belief, Dr. "J.N.".  In
> November 2007, Mr. F.I. received Medicaid insurance through HealthFirst, a
> managed care organization that provides government-sponsored health insurance
> plans in New York.
>
> On information and belief, DePuy's surgical instructions and materials provided
> to Dr. J.N. regarding implantation of F.I. with the Pinnacle device represented that
> the device was a safe and effective hip implant device when implanted in
> accordance with such instructions.
>
> DePuy's product label accompanying the Pinnacle device stated that the product
> was indicated for use as the acetabular component in total hip-replacement
> procedures.  On information and belief, under the heading "Information for Use,"
> the product label stated that an "instrumentation system, as well as a system of
> trial components, is available to assure proper fit and alignment of the prosthesis"
> and that physicians should refer to the surgical technique manual on their use.
>
> Within the Pinnacle's packaging, DePuy provided surgeons with Instructions for
> Use ("IFU") of the product.  The IFU contained numerous false statements
> regarding the safety and efficacy of the Pinnacle MoM.  The IFU stated, "An
> instrument system, as well as system of trial components, is available to assure
> proper fit and alignment of the prosthesis."  The IFU also instructed the surgeon
> to "refer to the appropriate surgical technique manual on the use of the instrument
> system."  In reality, surgeons could not achieve a proper fit and alignment of the
> prosthesis by using DePuy's tools and instructions.

Around the time of Mr. F. I.'s surgery, DePuy widely distributed the Ultamet Technical Monograph, a Pinnacle marketing material, throughout the United States.  This pamphlet falsely stated that the Pinnacle MoM implants experienced reduced wear as compared to competing devices because of the purported benefit of their low diametrical clearances.

At the time of Mr. F.I.'s surgery, other safe and effective alternatives were widely available on the market.  As alleged above, DePuy's marketing materials and device operating instructions claimed that the ASR and Pinnacle's lower failure rates and diametrical clearance specifications were superior to those competing products[.]

On information and belief, but for DePuy's false statements, Dr. J.N. would have chosen a different available device for the hip-replacement surgery he performed on Mr. F.I.

. . . .

As with Mr. F.I.'s ASR XL hip prosthesis, Mr. F.I's Pinnacle device quickly failed, as a result of manufacturing defects in the device, including nonconforming diametrical clearance dimensions.  The failures resulted in great pain and suffering to F.I. and posed the possibility of additional revision surgery.

Mr. F.I's implantation with a Pinnacle device was neither medically reasonable nor medically necessary, because of the unreasonably high possibility that the device would fail and release metal ions into Mr. F.I.'s blood stream.  No reasonable physician would implant a hip-replacement device with a failure rate of 15 percent at five years.

. . . .

In order to obtain Government reimbursement in connection with the procedure, Stony Brook University Medical Center and Dr. J.N. certified that Mr. F.I.'s Pinnacle device was reasonable and medically necessary for his treatment under 42 U.S.C. § 1395y(a)(l)(A).  This certification was false as the implantation of a defective device is not a medically reasonable treatment.

Upon information and belief, on or about November 2007, Stony Brook University Medical Center submitted a claim to Medicaid for Mr. F.I.'s Pinnacle hip device and implant surgery. Medicaid paid for Stony Brook's hip device and implant surgery.

New York Medicaid reimbursed approximately $34,000 in costs for the implantation of Mr. F.I.'s Pinnacle device.

. . . .

> Without DePuy's false representations and warranties, Mr. F.I. would not have
> received a DePuy implant and the Government would not have expended funds on
> the device.  If Dr. J.N. had been provided appropriate information showing the
> truth about the Pinnacle, Dr. J.N. would not have selected the Pinnacle implant for
> F.I's procedure.  Similarly, had DePuy divulged what it knew about the Pinnacle,
> the Government would not have approved any claim for reimbursement for the
> costs of the system.

(SAC ¶¶ 414-20, 423-24, 426-28, 432).

According to the SAC, "over one million MoM hips were sold worldwide" during the times relevant to the complaint.  (SAC ¶ 434).  "Amongst the models manufactured at DePuy plants, the Pinnacle MoM Hip was one of the most widely used hip-replacement systems that remained in the international market place."  (SAC ¶ 434).  The SAC alleges that the United States "constitutes almost two-thirds of the world's orthopedic device market."  (SAC ¶ 435).  Over 300,000 hip-replacement surgeries were performed in the United States in 2010.  (SAC ¶ 436).  The SAC alleges that, "[a]ccordingly, it follows that hundreds of thousands of Pinnacle products were implanted in government health-care recipients and reimbursed by the government during the lifespan of the product."  (SAC ¶ 437).

The SAC alleges that between 2005 and 2010, New York Medicaid paid for an average of approximately 1,280 claims each year for total hip-replacement devices.  (SAC ¶ 438).  New York State Medicaid paid approximately $52 million to cover its total cost for inpatient visits for those 1,280 claims, or $40,625 per claim.  (SAC ¶ 439).  In 2010, New York State's Federal Medical Assistance Percentage ("FMAP") was approximately 50 percent.  (SAC ¶ 440).  The SAC alleges that "[t]herefore, the United States paid an additional $52 million to cover its total cost for each inpatient visit for those 1,280 claims, or $40,625 per claim."  (SAC ¶ 441).  New York State Medicaid covers approximately 8 percent of all Medicaid beneficiaries in the United

States; therefore, according to the SAC, "thousands more Medicaid patients received total hip-replacement devices in 2010, at a cost of hundreds of millions of dollars to the Plaintiff States and the United States."  (SAC ¶ 442).

The SAC alleges that "[a]lthough the proportion of MoM hip-replacement devices on the United States market had begun to decline by 2010, according to the FDA, in 2010, a full 27 percent of all total hip-replacement surgeries were MoM device surgeries."  (SAC ¶ 443). "During relevant periods, DePuy's two MoM hip implant products (the Pinnacle and the ASR XL) had captured 75 percent of the Metal on Metal hip-replacements market.  Prior to 2010, the Pinnacle constituted roughly 50 percent of DePuy's MoM hip-replacement sales."  (SAC ¶ 444). The SAC alleges that "[g]iven the August 2010 recall of the ASR, the Pinnacle would have constituted at least 70 percent of DePuy's Metal on Metal hip-replacement sales."  (SAC ¶ 445). Therefore, according to the SAC, "between 2005 and 2010, nearly 850 Pinnacle devices were purchased by New York State Medicaid."  (SAC ¶ 446).  The relators estimate that the diametrical clearance defect affected 14.93 percent of "explant head[s]" and 50.41 percent of "explant liner[s]."  (SAC ¶ 447).  Thus, "relators estimate that nearly 425 Pinnacle devices bearing the diametrical clearance manufacturing defect would have been paid for by New York State Medicaid between 2005 and 2010."  (SAC ¶ 448).  Based on the alleged 14 percent five-year failure rate in Pinnacle's internal system, the relators allege that between 2005 and 2010, "nearly 130 Pinnacle devices paid for by New York State Medicaid would have failed in patients at [five] years."  (SAC ¶ 451).

**b.      Alleged Direct False Claims**

The SAC alleges that the VA entered into two contracts with DePuy "that include the sale of the Pinnacle hip implants."  (SAC ¶ 474).  The SAC alleges:

On February 21, 2006, DePuy was awarded an Orthopaedics Implant contract worth $8,042,500 by the VA National Acquisition Center with the Procurement Instrument Identifier V797P-9 l 88.  The VA Point of Contact for the contract was Deborah Koval.

On April 29, 2011 DePuy entered into another Indefinite Delivery contract with the VA National Acquisition Center with the Procurement Instrument Identifier VA-797P-0263.  The VA NAC Point of Contact was Timothy Richards and the DePuy Contract Point of Contact was Michelle Roberts. Since 2011, this contract has involved payment for dozens of Pinnacle components.

(SAC ¶¶ 476-77).

The SAC then alleges that the following twelve "purchases" by the VA are

"representative claims" for purposes of the False Claims Act.  (SAC ¶¶ 479-90).

479.  [O]n January 18, 2011, VA employee Aryeh Lax from Los Angeles, California ordered a "SUMMIT FEMORAL STEM" and "ARTICUL/EZE METAL ON MET AL FEMORAL HEAD" from DePuy.  This order obligated the VA to pay $3,358.38.

480.  On January 30, 2011, Lax ordered a "SUMMIT FEMORAL STEM" and "ARTICUL/EZE METAL ON METAL FEMORAL HEAD" from DePuy.  This order obligated the VA to pay $3,358.38.

481.  On February 27, 2011, Lax ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $4,779.50.

482.  On June 1, 2012, VA employee Scott Delancey from Grand Junction ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $3,967.00.

483.  On September 29, 2011, VA employee Loretta Henry McLain from Los Angeles ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $8,712.14.

484.  On September 27, 2012, VA employee Kami Wiggins from Martinsburg ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $15,228.50.

485.  On September 28, 2007, Naval Medical Center employee Jojie Urrete from San Diego, California ordered a "Pinnacle metal on metal" device from DePuy. This order obligated the Navy to pay $8,000.00.

486.  On February 22, 2008, Urrete ordered a "Summitt (sic) Pinnacle metal on

26

metal" device from DePuy.  This order obligated the Navy to pay $13,000.00.

487.  On June 18, 2007, Department of the Army employee Ann Slagle from Tacoma, Washington ordered a "SUMMIT METAL ON METAL" device from DePuy.  The Summit stem is one of the parts of the Pinnacle Hip replacement system.  This order obligated the Army to pay $9,000.00.

488.  On February 7, 2008, Naval Medical Center employee C. Johnson from San Diego, California ordered a "Srom Metal on Metal" device form DePuy.  The S-Rom is a metal head used as a part of the Pinnacle Hip replacement system.  This order obligated the Navy to pay $9,000.00.

489.  On July 5, 2007, Department of the Army employee Amparo Hall from Tacoma, Washington ordered "SUMMIT METAL ON METAL SYS."  The Summit stem is one of the parts of the Pinnacle Hip replacement system.  This order obligated the Army to pay $10,000.00.

490.  On July 12, 2007, Department of the Army employee Amparo Hall from Tacoma, Washington ordered "SUMMIT METAL ON METAL SYSTEM."  The Summit stem is one of the parts of the Pinnacle Hip replacement system.  This order obligated the Army to pay $10,000.00.

**B.**      **Procedural Background**

On May 18, 2012, the relators filed the original complaint in this case under seal.[6]  The complaint alleged, among other things, violations of the False Claims Act.  The FCA claims were pursued by the relators on behalf of the United States as a *qui tam* action.  The Court granted the relators' motion to file an amended complaint on December 2, 2013.  On July 29, 2014, the government filed a notice declining to intervene in this case.  On August 13, 2014, the case was partially unsealed.  On May 4, 2015, the relators filed under seal a motion to file a second amended complaint.  DePuy opposed that motion on May 26, 2015.  On June 5, 2015, the Court granted the relators' motion to amend the complaint and deemed the SAC, effectively the relators' third complaint, as the operative complaint.

---

[6] The case was initially assigned to Judge O'Toole, then was reassigned to this judge on August 10, 2012, then was reassigned to Judge Talwani on June 26, 2014, and finally reassigned back to this judge on October 8, 2014.

The SAC, which remains sealed, alleges claims of (1) causing false or fraudulent claims for payment to be presented to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) (Count One); (2) knowingly making, using, or causing to be made or used false records or statements material to a false of fraudulent claim paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(B) (Count Two); (3) conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C) (Count Three); and (4) violations of various state analogues to the FCA (Counts Four through Thirty-Seven).

On June 29, 2015, DePuy filed a motion to dismiss.  DePuy contends that the relators' FCA claims fail to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6), and that they also fail to satisfy the pleading requirements of Fed. R. Civ. P. 9(b).  DePuy also contends that the conspiracy and state-law FCA claims should be dismissed for the same reasons.

On August 24, 2015, the relators moved to unseal the SAC.  DePuy assented to that motion on September 2, 2015, but requested that other documents also be unsealed, including (1) the relators' motion to unseal the SAC, their accompanying memorandum of law and exhibits, and DePuy's response and accompanying exhibits; and (2) all documents and filings related to DePuy's motion to dismiss.

## II.   <u>Legal Standard</u>

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do

not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer*

*Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks

omitted).

**III.**    **Analysis**

   **A.**    **Counts One and Two:  Federal FCA Claims**

   Counts One and Two of the SAC allege violations of the FCA. Under the FCA, it is

unlawful for a person or entity to (1) knowingly present, or cause to be presented, a false or

fraudulent claim for payment or approval to the United States, (2) knowingly make, use, or cause

to be made or used, a false record or statement material to a false or fraudulent claim; or

(3) conspire to commit a violation of the statute. 31 U.S.C. §§ 3729(a)(1)(A)-(C). To be

actionable under the FCA, a false statement must be material to a false claim—that is, the false

statement must "hav[e] a natural tendency to influence, or be capable of influencing, the payment

or receipt of money or property." *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300,

307 (1st Cir. 2010) (quoting 31 U.S.C. § 3729(b)(4)).

   Private persons, known as relators, can file civil *qui tam* actions on behalf of the United

States against persons or entities who violate the act. 31 U.S.C. § 3730(b). The government can

intervene in a *qui tam* action and assume primary responsibility over it. *Id.* §§ 3730(b)(2), (b)(4),

(c)(1). The relator is eligible to collect a portion of any damages awarded in a *qui tam* action,

whether or not the government intervenes. *Id.* § 3730(d).

1.    **Rule 9(b)**

DePuy contends that the FCA claims should be dismissed because the SAC does not

satisfy the pleading requirements of Fed. R. Civ. P. 9(b).  That rule requires that "[i]n alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake."  Fed. R. Civ. P. 9(b).  The heightened pleading requirements of Rule 9(b) apply to

claims brought under all three subsections of the FCA.  *United States ex rel. Ge v. Takeda*

*Pharm. Co.*, 737 F.3d 116, 123-24 (1st Cir. 2013).[7]  The First Circuit explained the reasoning for

applying those requirements to FCA claims in *United States ex rel. Duxbury v. Ortho Biotech*

*Products, L.P.* ("*Duxbury II*"):  "Although [the FCA's] financial incentive encourages would-be

relators to expose fraud, it also attracts parasitic relators who bring FCA damages claims based

on information within the public domain or that the relator did not otherwise discover."  719 F.3d

31, 33 (1st Cir. 2013) (citations and internal quotation marks omitted).  "For those reasons, there

are a number of limitations on *qui tam* actions, including the particularity requirements of Rule

9(b)."  *Ge*, 737 F.3d at 123 (citing *Duxbury II*, 719 F.3d at 33).

a.    **Direct Claims**

For allegations of direct false claims under 31 U.S.C. § 3729(a)(1)(A), "[r]elators are

required to set forth with particularity the 'who, what, when, where, and how' of the alleged

fraud."  *Ge*, 737 F.3d at 123 (quoting *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F.

Supp. 2d 141, 147 (D. Mass. 2000)).  "Because FCA liability attaches only to false *claims*,

merely alleging facts related to a defendant's alleged *misconduct* is not enough.  Rather, a

complaint based on § 3729(a)(1)(A) must 'sufficiently establish that false claims were submitted

---

[7] "We recognize that . . . the 'presentment' requirement applies only to . . . subsection (a)(1)(A) claims and not . . . subsection (a)(1)(B) or subsection (a)(1)(C) claims.  However, Rule 9(b)'s particularity requirement applies with full force to all three subsections [of the FCA]."  *Ge*, 737 F.3d at 124-25 n.5.

for government payment' as a result of the defendant's alleged misconduct." *Id.* at 124

(emphasis in original) (quoting *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 733 (1st

Cir. 2007)).  Indeed, "[e]vidence of an actual false claim is the *sine qua non* of a False Claims

Act violation." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225

(1st Cir. 2004) (internal citations omitted), *abrogated on other grounds by Claudio-De Leon v.

Sistema Universitario Ana G. Mendez*, 775 F.3d 41 (1st Cir. 2014); *see also United States v.

Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) ("[T]he [FCA] statute attaches liability, not to the

underlying fraudulent activity or to the government's wrongful payment, but to the claim for

payment.").

     As the First Circuit explained in *Ge* concerning the particularity requirement for pleading

false claims:

> A relator must provide details that identify particular false claims for payment that
> were submitted to the government.  In a case such as this, details concerning the
> dates of the claims, the content of the forms or bills submitted, their identification
> numbers, the amount of money charged to the government, the particular goods or
> services for which the government was billed, the individuals involved in the
> billing, and the length of time between the alleged fraudulent practices and the
> submission of claims based on those practices are the types of information that
> may help a relator to state his or her claims with particularity.  These details do
> not constitute a checklist of mandatory requirements that must be satisfied by
> each allegations included in a complaint.  However, we believe that some of this
> information for at least some of the claims must be pleaded in order to satisfy
> Rule 9(b).

737 F.3d at 124 (internal quotation marks and alterations omitted) (quoting *Karvelas*, 360 F.3d at

232-33); *see also United States ex rel. Escobar v. Universal Health Servs.*, 780 F.3d 504, 515

(1st Cir. 2015) (noting that while there was no "mandatory checklist" to satisfy the particularity

requirement, relators "succeeded in linking their allegations of fraud to specific claims for

payment" because the complaint "allege[d] twenty-seven separate dates on which claims were

submitted in connection with Yarushka's care, each time including the relevant billing codes,

amount invoiced, and the name of the [ ] staff member who provided the treatment for which reimbursement was sought"), *cert. granted*, 136 S. Ct. 582 (2015).

Here, the SAC alleges that the VA purchased twelve hip devices directly from DePuy pursuant to two procurement contracts. (SAC ¶¶ 473-90). Those alleged false claims, however, do not satisfy Rule 9(b)'s heightened pleading requirements.

First, ten of the twelve alleged claims do not allege with sufficient particularity that the VA purchased the specific DePuy product that is the sole focus of this action: the Pinnacle MoM hip-implant device. (*See* SAC ¶¶ 494, 500). As described above, DePuy manufactured Pinnacle devices that had various combinations of head, liner, and cup materials, including "metal-on-metal, ceramic-on-polyethylene, or metal-on-polyethylene." (SAC ¶¶ 176-77; Def. Mem. Ex. C at 5). The alleged defects concern the interaction of a metal head with a metal liner in a Pinnacle device. There was only one head and liner combination of Pinnacle parts that produced a Pinnacle metal-on-metal, or MoM, device: a M-Spec or aSphere M-Spec head with an Ultamet or Ultamet XL liner. (SAC ¶¶ 176-77; Def. Mem. Ex. C at 3).

Before turning to the specific alleged false claims, the Court notes that the SAC uses the terms "Pinnacle" and "MoM" inconsistently. In paragraph 6, the SAC states that "Relators Antoni Nargol and David Langton—world-renowned experts on hip-implant products—allege that DePuy submitted false claims for payment for one of DePuy's MoM devices: the Pinnacle Acetabular Hip System ('Pinnacle')." (SAC ¶ 6). It is unclear whether the relators intended to define "Pinnacle" to mean "the Pinnacle Acetabular Hip System" (which comprises metal, ceramic, and polyethylene products) or to mean the metal-on-metal subset of Pinnacle devices. Seven paragraphs later, relators use the specific term "MoM." (*See* SAC ¶ 13) ("In one June 2010 email, a top DePuy executive admitted to Dr. Langton that, were DePuy to conclude from

Relators' research that its MoM parts 'were out of specification,' the Company would 'need to

notify patients if we have made a serious manufacturing error.'").  And in the 200-paragraph

section detailing the alleged DePuy misrepresentations, relators use the term "MoM"

consistently.  (*See, e.g.*, SAC ¶¶ 201, 248, 259, 273, 277, 279, 307, 310-11, 314, 316, 319-20,

334, 338, 340, 343-44, 348-49, 351-52, 361, 379, 395-96).  The complaint thus seems to make

clear that the only relevant fraudulent activity involved Pinnacle metal-on-metal devices.  But in

the section that alleges the proposed false claims, the relators use vague terms such as "Pinnacle

products" or refer to products that are not a part of the Pinnacle system at all.

### i.  Paragraphs 479-480

> *479.  [O]n January 18, 2011, VA employee Aryeh Lax from Los Angeles, California ordered a "SUMMIT FEMORAL STEM" and "ARTICUL/EZE METAL ON METAL FEMORAL HEAD" from DePuy.  This order obligated the VA to pay $3,358.38.*

> *480.  On January 30, 2011, Lax ordered a "SUMMIT FEMORAL STEM" and "ARTICUL/EZE METAL ON METAL FEMORAL HEAD" from DePuy.  This order obligated the VA to pay $3,358.38.*

Depuy's marketing materials demonstrate that the "Summit femoral stem" is not a

Pinnacle product, and even the relators appear to concede that it is not part of the Pinnacle MoM

device.  (*See* SAC ¶ 396) ("[T]he surface roughness manufacturing defect also affects devices

*other than the Pinnacle MoM . . . .*  These affected devices include DePuy's S-ROM, SUMMIT,

CORAIL, and AML hip replacement products." (emphasis added)).  The "Articul/eze metal-on-

metal femoral head" does not appear to be a Pinnacle component because the only Pinnacle

metal heads were the "aSphere M-Spec," the "M-Spec," and the "Standard Metal."  (*Compare*

SAC ¶¶ 176-77, *and* Def. Mem. Ex. C at 3, *with* SAC ¶¶ 479-80).  Furthermore, neither

paragraph mentions a DePuy Pinnacle liner, much less an Ultamet metal liner.  Thus, even

assuming the Articul/eze head is metal and part of the Pinnacle device—which it is not—those

paragraphs allege only part of a MoM device and ignore the liner.  Finally, paragraphs 479 and

480 allege only "orders."  They do not allege that those orders formed the basis of any actual

claims that were presented to the VA.

### ii.    Paragraphs 481-484

*481.  On February 27, 2011, Lax ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $4,779.50.*

*482.  On June 1, 2012, VA employee Scott Delancey from Grand Junction ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $3,967.00.*

*483.  On September 29, 2011, VA employee Loretta Henry McLain from Los Angeles ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $8,712.14.*

*484.  On September 27, 2012, VA employee Kami Wiggins from Martinsburg ordered a Pinnacle product from DePuy.  This order obligated the VA to pay $15,228.50.*

A "Pinnacle product" could refer to any combination of DePuy's three Pinnacle heads

and three Pinnacle liners.  (Def. Mem. Ex. C at 3).  Only a "M-Spec" head and "Ultamet" liner

combined to create the Pinnacle MoM device.  It is therefore unclear whether any of the products

in question are even metal-on-metal devices.  Also, the prices alleged in paragraphs 481 through

484 vary significantly.  If those four "Pinnacle products" were all Pinnacle MoM devices, one

would expect the prices to be at least somewhat similar.  And as noted above, paragraphs 481

through 484 allege only "orders," not claims.

### iii.    Paragraphs 487-490

*487.  On June 18, 2007, Department of the Army employee Ann Slagle from Tacoma, Washington ordered a "SUMMIT METAL ON METAL" device from DePuy.  The Summit stem is one of the parts of the Pinnacle Hip replacement system.  This order obligated the Army to pay $9,000.00.*

*488.  On February 7, 2008, Naval Medical Center employee C. Johnson from San*

34

*Diego, California ordered a "Srom Metal on Metal" device form DePuy.  The S-Rom is a metal head used as a part of the Pinnacle Hip replacement system.  This order obligated the Navy to pay $9,000.00.*

*489.  On July 5, 2007, Department of the Army employee Amparo Hall from Tacoma, Washington ordered "SUMMIT METAL ON METAL SYS."  The Summit stem is one of the parts of the Pinnacle Hip replacement system.  This order obligated the Army to pay $10,000.00.*

*490.  On July 12, 2007, Department of the Army employee Amparo Hall from Tacoma, Washington ordered "SUMMIT METAL ON METAL SYSTEM."  The Summit stem is one of the parts of the Pinnacle Hip replacement system.  This order obligated the Army to pay $10,000.00.*

Confusingly, paragraphs 487, 489, and 490 allege that the Summit femoral stem is part of the "Pinnacle Hip replacement system."  But as noted above, even the relators allege elsewhere in the SAC that the Summit stem is a different product from the Pinnacle MoM device.  (*See* SAC ¶ 396).  In fact, Summit stems could be used with entirely different hip-replacement systems, such as the ASR.  (Def. Mem. Ex. D at 29).  Paragraph 488 alleges an order of a S-Rom metal femoral head and alleges that the S-Rom was part of the "Pinnacle Hip replacement system."  But DePuy's marketing materials, which the SAC incorporates, show that S-Rom heads were not part of the Pinnacle system.  (Def. Mem. Ex. C at 3).

Thus, paragraphs 479 through 484 and 487 through 490 do not even allege that DePuy presented false claims to the VA for the only device relevant to this action, nor do they plead those "orders" with sufficient particularity to satisfy Rule 9(b).  Only two of the twelve direct orders alleged in the SAC actually refer to a Pinnacle MoM device—the two alleged in paragraphs 485 and 486.  (SAC ¶¶ 485-86).

### iv.    <u>Paragraphs 485-486</u>

*485.  On September 28, 2007, Naval Medical Center employee Jojie Urrete from San Diego, California ordered a "Pinnacle metal on metal" device from DePuy.  This order obligated the Navy to pay $8,000.00.*

35

> 486.  On February 22, 2008, Urrete ordered a "Summitt (sic) Pinnacle metal on metal" device from DePuy.  This order obligated the Navy to pay $13,000.00.

To plead direct false claims pursuant to 31 U.S.C. § 3729(a)(1)(A), a complaint must allege at least some hallmarks of particularity.  The First Circuit has provided a non-exhaustive list, including

> details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices . . . .

*Karvelas*, 360 F.3d at 228; *see also Ge*, 737 F.3d at 124.  Following the decisions in *Karvelas* and *Ge*, several judges in this district have held that "[i]n cases where the defendant directly presents the claim to the government, the plaintiff must provide details identifying particular false claims submitted, including who filed the claims, the content of the claims, when such claims were submitted, where such claims were submitted, and how much it sought in payment." *United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 275 (D. Mass. 2010) (citing *Karvelas*, 360 F.3d at 225); *see also United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 352 (D. Mass. 2011) (noting that relators must plead "which [of defendant's] personnel engaged in [the] conduct, where such conduct took place, which VA personnel were involved, [and] any specific fraudulent statements made to personnel at the Veterans Administration").  The two descriptions of "orders" set forth in paragraphs 485 and 486 fail to allege with sufficient particularity that DePuy presented false claims to the VA.

First, the allegations focus entirely on the actions of a Naval Medical Center employee and do not specifically allege any actions by DePuy concerning the orders.  The SAC lists *orders* by the employee requesting a Pinnacle MoM product, but it does not include any details about alleged *claims* or any actions by DePuy employees in relation to the orders.  Paragraphs 485 and

486 do not even allege that DePuy in fact filled the orders and delivered the devices to the Naval

Medical Center.  Nor are there any allegations that DePuy invoiced the VA for the ordered

products or requested payment, other than the broad allegation that the orders "obligated the

Navy to pay" certain amounts.  The paragraphs do not allege an order number or any other

source-identifying information about any particular claim.  There is no indication that any DePuy

employee solicited, processed, or even knew about those alleged orders.

Second, the allegations fail to allege any details about the products themselves and how

they caused the claim in question (if there was a claim) to be *false*.  There is no allegation, for

example, that those two specific products actually failed, had to be replaced, or were otherwise

defective.  Indeed, paragraphs 485 and 486 do not even allege that the ordered products were in

fact implanted in a patient, or when, where, and by which doctor.  In short, the SAC pleads no

specific details that would suggest that the two orders resulted in false claims.

The relators rely on *United States ex rel. Rodwell v. Excelitas Technologies, Corp.*, 2015

WL 3766866 (D. Mass. June 16, 2015), in support of their contention that the complaint is

sufficient.  In *Rodwell*, the court denied the defendant's motion to dismiss on Rule 9(b) grounds

even though the relator "d[id] not identify any particular claim or invoice submitted to the

government."  *Id.* at *6.  But in *Rodwell*, the relator identified specific contracts that the

defendant had with the government, the specific terms of those contracts, and three batches of

product orders that the government placed pursuant to those contracts, including the specific

models of products ordered, specific quantities of each model ordered (more than one thousand

in total), and the specific costs to the government.  *Id.*

Here, however, the relators' allegations about DePuy's two alleged contracts are vague as

to what products they covered, what their terms were, and whether DePuy presented the VA with

37

any false claims for Pinnacle MoM devices pursuant to those contracts.  Notably, the SAC does

not connect the two contracts to any of the twelve alleged orders in paragraphs 479 through 490.

The SAC generally describes the Federal Supply Schedule Service ("FSS") and Federal Supply

Schedule Group 65 Part II Section A ("65 II A contract").  (SAC ¶¶ 114-15).  But although the

SAC describes the two VA contracts, it never actually alleges that DePuy had an FSS contract

with the VA.  (SAC ¶ 474).  The SAC does not allege that either the 2006 "Orthopaedics Implant

contract" (SAC ¶ 476) or the 2011 "Indefinite Delivery contract" (SAC ¶ 477) were FSS 65 II A

contracts that would be governed by FDA regulations.  Nor does the SAC include the contracts

as attachments or quote relevant content from their terms.  In fact, the SAC does not cite any

terms of those specific alleged contracts at all.  And finally, unlike in *Rodwell*, the SAC here

contains no allegations about the specific products purchased pursuant to the contracts.  In

*Rodwell*, the relators included specific product models and quantities.  Here, the SAC vaguely

alleges that DePuy sold an unknown number of "Pinnacle Hip Implant products" under the

contracts, without alleging that the contracts covered the sale of the Pinnacle MoM device.

(SAC ¶ 478).

In sum, the SAC spends more than two hundred paragraphs detailing misrepresentations

and false statements that DePuy allegedly made to the FDA and surgeons, including the relators

themselves.  (*See* SAC ¶¶ 201-412).  It alleges in general terms that "the government directly

purchased . . . hundreds of thousands of Pinnacle products."  (SAC ¶ 7).  But ten of the twelve

allegedly false claims do not even refer to the only product relevant to this suit:  the Pinnacle

metal-on-metal device.  For the two remaining "orders," the SAC fails to plead with sufficient

particularity the who, what, when, where, and how of a single false claim that DePuy presented

to the VA.  Accordingly, the relators' claims pursuant to 31 U.S.C. § 3729(a)(1)(A) will be dismissed for failure to meet the heightened pleading requirements of Rule 9(b).

### b.   Indirect Claims

The SAC alleges that DePuy is liable under 31 U.S.C. § 3729(a)(1)(B) because it made false statements and omissions that were material to the claims of third-party surgeons to government health-care programs such as Medicare and Medicaid.  DePuy contends that the claim should be dismissed under Rule 9(b) because the SAC fails to allege any specific false claims and because it fails to suggest an inference of fraud beyond a mere possibility.

The First Circuit has distinguished pleading standards for direct claims, or sales to the government, which are governed by 31 U.S.C. § 3729(a)(1)(A), from indirect claims to the government where a defendant causes third-parties to submit false claims, which are governed by 31 U.S.C. § 3729(a)(1)(B).  *See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009) ("*Duxbury I*").  "In a *qui tam* action in which the defendant is alleged to have induced third parties to file false claims with the government, a relator can satisfy this requirement by 'providing factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim.'"  *Ge*, 737 F.3d at 123-24 (quoting *Duxbury I*, 579 F.3d at 29).  Thus, a *qui tam* complaint alleging that a defendant induced a third party to submit false claims to the government for reimbursement must allege two things to satisfy Rule 9(b):  (1) particular details of a scheme to cause the submission of false claims to the government; and (2) factual or statistical evidence that strengthens the inference of fraud on the government beyond a mere possibility.  *Duxbury I*, 579 F.3d at 29.

The SAC pleads a single representative indirect claim in paragraph 414.  The relators contend that, even standing alone without further support, the allegation is sufficient to defeat

DePuy's motion to dismiss.  Specifically, the SAC alleges that on November 12, 2007, patient "'F.I.' was implanted with a DePuy Pinnacle hip implant" by a surgeon in New York.  (SAC ¶ 414).  For the reasons explained above, such a claim does not meet the requirements of Rule 9(b); it does not identify the specific Pinnacle MoM device that is the subject of the present controversy.  Put another way, the SAC does not allege that the surgeon presented a claim to Medicaid for a Pinnacle MoM device, as opposed to a Pinnacle device with a ceramic head or a polyethylene liner.

Accordingly, without alleging any details as to a specific false claim for the relevant DePuy Pinnacle device, the relators must rely on the SAC's other factual and statistical evidence to strengthen the inference of fraud beyond a mere possibility.  That evidence, however, fails to satisfy the requirements of Rule 9(b) as described by the First Circuit in *Ge* and *Duxbury I*.

In *Ge*, the relator's complaint alleged that the defendant pharmaceutical company had failed to file accurate and timely adverse event reports with the FDA, and that if it had done so, numerous claims for those pharmaceuticals would not have been submitted to the federal government.  737 F.3d at 119-21.  The FCA claim was dismissed because the relator "made no attempt in her complaints to allege facts that would show that some *subset* of claims for government payment for the four subject drugs was rendered false as a result of [defendant's] alleged misconduct."  *Id.* at 124 (emphasis in original).  "What is missing are any supporting allegations upon which her conclusion rests and any particulars."  *Id.*

In contrast, the court in *Duxbury I* found that the complaint sufficiently alleged factual evidence to sustain an inference of fraud.  579 F.3d at 30.  The relator alleged that kickbacks provided by the defendant resulted in the submission of false claims by eight named health-care providers in the state of Washington.  *Id.*  The court concluded that those eight specific

allegations were sufficient factual support to satisfy the requirements of Rule 9(b), although it

described the matter as "a close call."  *Id.*; *see also Ge*, 737 F.3d at 124 (referring to the

allegations in *Duxbury I* as "barely adequate").

In *Duxbury I*, the First Circuit quoted one of the specific allegations the plaintiff made in

that case:

> In 1997-98 Western Washington Treatment Center in Olympia, Washington,
> received more than $5,000 of free commercially packaged ProCrit from
> [defendant] under the direction of Robert Ashe so that Western Washington could
> submit the free product for reimbursement to Medicare under the false and
> fraudulent certification that the provider had paid for the product.  [Defendant]
> intended the free commercially packaged ProCrit to be a "cash equivalent"
> "kickback" to Western Washington in order to induce the provider to purchase
> ProCrit and to administer ProCrit at the "off-label" once a week dosing regiment.
> Western Washington was reimbursed by Medicare for the free commercially
> packaged ProCrit.  As a result, [defendant] knowingly caused the presentation by
> Western Washington of these false claims to the United States Government.

579 F.3d at 30.  The court concluded that the complaint's collection of eight specific examples of

similar specificity, along with other allegations of the defendant's fraudulent scheme, were

adequate (if "barely" so) to satisfy the requirements of Rule 9(b).  *Id.*  As the court noted, the

plaintiff "identified, as to each of the eight medical providers (the who), the illegal kickbacks

(the what), the rough time periods and locations (the where and when), and the filing of the false

claims themselves."  *Id.*

This Court has recently addressed another FCA case that presented a close call and found

that the complaint satisfied the standards set forth in *Duxbury I* because the relator identified

"one of defendants' sales representatives, the doctor, and the patient (the who), the specific

misrepresentations made by the defendants (the what), time periods and locations (the where and

when), and the filing of the false claims themselves."  *See United States ex rel. Leysock v. Forest

Labs., Inc.*, 55 F. Supp. 3d 210, 219 (D. Mass. 2014).

Here—setting aside for the moment the SAC's statistical allegations—the factual allegations in the SAC more closely resemble those rejected in *Ge* than those that were acceptable *Duxbury I* and *Leysock*.  In *Duxbury I*, the relator alleged that specific employees of the defendant received kickbacks from specific health-care providers *and* that the kickbacks resulted in a false claim.  In *Leysock*, the relator alleged that specific physicians were the targets of defendants' off-label marketing and relied on that marketing, and alleged the specific dates that the physicians filled the prescriptions.  The SAC here fails to connect the multiple allegations of DePuy's misrepresentations and omissions to any specific claims for payment.  Nor does the SAC appear to identify a single physician who was a target of allegedly false DePuy marketing, identify a single physician who relied on that marketing, or identify a single physician who filed a false claim for the DePuy MoM device.  The closest that the SAC comes to such specificity is "Dr. J.N." and "patient F.I.", but the SAC does not identify the specific representations or materials that the doctor received and relied upon, nor does it allege the specific DePuy device for which the doctor filed a claim.  (*See* SAC ¶¶ 414-24).[8]

Furthermore, the SAC's unfocused and imprecise statistical evidence adds little to establish DePuy's fraud beyond a mere possibility.  The SAC alleges that more than one million metal-on-metal devices were sold worldwide "[d]uring the times relevant to this complaint," and that in 2010, more than 300,000 "hip-replacement surgeries were performed in the United States."  (SAC ¶¶ 434, 436).  Therefore, according to the SAC, because "the Pinnacle MoM hip was one of the most widely used hip-replacement systems that remained in the international marketplace," as a matter of logic "it follows that hundreds of thousands of Pinnacle products were implanted in government healthcare recipients and reimbursed by the government during

---

[8] It is also noteworthy that the allegations with regard to that order are based on mere "information and belief."  (SAC ¶¶ 414-24).

the lifespan of the product." (SAC ¶¶ 434, 437). Those statistical allegations are not sufficiently precise or consistent as to the geographical scope, time period, or product type to maintain an inference of fraud. The broad statistical claims made here could be made about virtually any successful medical device or product.[9]

Finally, to the extent that the relators contend that every indirect claim for reimbursement of the Pinnacle MoM device was false because the device's defects made it "not reasonable and necessary" under 42 U.S.C. § 1395y(a)(1)(A), such an argument must fail. Surely to survive a motion to dismiss pursuant to Rule 9(b) and Rule 12(b)(6), the relators must do more than allege that a product's alleged defects automatically make it unreasonable and unnecessary. Such a theory of liability, if allowed to proceed, would convert almost any product-liability suit into one that also states a claim under the False Claims Act.

In short, the SAC is slightly more detailed than the complaint in *Ge*, which the First Circuit found to be inadequate under Rule 9(b). It contains, however, almost no specific allegations as to actual false claims in comparison to the detailed eight claims in *Duxbury I*, which the First Circuit said was "barely adequate" and where dismissal was considered a "close call." Accordingly, DePuy's motion to dismiss will be granted as to the federal FCA claims (Counts One and Two) for failure to comply with the requirements of Rule 9(b).

---

[9] If the rule were otherwise, virtually any claim of misrepresentation or a product defect involving medical devices, pharmaceuticals, or other medical products could be brought as a *qui tam* action. Government health-care programs such as Medicare and Medicaid represent a huge portion of health-care expenditures in the United States. As a matter of logic, any scheme that causes unreasonable or unnecessary purchases of a product or service will almost certainly result in the submission of some false claim, by someone, somewhere, to the federal government. Rule 9(b), however, requires something more than conclusory allegations that false claims must have resulted from the misconduct. *See Ge*, 737 F.3d at 124 (stating that the court "reject[s] [the] approach" sought by the relator, which was "a *per se* rule that if sufficient allegations of misconduct are made, it necessarily follows that false claims and/or material false information were filed").

2.      **Rule 12(b)(6)**

DePuy also contends that the relators' federal FCA claims pursuant to § 3729(a)(1)(A)-

(B) should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Specifically,

DePuy contends that the SAC fails to state a claim because even if it made misstatements about

the Pinnacle MoM device, the relators fail to allege that those misstatements resulted in any

claims that were actually "false" as the First Circuit interpreted the meaning of the term in

*United States ex rel. Escobar v. Universal Health Services*, 780 F.3d 504, 512 (1st Cir. 2015).[10]

After the Court held a hearing on DePuy's motion to dismiss, the Supreme Court, on

December 3, 2015, granted a petition for review of the First Circuit's decision in *Escobar.  See*

*Universal Health Servs., Inc. v. United States*, No. 15-7, 136 S. Ct. 582.  As explained more fully

below, a complicated circuit split on the issues of (1) implied certification and (2) conditions of

participation versus conditions of payment will continue to affect FCA cases until the Supreme

Court issues its ruling in *Universal Health Services*.  It does not appear that the Supreme Court

has set a briefing schedule or argument date, and the Court very well could resolve some issues

while reserving others for remand to the First Circuit.  Thus, it appears unlikely that the FCA

issues presented by *Escobar* and related cases in other circuits—namely, what suffices as a

"false" claim—will be resolved within the next year.  In any event, the Court has already reached

a resolution of the relators' federal FCA claims on the independent grounds of Rule 9(b).

Accordingly, the Court will defer ruling on the Rule 12(b)(6) issues.

---

[10] DePuy also contends that the SAC fails to allege that DePuy made any false statements in submitting or causing third-parties to submit false claims that were "material" to the government's decision to reimburse the claim.  In most cases, materiality issues are not appropriate for resolution on the pleadings because the element, as defined by the First Circuit, is highly dependent on the facts.  *See, e.g.*, *Loughren*, 613 F.3d at 308 (noting that "materiality in the FCA context involves a factual determination of the weight that the decisionmaker would have given particular information").  Because the Court has resolved the present motion on the narrower issue of Rule 9(b)'s pleading requirements—along with the fact that *Escobar* would need to be resolved by the Supreme Court— the Court will not address DePuy's second argument.

As noted, the False Claims Act proscribes "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" and "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  To be actionable, a false or fraudulent claim or statement must also be material to the government's decision to pay a claim.  *See Loughren*, 613 F.3d at 307 ("We have long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material.").

As one judge in this district has recently noted since the First Circuit's decision in *Escobar*, "[f]alse statements come in the full spectrum of shades of gray, and the False Claims Act provides little help to courts attempting to separate actionable ones from permissible ones." *United States ex rel. Bierman v. Orthofix Int'l, N.V.*, 2015 WL 4197551, at *3 (D. Mass. July 1, 2015) (Zobel, J.).  Some circuits have announced fixed rules to determine whether a claim is actionable by separating various types of false claims into categories.  One such categorization divides claims and statements that are factually false (such as when a contractor does not provide the product for which reimbursement is sought) from those that are legally false (such as false certifications of compliance with statutes or regulations).  *See, e.g.*, *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008); *Mikes v. Straus*, 274 F.3d 687, 696-97 (2d Cir. 2001).

But the disagreement among the circuits about the meaning of a false claim exists at two further levels of categorization.  First, one categorization divides legally false statements into groups based on theories of "express" certification and "implied" certification.  *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305-06 (3d Cir. 2011) (collecting cases).  Under the theory of express certification, a company faces liability under the FCA by

fraudulently and expressly certifying compliance with a statute, regulation, or contractual provision when submitting a claim for payment. *Id.* Under the theory of implied certification, a company may face liability even if it did not certify compliance with a statute or regulation when submitting the claim, but instead made an earlier, more general certification. *Id.* The Seventh Circuit has recently adopted only express certification and rejected all theories of implied certification. *See United States v. Sanford-Brown, Ltd.*, 2015 WL 3541422, at *12 (7th Cir. June 8, 2015) ("Although a number of other circuits have adopted the so-called doctrine of implied false certification . . . we decline to join them . . . ."). Other circuits however, including the First Circuit, have accepted, to varying degrees, the theory of implied certification.[11]

Second, the circuits that have accepted the implied certification theory are further divided. Every circuit to accept implied certification requires that compliance with a statute, regulation, or contractual provision that is allegedly violated must be a condition of payment by the government payor. There is disagreement among the circuits, however, as to whether a condition of payment must be expressly identified as such, or whether a statute, regulation, or contractual provision can be a condition of payment if it does not state that payment is conditioned on compliance. The Second and Sixth Circuits fall into the former category, concluding that a company impliedly certifies compliance with a statute, regulation, or contractual provision for purposes of FCA liability only if the government expressly conditions payment on compliance. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011); *Strauss*, 274 F.3d at 700-02. In other words, according to those circuits, the legal obligation in question must be explicitly designated as a condition of *payment*. Conversely, the First, Fourth,

---

[11] Although the First Circuit has "eschewed distinctions" used by other circuits in describing types of FCA claims, as discussed below, it appears that the court in *Escobar* applied a theory of implied certification. 780 F.3d at 512.

46

and D.C. Circuits do not require a legal obligation to be expressly identified as a condition of payment; instead, those circuits have found "implied conditions of payment"—sometimes referred to as conditions of participation—without explicit language in the relevant statute, regulation, or contract.  *See Escobar*, 780 F.3d at 513-14; *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 636 (4th Cir. 2015); *United States v. Science Apps. Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) ("*SAIC*").

In *Escobar*, the First Circuit declared that it had "eschewed distinctions between factually and legally false claims, and those between implied and express certification theories, reasoning that they 'create artificial barriers that obscure and distort [the statute's] requirements.'" *Escobar*, 780 F.3d at 512 (quoting *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 385 (1st Cir. 2011)).  Instead, the court wrote that it takes "a broad view of what may constitute a false or fraudulent statement to avoid 'foreclos[ing] [False Claims Act] liability in situations that Congress intended to fall within the Act's scope,'" *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 85 (1st Cir. 2012) (quoting *Hutcheson*, 647 F.3d at 387), "ask[ing] simply whether the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment."  *Escobar*, 780 F.3d at 512.  As interpreted by the First Circuit, "preconditions of payment, which may be found in sources such as statutes, regulations, and contracts, need not be 'expressly designated.'"  *Id.* (quoting *Hutcheson*, 647 F.3d at 387-88).  "Rather, the question whether a given requirement constitutes a precondition to payment is a 'fact-intensive and context-specific inquiry,' involving a close reading of the foundational documents, or statutes and regulations, at issue."  *Id.* at 512-13 (quoting *New York v. Amgen Inc.*, 652 F.3d 103, 110 (1st Cir. 2011)).

In *Escobar*, the relators' daughter died while receiving treatment from unlicensed

providers at a Massachusetts counseling center owned by Universal Health Services. *Id.* at 509. The relators alleged that the treatment facility violated the FCA because it, in submitting claims for payment, impliedly falsely represented that it had complied with various state regulations, including regulations concerning the licensing and supervision of providers. *Id.* at 510-11. The district court dismissed the complaint in its entirety for failure to plead the requisite element of falsity. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 2014 WL 1271757, at *7 (D. Mass. Mar. 26, 2014). The district court drew a distinction between requirements that MassHealth imposed on providers as conditions of payment, and those imposed as conditions to participation in the program in the first instance. *Id.* at *6 ("Violations of only a condition of participation will not suffice."). The district court concluded that only one of the regulations cited by the relators was a condition of payment, and for that regulation, it concluded that the relators had not plausibly alleged that the defendant had violated the provision. *Id.* at *11-12. The First Circuit reversed, finding that a regulation that the district court did not address was a condition of payment, and held that "[b]ecause [First Circuit] case law makes clear that a healthcare provider's noncompliance with conditions of payment is sufficient to establish the falsity of a claim for reimbursement, we need not address here whether the False Claims Act embraces a distinction between conditions of payment and conditions of participation." *Escobar*, 780 F.3d at 517. Nonetheless, the court further stated that "express certification" of compliance with a condition of payment is not required under the FCA. *Id.* at 514 n.14.

Thus, even though the First Circuit indicated that it would not entertain distinctions between express and implied certification, the defendant filed a petition for a writ of certiorari asking the Supreme Court to address issues of implied certification and conditions of payment. The Supreme Court granted review on two questions:

**Add. 49**

(1) Whether the "implied certification" theory of legal falsity under the FCA—applied by the First Circuit below but recently rejected by the Seventh Circuit—is viable; and

(2) Whether, if the "implied certification" theory is viable, a government contractor's reimbursement claim can be legally "false" under that theory if the provider failed to comply with a statute, regulation, or contractual provision that does not state that it is a condition of payment, as held by the First, Fourth, and D.C. Circuits; or whether liability for a legally "false" reimbursement claim requires that the statute, regulation, or contractual provision expressly state that it is a condition of payment, as held by the Second and Sixth Circuits.

*Universal Health Services, Inc. v. United States*, 136 S. Ct. 582 (2015).

Here, taking all of the SAC's allegations as true, it appears that DePuy's motion to dismiss on Rule 12(b)(6) grounds depends on the resolution of those two issues by the Supreme Court. Liberally construed, the SAC alleges that DePuy had two contracts to sell DePuy Pinnacle devices to the VA; that the contracts at least implicitly certified that the devices were sold pursuant to Federal Supply Schedule Group 65 Part II Section A, which requires that items are "merchantable and fit for use of the particular purpose described in th[e] contract" and "in compliance with Section 510(k) of the Federal Food, Drug, and Cosmetic Act"; and that the MoM device did not comply with those implied certifications. (SAC ¶¶ 117, 281-99, 474-78).

Thus, it appears that in order to address DePuy's motion to dismiss on Rule 12(b)(6) grounds, the Court would need to await a decision from the Supreme Court about the viability of the implied-certification theory—and in particular, the theory of implied certification adopted by the First Circuit in *Escobar*. Accordingly, the Court will reserve judgment as to those issues.

**B.      Count Three:  FCA Conspiracy Claim**

Count Three alleges that DePuy violated the FCA by conspiring with its own employees to defraud government health-care programs. The SAC alleges that "[a]s set forth above, all named defendants have conspired with its officers, agents, and employees to defraud the United

States government by presenting false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1)(C)."  (SAC ¶ 506).  The SAC further alleges that "defendants conspired with its officers, agents, and employees authorizing them to take and conceal the actions set forth above."  (SAC ¶ 507).  DePuy contends that the conspiracy claim should be dismissed because a corporation cannot conspire with its officers and employees to violate the FCA.

Pursuant to 31 U.S.C. § 3729, "any person who—(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B) . . . is liable" for a violation of the FCA.

Of course, a corporation can only violate the FCA through the actions of its agents and employees.  If DePuy is violating the FCA, there is no meaningful distinction between the relators' claims in Counts One and Two for false or fraudulent claims, statements, and records and Count Three for conspiracy to defraud the government health-care programs.

It therefore does not make sense to permit a conspiracy claim under the FCA to proceed on the theory that DePuy has conspired with its officers and employees.  This concept has been endorsed by the Supreme Court in antitrust law.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984) (explaining that "officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them . . . do not provide the plurality of actors imperative for a" conspiracy under section 1 of the Sherman Act). Multiple courts have found that companies cannot conspire with their employees or agents in the FCA context.  *See, e.g.*, *United States ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1037-38 (C.D. Cal. 2012) (holding that conspiracy claim failed to state a claim because a

corporation cannot conspire with its own employees or agents); *United States ex rel. Head v.*
*Kane & Co.*, 798 F. Supp. 2d 186, 201 (D.D.C. 2011) (finding that a company could not have
conspired with its employees to violate the FCA); *United States ex rel. Loughren v.*
*Unumprovident Corp.*, 2008 WL 4280133, at *3 (D. Mass. Sept. 15, 2008) (dismissing FCA
conspiracy claims during periods when defendants were corporate affiliates because parent and
subsidiary corporation cannot conspire as a matter of law); *United States ex rel. Brooks v.*
*Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 528 (D. Md. 2006) (finding that parent company
and its two wholly-owned subsidiaries could not conspire among themselves to violate the FCA);
*United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Health-care Sys.*, 274 F. Supp. 2d 824,
856 (S.D. Tex. 2003) (finding that a parent corporation cannot conspire with various components
and subsidiaries to commit a conspiracy in violation of the FCA).

In short, although corporate employees could conspire with outside individuals, such as
physicians, the conspiracy cannot be between the corporations and their officers and employees.
Accordingly, DePuy's motion to dismiss the conspiracy claim (Count Three) will be granted.

### C. Counts Four through Thirty-Seven:  State FCA Claims

Counts Four through Thirty-Seven of the SAC allege violations of various state and
municipal analogues to the federal FCA.[12]  DePuy contends that those claims should be
dismissed for the same reasons the federal FCA claims should be dismissed.

The First Circuit has noted that "[g]iven the substantive similarity of the state
FCAs . . . and the federal FCA with respect to the provisions at issue in this litigation, the state
statutes may be construed consistently with the federal act."  *Amgen*, 652 F.3d at 109.  Thus,
Rule 9(b)'s heightened pleading requirements apply equally to allegations made pursuant to

---

[12] For these purposes, the District of Columbia will be considered a "state."

violations of a state FCA.  *See, e.g.*, *Nowak*, 806 F. Supp. 2d at 357 ("In order to satisfy Rule 9(b), [relator] must allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings.").

Here, with two exceptions, the SAC's state FCA allegations do not even come close to satisfying the pleading requirements of Rule 9(b).  For 33 of the state-law FCA counts, the SAC contains identical language that "repeat[s] and reallege[s] each and every allegation contained in the paragraphs above as though fully set forth herein."  (*See, e.g.*, SAC ¶ 509).  With the exceptions of California[13] and New York, the SAC contains no allegations of fraudulent conduct or false claims for the Pinnacle MoM device beyond the repeated conclusory allegations found in the specific counts.

Moreover, the SAC's allegations concerning California are limited to a San Diego patient who allegedly ordered a Pinnacle MoM device and a "Summit Pinnacle metal on metal" device through the VA on September 28, 2007.  (SAC ¶¶ 485-86).  For the reasons discussed above, those allegations are insufficient to meet the requirements of Rule 9(b).  Finally, the SAC's allegations about the one New York Medicaid patient who received a "Pinnacle hip implant"— along with the related New York statistics—are insufficient to survive Rule 9(b) because they do not refer to the Pinnacle MoM device that is the subject of this litigation and do not raise an inference of fraud beyond mere possibility.  (SAC ¶¶ 414-28, 438-55).

Accordingly, DePuy's motion to dismiss will be granted as to the state and municipal FCA claims (Counts Four through Thirty-Seven) for failure to comply with the requirements of Rule 9(b).

---

[13] California is the only state among the alleged false claims in paragraphs 479 through 490 where the SAC alleges an order of a Pinnacle MoM device.  (*See* SAC ¶¶ 479-90).

### D.     Motion to Unseal

On August 24, 2015, the relators moved under seal to unseal the SAC.  DePuy assented

to that motion on September 2, 2015, but requested that certain other documents also be

unsealed:  (1) the relators' motion to unseal the SAC, the accompanying memorandum of law

and exhibits, and DePuy's response and accompanying exhibits; and (2) all documents and

filings relating to DePuy's motion to dismiss.

> Under the FCA, a *qui tam* relator must comply with the following pre-suit requirements:
>
> A copy of the complaint and written disclosure of substantially all material
> evidence and information the person possesses shall be served on the
> Government . . . .  The complaint shall be filed in camera, shall remain under seal
> for at least 60 days, and shall not be served on the defendant until the court so
> orders.  The Government may elect to intervene and proceed with the action
> within 60 days after it receives both the complaint and the material evidence and
> information.

31 U.S.C. § 3730(b)(2).

The relators filed the initial complaint under seal on May 18, 2012.  Judge Talwani

partially unsealed the case on August 12, 2014, but the complaint remained under seal.  This

Court denied a renewed motion to unseal the case on March 18, 2015, without prejudice.  The

SAC and documents relating to DePuy's motion to dismiss have remained under seal since.

The case has reached a point where unsealing the complaint and related documents is

appropriate.  Accordingly, both parties' motions to unseal certain documents will be granted and

the Court directs the clerk to unseal the following docket number entries, including exhibits:

Docket Nos. 145, 146, 152, 153, 159, 166, 172, and 177.

### E.     Leave to Amend

The relators filed the initial complaint in this case on May 18, 2012.  The relators filed an

amended complaint on December 2, 2013.  On June 5, 2015, the Court granted, over the

objection of DePuy, the relators' motion to amend the first amended complaint and file a second amended complaint.  On June 29, 2015, DePuy filed its motion to dismiss.  The relators have not filed a formal motion for leave to amend the SAC.  However, in the conclusion section of their opposition to DePuy's motion to dismiss, filed on July 13, 2015, the relators conclude:  "For all the foregoing reasons, defendants' motion to dismiss the SAC should be denied.  In the alternative, relators should be granted leave to amend insofar as it may be necessary to plead additional facts to meet the standards of Rule 12(b)(6) and/or 9(b)."  (Relators' Mem. Opp. 30).[14]

The SAC will be dismissed with prejudice and the relators' request to file a fourth complaint will be denied.  Relators filed their original complaint in 2012, three years after *Duxbury I* firmly established the FCA pleading requirements in the First Circuit.  After amending their complaint twice, relators opposed DePuy's motion to dismiss instead of filing a request to amend the complaint a third time.  Hedging their bets, at the very end of their opposition, relators requested leave to amend using boilerplate language.  *See Ge*, 737 F.3d at 128 ("[W]here, as here, a request to file an amended complaint consists of nothing more than 'boilerplate sentences stating the well-settled 'freely given' standard under which a request for leave to amend is generally analyzed,' a district court 'acts well within its discretion when completely disregarding the request.'" (quoting *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 107-08 (1st Cir. 2013))).  Moreover, as the First Circuit has held in the context of post-judgment requests to amend a complaint, allowing relators to file a fourth complaint here after fully litigating the issues "would allow plaintiffs to pursue a case to judgment and then, if they

---

[14] The relators made similar requests in their sur-reply brief and post-hearing supplemental filing.  (Docket Nos. 166, 179).  The relators also contend that leave to amend should be granted because DePuy did not move to dismiss the SAC with prejudice.  But DePuy explicitly did so, as noted on the first page of its motion to dismiss, filed on June 29, 2015.  (Docket No. 145) ("Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants . . . respectfully move to dismiss the relators' second amended complaint with prejudice.").

lose, to reopen the case by amending their complaint to take account of the court's decision. Such a practice would dramatically undermine the ordinary rules governing the finality of judicial decisions, and should not be sanctioned in the absence of compelling circumstances." *James v. Watt*, 716 F.2d 71, 78 (1st Cir. 1983) (Breyer, J.).

Despite full awareness of Rule 9(b)'s pleading standards, the relators—who are expert witnesses in related products-liability lawsuits against DePuy—have failed to plead with requisite particularity even a single false claim for the Pinnacle MoM device in their 168-page second amended complaint.  The Federal Rules call for courts to "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Justice would not be served by granting relators' request to file a third amended complaint; rather, such a grant would prejudice the defendants and incentivize future unfair amendment tactics.

Accordingly, relators' request to file a third amended complaint is denied on the grounds of undue delay.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that amendments may be denied on the basis of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment"); *United States ex rel. D'Agostino v. EV3, Inc.*, 802 F.3d 188, 195 (1st Cir. 2015) (noting that, even though the Rule 15 standard applied—instead of the Rule 16 good cause standard—to a relator's request to amend a *qui tam* complaint, "[l]et us be perfectly clear.  We do not suggest that the district court will be compelled to grant the motion to amend on remand.  After all, there are myriad reasons that might justify the denial of a motion for leave to amend, including undue delay, repeated failure to cure deficiencies, or futility." (citing *Foman*, 371 U.S. at 182)).  "When 'considerable time has elapsed between the filing of the complaint and the motion to amend, the

movant has [at the very least] the burden of showing some valid reason for his neglect and delay.'" *In re Lombardo*, 755 F.3d 1, 3 (1st Cir. 2014) (internal quotation marks omitted) (quoting *Stephanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir. 1983)). The First Circuit has "previously labeled as 'considerable time' warranting explanation, periods of fourteen months, fifteen months, and seventeen months." *Id.* (citations omitted) (citing *Grant v. News Grp. Bos., Inc.*, 55 F.3d 1, 6 (1st Cir. 1995) (fourteen months); *Acosta-Mestre v. Hilton Int'l of P.R., Inc.*, 156 F.3d 49, 51-52 (1st Cir. 1998) (fifteen months); *Stepanischen*, 722 F.2d at 933 (sixteen months)). The First Circuit has "also held that in assessing whether delay is undue, a court will take account of what the movant 'knew or should have known and what he did or should have done.'" *Id.* at 3-4 (quoting *Invest Almza v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57, 72 (1st Cir. 2001)). Delays for periods as short as eleven months, four months, and less than three months have been found to constitute undue delay. *See Calderón-Serra v. Wilmington Trust Co.*, 715 F.3d 14, 19-20 (1st Cir. 2013) (eleven-month delay); *Villanueva v. United States*, 662 F.3d 124, 127 (1st Cir. 2011) (four-month delay); *Kay v. N.H. Dem. Party*, 821 F.2d 31, 34 (1st Cir. 1987) (less than three-month delay).

Here, the relators filed their original complaint in 2012, when they should have already been aware of the First Circuit's Rule 9(b) pleading standard in FCA cases. Since that time, they have amended the complaint twice. At the very latest, they should have been aware of the SAC's deficiencies when DePuy filed its motion to dismiss in June 2015. Instead, the relators vigorously litigated the motion, including the filing of a sur-reply and multiple post-argument supplemental briefs. Now, they wish to amend the complaint a third time. Considerable time has passed since the filing of the original complaint and since the relators were put on notice of the defects in the complaint, and the relators have not demonstrated a legitimate reason for their

neglect and delay.  Accordingly, the relators' request for leave to amend the SAC and file a third

amended complaint will be denied.

**IV.**     **Conclusion**

For the foregoing reasons, DePuy's motion to dismiss the second amended complaint

with prejudice is GRANTED, and the clerk is hereby directed to unseal the docket entries

indicated above.  Relators' request for leave to amend its second amended complaint is

DENIED.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: February 2, 2016            United States District Judge

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** *et al. ex rel.* **ANTONI NARGOL** and **DAVID LANGTON,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) **Civil Action No.** ) **12-10896-FDS** |
| **DEPUY ORTHOPAEDICS, INC., DEPUY, INC., and JOHNSON & JOHNSON SERVICES, INC.,** | ) ) ) ) |
| **Defendants.** | ) ) |

## ORDER OF DISMISSAL

**SAYLOR, J.**

    In accordance with the Court's Memorandum and Order of February 2, 2016, it is hereby

ORDERED that the above-entitled action be dismissed.

 

        SO ORDERED.
        BY THE COURT:

 

February 2, 2016            /s/ Lisa Pezzarossi
Date                Deputy Clerk

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                      )
**UNITED STATES OF AMERICA** *et al. ex*    )
*rel.* **ANTONI NARGOL and**                        )
**DAVID LANGTON,**                                    )
                                                      )
             **Plaintiffs,**                          )
                                                      )    **Civil Action No.**
        **v.**                                        )    **12-10896-FDS**
                                                      )
**DEPUY ORTHOPAEDICS, INC.,**                         )
**DEPUY, INC., and**                                  )
**JOHNSON & JOHNSON SERVICES, INC.,**                 )
                                                      )
             **Defendants.**                          )
_____)

## MEMORANDUM AND ORDER ON
## RELATORS' MOTION FOR RECONSIDERATION

**SAYLOR, J.**

This is a *qui tam* action alleging the submission of false claims to government health-care

programs for a defective hip-replacement device.  Relators Dr. Antoni Nargol and Dr. David

Langton, who are expert witnesses in two related MDL proceedings that involve a similar device,

brought suit against defendants DePuy Orthopaedics, Inc., DePuy, Inc., and Johnson & Johnson

Services, Inc.[1]  The second amended complaint ("SAC") alleges that DePuy directly submitted

and indirectly caused third parties to submit false claims for payments to government health-care

programs for the Pinnacle metal-on-metal hip device ("Pinnacle MoM").  According to the SAC,

the claims were false because DePuy made numerous misrepresentations to the FDA and

surgeons concerning, among other things, the Pinnacle MoM's failure rates.

On February 1, 2016, the Court unsealed the SAC and granted DePuy's motion to dismiss

_____

[1] For clarity, the defendants will be referred to collectively as "DePuy."

the relators' 168-page SAC for failure to plead a single false claim, either direct or indirect, with the particularity required by Fed. R. Civ. P. 9(b) and *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13 (1st Cir. 2009) ("*Duxbury I*"). In the same order, the Court also denied the relators' informal and boilerplate request for leave to file a third amended complaint, on the basis of undue delay.

On March 1, 2016, the relators moved for reconsideration of the Court's order pursuant to Fed. R. Civ. P. 59(e) and 60(b)(2) and renewed their request for leave to file a fourth complaint. Despite having three opportunities over the course of four years to satisfy long-established False Claims Act pleading standards, the relators now contend that in the twenty-eight days since the Court's order, they have secured new, previously undiscoverable evidence of false indirect claims.

A motion for reconsideration on the basis of new evidence must be denied where the movant fails to provide a cogent reason for why the evidence was previously undiscoverable. If the evidence should have been discovered previously with appropriate diligence, the evidence is not considered "new." After careful review of the added information in the proposed third amended complaint and the relators' explanations for why it was previously undiscoverable, it appears that the information should have been discovered before the SAC was filed, even with only the most basic investigative diligence. Indeed, the information should have been discovered four years and three complaints ago.

Accordingly, and for the following reasons, the relators' motion for reconsideration will be denied.

I.  **Background**

The facts as alleged in the relators' SAC are recited at length in the Court's February 1,

2

2016 order.  For purposes of understanding the issues involved in their motion for

reconsideration, the following abbreviated statement of facts is provided.

On May 18, 2012, the relators filed the original *qui tam* complaint in this case under

seal.[2]  The Court granted the relators' motion to file an amended complaint on December 2,

2013.  On July 29, 2014, the government declined to intervene in this case after conducting its

investigation.

On August 12, 2014, Judge Talwani unsealed the case going forward but granted the

relators' request to keep the first amended complaint under seal.  The relators made that request,

in part, because the first amended complaint incorporated confidential DePuy documents that the

relators had access to through their work as expert witnesses in two related MDL actions.

However, there were standing confidentiality orders in those two MDL actions that prevented the

relators from using confidential documents for any reason outside the scope of their expert

testimony.  *See In re:  DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*, No. 1:10-

md-02197 ("ASR MDL"); *In re:  DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab.

Litig.*, No. 3:11-md-02244 ("Pinnacle MDL").

The relators moved to intervene in the ASR MDL in an effort to modify the

confidentiality order.  However, the presiding judge denied the relators' motion, concluded that

the relators had violated the confidentiality order, and specifically prohibited the relators from

using any confidential information that they obtained through their role as expert witnesses in the

present FCA case.  (Def. Ex. A, Judge Katz Jan. 5, 2015 Order at 7-8) ("If the Court agreed with

the intervenors' request, these retained experts would be free to use the knowledge they obtain

---

[2] The case was initially assigned to Judge O'Toole, then was reassigned to this judge on August 10, 2012, then was reassigned to Judge Talwani on June 26, 2014, and finally reassigned back to this judge on October 8, 2014.

during this litigation for their own benefit [in the FCA case]. This result is unacceptable . . . .").

With the first amended complaint tainted, this Court granted the relators' request to file a second amended complaint devoid of any confidential information gleaned from the ASR MDL. That sealed SAC became the operative complaint on June 5, 2015. DePuy moved to dismiss the SAC for failure to meet the pleading requirements of Fed. R. Civ. P. 9(b) and 12(b)(6) on June 26, 2015. Instead of moving to amend, the relators opposed the motion, filed a sur-reply, and litigated the issue during a July hearing. On August 21, 2015, the relators moved to unseal the SAC, but again did not move for leave to amend.

On February 1, 2016, the Court granted DePuy's motion to dismiss, concluding that the 168-page SAC failed to plead a single direct or indirect false claim with the particularity required by Rule 9(b) and *Duxbury I*. The Court also denied the relators' informal request to file a fourth complaint on the basis of undue delay.[3]

On March 1, 2016, the relators moved for reconsideration and requested that the Court allow them to file a proposed third amended complaint. According to the relators, they have secured new, previously undiscoverable evidence of indirect false claims involving the Pinnacle MoM.[4]

## II.   <u>Legal Standard</u>

Amendment or alteration of a judgment is "an extraordinary remedy which should be used sparingly." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006).

The Court has "substantial discretion and broad authority" to grant a motion for reconsideration pursuant to Fed. R. Civ. P. 59(e). *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d

---

[3] The relators did not formally move for leave to amend the SAC. However, in the conclusion of their opposition to DePuy's motion to dismiss, they requested that leave be freely given should the Court conclude that the SAC did not meet the pleadings standards of Rule 9(b).

76, 81 (1st Cir. 2008). However, a motion for reconsideration will be granted only upon a showing of (1) a "manifest error of law," (2) new evidence, or (3) a misunderstanding or other error "not of reasoning but apprehension." *Id.* at 81-82. A Rule 59(e) motion should not be used to "advance a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003). Nor is a Rule 59(e) motion an appropriate means to "repeat old arguments previously considered and rejected." *National Metal Finishing Co. v. Barclays American/Commercial Inc.*, 899 F.2d 119, 123 (1st Cir. 1990).

Rule 60(b) provides a mechanism for setting aside a judgment in certain circumstances. The rule provides, in relevant part, that a court "may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons . . . (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). "Because Rule 60(b) is a vehicle for extraordinary relief, motions invoking the rule should be granted only under exceptional circumstances." *Davila-Alvarez v. Escuela de Medicina Universidad Central del Caribe*, 257 F.3d 58, 64 (1st Cir. 2001) (internal quotation marks omitted).

III. **Analysis**

The relators contend that their motion for reconsideration should be granted because they have discovered new, previously undiscoverable evidence of purportedly false indirect claims.

A Rule 59(e) motion brought on the basis of new evidence "must be denied where the 'new evidence' consists of information that, in the exercise of due diligence, could have been

---

[4] The relators style their motion as a motion for reconsideration. The Federal Rules of Civil Procedure do not expressly recognize post-judgment motions for reconsideration. Accordingly, the Court will treat the relators' motion under the standards of Fed. R. Civ. P. 59(e) and 60(b)(2).

presented earlier." *In re Genzyme Corp.*, 2012 WL 6674483, at *2 (D. Mass. Dec. 21, 2012),

*aff'd sub nom. In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31 (1st Cir. 2014) (citing *Emmanuel v.*

*International Broth. of Teamsters, Local Union No. 25*, 426 F.3d 416, 422 (1st Cir. 2005)).  "At

the very least the [moving party] must put forth a 'cogent reason' as to why this evidence could

not have been offered at an earlier stage of the proceedings."  *Id.* (quoting *Fisher v. Kadant*, 589

F.3d 505, 513 (1st Cir. 2009)).  In short, evidence is not "new" if the underlying facts were

previously discoverable with appropriate diligence.  *See Biltcliffe v. CitiMortgage, Inc.*, 952

F. Supp. 2d 371, 384 (D. Mass. 2013).

     A party moving for relief from judgment on the basis of newly discovered evidence under

Rule 60(b)(2) "'must at the very least, offer a convincing explanation as to why he could not

have proffered the crucial evidence at an earlier stage of the proceedings.'"  *Fisher*, 589 F.3d at

513 (quoting *Karak v. Bursaw Oil Corp.*, 288 F.3d 15, 19-20 (1st Cir. 2002)).

     The parties do not dispute that the evidence presented in the relators' proposed third

amended complaint is new, in the sense that it was not pleaded in the SAC.  However, DePuy

contends that the evidence of purportedly false indirect claims is not new because the relators

could have presented it earlier if they had conducted their investigation with due diligence.  The

relators appear to present two principal explanations for why the evidence was previously

undiscoverable, even with the appropriate level of diligence.  First, they contend that the MDL

confidentiality orders prevented them from pleading in the SAC information that they had

obtained from those proceedings.  Second, they contend that the sealed status of the SAC in this

proceeding hindered their ability to investigate false claims and obtain information from MDL

plaintiffs' counsel, surgeons, and Pinnacle MoM patients themselves.  Specifically, they contend

that the MDL plaintiffs' attorneys would not speak with them because the SAC in this case remained under seal.

After careful consideration of the proposed third amended complaint and the relators' two explanations, it appears that the relators' "newly discovered" evidence should have, with the appropriate investigative diligence, been discovered and presented earlier in the proceeding. Even relying only on publicly available information and basic investigative strategies, the relators could have—indeed, should have—discovered and presented the "new" evidence not only in their first or second amended complaints, but also in their original complaint filed four years ago.

The analysis begins with the relators' argument that the MDL confidentiality orders hindered their ability to discover information about false claims.  It is important to note that those orders appear to be still in effect; the relators were, and continue to be, prohibited from using confidential information that they obtained in their role as experts in the MDL proceedings.  Accordingly, any new information in the proposed third amended complaint has not suddenly become discoverable because of changes in the MDL confidentiality orders.

Furthermore, the relators' argument fails to observe the critical distinction between the confidential documents themselves, the use of which is prohibited, and the facts that underlie those documents.  The confidentiality orders prevent the relators from using confidential DePuy documents that they obtain through the MDL; they do not prevent the use of any underlying facts.  Furthermore, the relators could have used basic investigative tactics to obtain those underlying facts without violating the confidentiality orders.  Indeed, much of the investigative legwork had already been completed for the relators by thousands of MDL plaintiffs and their attorneys in their publicly available complaints.  Accordingly, the existence of the confidentiality

order is not a sufficiently cogent or convincing reason as to why the evidence was previously undiscoverable.

The relators' second argument—that the SAC's sealed status prevented them from discovering the newly-pleaded evidence of allegedly false claims—is equally unpersuasive. Before addressing the actual substantive reasons why the seal is not a convincing explanation, the Court will make two background observations.

First, the SAC was sealed, and remained sealed, at the relators' request because they had previously violated the ASR MDL confidentiality order. In essence, the relators requested that the Court seal the SAC as a backstop to prevent the disclosure of DePuy's confidential information, and to avoid being reprimanded by Judge Katz for a second time. It is unclear why the relators did not simply review the SAC carefully before filing in order to ensure that it did not contain any confidential information.

Second, while the Court did not unseal the SAC until it ruled on DePuy's motion to dismiss in February 2016, the relators did not move to unseal it until August 2015, after DePuy filed its motion to dismiss. Moreover, the relators did not move to amend the SAC at that time. Instead, they vigorously opposed DePuy's motion, evidently satisfied to accept the risk that the Court would find the SAC's allegations insufficient under the well-established pleading standards required by Rule 9(b) and *Duxbury I*. *See Fisher*, 589 F.3d at 513 (noting that plaintiffs' decision to wait to "seek leave to amend their complaint based on [supposedly new] evidence" until after the district court entered judgment was "a strategic choice," and the fact that their choice "backfired is not a ground for relief from judgment").[5]

---

[5] The relators repeatedly suggest throughout their motion for reconsideration that this Court's decision in *United States ex rel. Leysock v. Forest Labs, Inc.*, 55 F. Supp. 3d 210 (D. Mass. 2014) established new, heightened Rule 9(b) pleading standards for cases brought pursuant to the FCA. The Court disagrees. In *Leysock*, the Court applied the well-established standard explained by the First Circuit in *Duxbury I*, which was issued in 2009. *See id.*

In any event, the relators assert, without explanation, that the MDL plaintiffs' attorneys would not speak to them unless the SAC was unsealed. But even accepting that bald assertion as true, the relators do not explain why they did not utilize other basic investigative means to obtain the relevant facts. For example, it is unclear why the relators could not have contacted orthopedic surgeons—at least some of whom should have been well-known to the relators, as orthopedic surgeons themselves—who had implanted the Pinnacle MoM. If they had contacted the surgeons, some simple questions that did not violate patient privacy rights might have provided some basic answers.[6] Again, the underlying facts of potentially false claims were not unavailable simply because the SAC remained under seal.

Moreover, even assuming that the relators could not investigate the underlying facts of potentially false claims by contacting MDL plaintiffs' attorneys or surgeons, there were hundreds, if not thousands, of publicly available complaints filed in the MDL. The relators do not explain why they failed to review those complaints at the outset of this litigation to find situations where the federal government had paid for a Pinnacle MoM implant.

To highlight just two examples, in their motion for reconsideration the relators contend that they did not know that Patient 4, identified in their proposed third amended complaint, was a veteran—and thus likely to have his hip-replacement device paid for by the federal

---

at 219 (quoting *Duxbury I*, 579 F.3d at 30) (noting that the *Leysock* relator identified "one of defendants' sales representatives, the doctor, and the patient (the who), the specific misrepresentations made by the defendants (the what), time periods and locations (the where and when), and the filing of the false claims themselves"). Moreover, and in any event, it is disingenuous for the relators to suggest that the Court applied its own unique pleading standards in considering DePuy's motion to dismiss. The Court did what it always must do: apply the law dictated by the First Circuit, which in this case is *Duxbury I*. In ruling on DePuy's motion, the Court discussed *Leysock* very briefly, and only because both parties spent significant portions of their briefs comparing *Leysock* to the relators' allegations here.

[6] One would expect a non-exhaustive list to include questions such as: Have you implanted a DePuy Pinnacle MoM device? When? How old was the patient? How was the device paid for? What types of marketing materials did you receive from DePuy? Did those affect your decision to use the Pinnacle MoM for your patient? What were the results of the surgery?

government—until he testified during a public MDL hearing on February 10, 2016.  But the

relators fail to mention that Patient 4 filed his complaint on August 5, 2011, nine months before

the relators filed their *original* complaint in this action, and that the complaint remained publicly

available for the entire four-year period leading up to DePuy's motion to dismiss.  In that

complaint, Patient 4 identifies himself as a "30 year U.S. Navy veteran" who received a total hip

replacement on January 19, 2005.  (Def. Ex. I ¶ 35).  The complaint identifies the exact type of

device he was implanted with:  a Pinnacle MoM with an Ultamet liner.  (*Id.*).[7]  A diligent

investigator might have attempted to contact Patient 4's counsel before filing the initial, much

less the third, complaint in this action.  Another publicly available MDL complaint, filed on

November 14, 2011, identifies a plaintiff who was implanted with a "Pinnacle Hip" on October

20, 2009 at a VA hospital in Seattle, Washington by Dr. Howard Chansky.  (Def. Ex. H ¶ 36).  A

diligent investigator might have attempted to contact Dr. Chansky or the plaintiff's counsel to

determine whether the plaintiff was implanted with a Pinnacle MoM device (as suggested by

paragraph 28 of his complaint), and whether his device was paid for by the federal government

(as suggested by the fact the procedure occurred in a VA hospital).

 As noted in the Court's earlier order, the SAC was essentially a products-liability

complaint, not an FCA complaint.  Despite access to large quantities of publicly available MDL

complaints and related information, the 168-page SAC failed to plead with sufficient

particularity even a *single* false claim.  In fact, after four years and three complaints, many of the

SAC's allegedly false claims did not even refer to the Pinnacle MoM, the only device that is at

issue in this case.  If there is any cogent, convincing reason for why the information in the

---

[7] For an explanation of the Ultamet liner's significance to the particularity requirements of Rule 9(b) in this case, refer to the Court's February 1, 2016 order at pages 32 through 34.

**Add. 69**

relators' proposed third amended complaint was previously undiscoverable, the relators have

failed to provide it in their motion for reconsideration.

In sum, the relators' motion for reconsideration will be denied under Fed. R. Civ. P. 59(e)

and 60(b)(2) for failure to provide a cogent, convincing explanation as to why the "new"

evidence was previously undiscoverable.

## IV.   Conclusion

For the foregoing reasons, the relators' motion for reconsideration of the Court's denial

of leave to amend the complaint is DENIED.

**So Ordered.**


/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated: April 11, 2016                    United States District Judge