# United States Court of Appeals
## For the First Circuit

———————————

No. 14-1423

UNITED STATES, ex rel. JULIO ESCOBAR; CARMEN CORREA,
administratrix of the Estate of Yarushka Rivera,

Plaintiffs, Appellants,

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff, Amicus Curiae,

v.

UNIVERSAL HEALTH SERVICES, INC.,

Defendant, Appellee.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

———————————

Before

Howard, Chief Judge,
Stahl and Barron, Circuit Judges.

———————————

Michael Tabb, with whom Thomas M. Greene, Elizabeth Cho,
Greene LLP, were on brief for appellants.
Mark T. Stancil, with whom Donald Burke, Robbins, Russell,
Englert, Orseck, Untereiner & Sauber LLP, and Mark W. Pearlstein,
Evan D. Panich, Laura McLane, McDermott Will & Emery LLP, were on
brief for appellee.
Maura Healey, Attorney General of Massachusetts, with whom
Robert Patten and Jeffrey Walker, Assistant Attorneys General,
were on brief for amicus curiae Commonwealth of Massachusetts.
Charles S. Scarborough, Attorney, Appellate Staff, with whom
Benjamin C. Mizer, Principal Deputy Assistant Attorney General,

Carmen M. Ortiz, United States Attorney, and Michael S. Raab, Attorney, Appellate Staff, were on brief for amicus curiae United States of America.

Jennifer M. Verkamp, Morgan Verkamp LLC, and Jacklyn N. DeMar, on brief for amicus curiae Taxpayers Against Fraud Education Fund.

Jeremy W. Meisinger, Thomas R. Barker, Kristyn M. DeFilipp, and Foley Hoag, LLP, on brief for amicus curiae National Association of Psychiatric Health Systems.

Lawrence M. Kraus, Lawrence W. Vernaglia, Jason L. Drori, and Foley & Lardner LLP, on brief for amicus curiae Massachusetts Hospital Association.

John P. Elwood, Craig D. Margolis, Jeremy C. Marwell, Tirzah S. Lollar, Christian D. Sheehan, Vinson & Elkins LLP, Kathryn Comerford Todd, Steven P. Lehotsky, and U.S. Chamber Litigation Center, on brief for amicus curiae Chamber of Commerce of the United States of America.

---

November 22, 2016

---

**STAHL**, <u>Circuit Judge</u>.  Yarushka Rivera died of a seizure in 2009 after receiving mental health treatment at Arbour Counseling Services in Lawrence, Massachusetts, a facility owned and operated by Defendant-Appellee Universal Health Services ("UHS").  UHS submitted reimbursement claims for these services to MassHealth, the state's Medicaid agency.

Following Yarushka's death, her mother and stepfather learned that Arbour had employed unlicensed and unsupervised personnel, in violation of state regulations -- many of whom were involved in treating their daughter during the years leading up to her death.  Relators subsequently brought a <u>qui tam</u> action against UHS under the False Claims Act (FCA), alleging that Arbour had employed unlicensed and unsupervised personnel, in violation of state regulations, and that UHS had fraudulently submitted reimbursement claims to the Commonwealth, despite knowing that they were in violation of relevant state regulations dealing with mental health and counseling facilities.  This is a theory of FCA liability known as the "implied false certification theory."

The district court granted defendant's motion to dismiss, concluding that the regulatory violations were conditions for participation in the state Medicaid program, but were not conditions of payment as required for a claim to be actionable under the FCA.  We reversed, holding that the regulatory violations in question were, in fact, conditions for payment and that the

Relators' complaint had "properly pleaded that the condition of payment at issue was a material one," given the ubiquity of the licensing and supervision requirements throughout the MassHealth regulations governing the state's Medicaid program with respect to mental health services. United States and Commonwealth of Mass. ex rel. Escobar v. Universal Health Servs., Inc., 780 F.3d 504, 514 (1st Cir. 2015) ("Escobar I").

UHS sought review in the Supreme Court, the Court granted certiorari, and ruled that the implied false certification theory can be a basis for FCA liability. However, the Supreme Court vacated our judgment and remanded the case for further consideration of whether Relators' complaint sufficiently alleged that the regulatory violations in question were material to the government's payment decision, a requirement for an actionable FCA claim. Universal Health Servs., Inc. v. United States and Commonwealth of Mass. ex rel. Escobar, 136 S. Ct. 1989, 2004 (2016) ("Escobar II").

Applying the Supreme Court's guidance on the question of whether UHS's misrepresentations were material, we again find that Relators' complaint sufficiently states a claim under the FCA. We therefore REVERSE the district court's grant of UHS' Motion to Dismiss and REMAND for further proceedings consistent with this opinion.

### I. Facts and Background[1]

Having previously had occasion to discuss the underlying facts that gave rise to this litigation, see Escobar I, 780 F.3d at 508-510, we briefly recount the most salient facts before proceeding to an analysis of the materiality of the misrepresentations alleged in Relators' Second Amended Complaint.[2]

### A. The False Claims Act Generally

The False Claims Act, 31 U.S. § 3729 et seq., was enacted in 1863 to address the "massive frauds perpetrated by large contractors during the Civil War," United States v. Bornstein, 423 U.S. 303, 309 (1976), which hampered the United States' war effort. The Act imposes civil penalties on "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim

---

[1] This case arises from Defendant-Appellee UHS's Motion to Dismiss Relators' Second Amended Complaint. Following our ruling in Escobar I, but prior to the Supreme Court's grant of certiorari, the District Court allowed the filing of a Third and Fourth Amended Complaint. These rulings were proper, as the mere act of filing a petition for certiorari does not deprive the district court of jurisdiction over the case. See United States v. Sears, 411 F.3d 1240, 1241-42 (11th Cir. 2005); see also 28 U.S.C. § 2101(f) (noting that the trial court or the Supreme Court may issue a stay pending disposition of a petition for certiorari). However, since our original ruling in this case and the Supreme Court opinion in Escobar II were both based on the factual allegations in the Second Amended Complaint, this Court and the parties all agree that it is that complaint that is the operative pleading at this stage.

[2] Because this appeal follows the granting of a motion to dismiss, we recite the relevant facts as they appear in Relators' Second Amended Complaint. See Hochendoner v. Genzyme Corp., 823 F.3d 724, 728 (1st Cir. 2016).

for payment or approval" to the government.  31 U.S.C. § 3729(a).
The Act contains qui tam provisions authorizing private
individuals to sue on behalf of the United States to recover monies
that were obtained from the government by fraudulent
misrepresentations.  31 U.S.C. § 3730.  To be actionable, a false
claim must be material to the government's decision to pay the
claim.  See, e.g., Escobar II, 136 S. Ct. at 2001; see also United
States ex rel. Loughren v. Unum Grp., 613 F.3d 300, 307 (1st Cir.
2010).  The Act itself defines "material" to mean "having a natural
tendency to influence, or be capable of influencing, the payment
or receipt of money or property."  § 3729(b)(4).

            B. Regulatory Framework[3]

        This case arose in the context of reimbursement claims
submitted to MassHealth, the Massachusetts Medicaid program.  The
applicable Massachusetts Code of Regulations at issue in this case,
and operative at the time of the events in question, required
dependent satellite programs to employ at least two full-time
equivalent professional staff members from separate nonphysician

---

[3] The regulations at issue were in effect from 2008 to 2014,
but have since been amended, with minor revisions.  References to
the state regulations and billing codes included herein are
therefore to the then-operative provisions, a copy of which are
attached to MassHealth Transmittal Letter MHC-39 and accessible at
http://www.mass.gov/eohhs/docs/masshealth/transletters-2009/mhc-
39.pdf.

core disciplines.[4]  130 Mass. Code Regs. § 429.422(D).  The satellite program's staff must meet the qualifications for core disciplines as outlined in 130 Mass. Code Regs. § 429.424.  For example, § 429.424 requires that staff psychiatrists must be either board certified or applying for such certification, or be licensed physicians in their second year of an accredited psychiatric residency.  Id. § 429.424(A)(1)-(2).  Staff psychologists must have completed a recognized doctoral program or be enrolled in such a program.  Id. § 429.424(B).  Social workers must be either licensed or applying for such a license, and all social workers (other than the chief social worker in a particular facility) must be under the "direct and continuous supervision of an independent clinical social worker."  Id. § 429.424(C).  While mental health

---

[4] We note that the record does not firmly establish whether Arbour, the facility where Yarushka received treatment, was a "dependent" or "autonomous" satellite facility for purposes of the MassHealth regulations.  Compare 130 Mass. Code Regs. § 429.422(D) (laying out staff composition requirements for dependent facilities) with id. § 429.422(F) (imposing more stringent staffing requirements for autonomous facilities, including more full-time personnel and greater emphasis on licensing, rather than supervision).  In their Second Amended Complaint, as the district court noted, Relators "do not allege that the Arbour location in Lawrence is an autonomous satellite program," U.S. ex rel. Escobar v. Universal Health Servs., Inc., No. CIV.A. 11-11170-DPW, 2014 WL 1271757, at *8 (D. Mass. Mar. 26, 2014).  Relators, for their part, argued before the district court and in their briefing to this Court during our first encounter with the case that without the benefit of discovery, they were unable to verify whether Arbour fit the definition of a "dependent" or "autonomous" facility.  We therefore assume, without deciding, that the applicable regulations are those governing dependent satellite facilities.

counselors are not required to be licensed, they "must be under the direct and continuous supervision of a fully qualified professional staff member." Id. § 429.424(E)(1).

If the satellite program's staff do not meet the qualifications for core disciplines as described in 130 Mass. Code Regs. § 429.424, the staff must receive supervision from qualified core staff professionals of the same discipline at the parent center. Id. § 429.422. There are also supervision requirements for less experienced personnel at satellite programs, with the regulations providing that "[e]ach staff member must receive supervision appropriate to the person's skills and level of professional development[.] Supervision must occur within the context of a formalized relationship providing for frequent and regularly scheduled personal contact with the supervisor." Id. § 429.422(D) (incorporating supervision requirements of § 429.438(E)).

When submitting claims to MassHealth, UHS used numerical codes corresponding to the particular types of services rendered, in this case individual therapy, family therapy, and group therapy. The definition of each of these types of services, for billing purposes, in Section 601 of MassHealth's then-operative Mental

Health Center Manual requires that they be performed "by [a] professional staff member as defined in 130 CMR 429.424."[5]

### C. Facts Pertinent to Relators' Claim against UHS

Relators allege that unbeknownst to Yarushka Rivera's family in the years leading up to her death, UHS's Arbour facility was in flagrant non-compliance with these regulations. According to the allegations in Relators' Second Amended Complaint, of the five specific individuals who treated Yarushka – Maria Pereyra, Diana Casado, Anna Fuchu, Maribel Ortiz and Anna Cabacoff – only one of them (Cabacoff) had the proper license or was under the proper supervision to deliver treatment to Yarushka. Neither Pereyra nor Casado, the counselors assigned to Yarusha, had a professional license and at no time during their treatment of Yarushka were they supervised by anyone that did. Fuchu, despite being held out to Yarushka's parents as an experienced "doctor" and representing herself as a psychologist with a Ph.D, in fact only had received her psychological instruction from an

---

[5] The now-operative provisions no longer include an explicit requirement for each billing code that the therapy be provided "by [a] professional staff member as defined in 130 CMR 429.424," but instead provide that "MassHealth pays for the services represented by the codes listed in Subchapter 6 in effect at the time of service, subject to all conditions and limitations in MassHealth regulations at 130 CMR 429.000 and 450.000." A copy of the now-operative regulations are attached to MassHealth Transmittal Letter MHC-48, and can be accessed at http://www.mass.gov/eohhs/docs/masshealth/servicecodes/sub6-mhc.pdf.

unaccredited internet college and had her application for licensure rejected by the Board of Licensure of the Commonwealth several years before the treatment giving rise to this lawsuit.

Ortiz was referred to Relators as a psychiatrist, when in fact she was a nurse, without a license to practice psychiatry. Ortiz prescribed Trileptal to Yarushka, a medication to which Yarushka had an adverse reaction. This medication was prescribed despite the fact that Ortiz could prescribe medications only if properly supervised by a board certified psychiatrist (she was not). Yarushka ultimately suffered a seizure, her second while receiving treatment at Arbour, and died. Throughout this course of treatment, UHS regularly sought and received reimbursement for these mental health services from MassHealth.

Finally, UHS's staff members at Arbour, like any health care practitioner who bills under Medicaid, received National Provider Identification ("NPI") numbers which identify the practitioner's level of expertise and whether the practitioner is, in fact, licensed. One of UHS's unlicensed counselors, Maria Pereyra, had a fraudulently-obtained NPI, having misrepresented her background and education. Relators uncovered information that an additional 22 UHS employees had obtained false NPI numbers that misrepresented their status as licensed social workers or licensed mental health counselors.

Following Yarushka's death, Relators learned that most of the individuals who had provided care for their daughter were not properly licensed or supervised. With this knowledge, they then filed complaints with several state agencies, including the Disabled Persons Protection Committee ("DPPC"), Division of Professional Licensure ("DPL"), and the Department of Public Health ("DPH"). These complaints eventually culminated in the DPH conducting on-the-ground inspections at Arbour during the spring of 2012, during which time they learned that Arbour was using unlicensed and unsupervised personnel. DPH issued a report in July of 2012 detailing its findings.

D. Procedural Background

On July 1, 2011, while the DPH investigation against Arbour was still pending, Relators brought suit against UHS in the United States District Court for the District of Massachusetts, arguing that by submitting claims for reimbursement to MassHealth, UHS had impliedly certified that its services were in conformity with the applicable licensing and supervision requirements, and that its failure to disclose or correct the violations made these reimbursement claims fraudulent under the FCA. Relators' Second Amended Complaint was filed in February of 2013. The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), holding that Relators had failed to state a claim because the regulations in question were preconditions for

participation in the state's Medicaid program, rather than preconditions to reimbursement -- and that only the latter could be used to establish the falsity of a claim under the FCA.

We reversed in relevant part and remanded, finding that a violation is material to payment if "the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment." Escobar I, 780 F.3d at 512. We found that "[c]ompliance with the regulations at issue pertaining to staff supervision and core staffing at satellite centers is a condition of payment by MassHealth," and noted that at the core of Relators' complaint was the allegation "[t]hat supervision at Arbour was either grossly inadequate or entirely lacking" and that Relators' daughter "died after receiving treatment that was out of compliance with over a dozen regulations." Id. at 517. We therefore found that the Second Amended Complaint had adequately stated a claim under the FCA.

The Supreme Court granted certiorari to resolve a disagreement among U.S. Courts of Appeals over the validity and scope of the implied certification theory. The Court upheld the validity of the implied certification theory, holding that "[w]hen, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations

misleading with respect to the goods or services provided."
Escobar II, 136 S. Ct. at 1999. In order for False Claims Liability
to attach, these misleading omissions must be material to the
government's decision to pay the claim. Whether the regulatory,
statutory or contractual requirement in question is a
precondiction for payment was not necessarily dispositive of
whether the requirement is material to the decision to pay, the
Court concluded. Id. at 2001. Rather, "[w]hat matters is ...
whether the defendant knowingly violated a requirement that the
defendant knows is material to the Government's payment decision."
Id. at 1996. The Supreme Court "remand[ed] the case for
reconsideration of whether [Relators] have sufficiently pleaded a
False Claims Act violation." Id. at 2004.

### E. The Materiality Test

The language that the Supreme Court used in Escobar II
makes clear that courts are to conduct a holistic approach to
determining materiality in connection with a payment decision,
with no one factor being necessarily dispositive. As the Court
observed, "materiality cannot rest 'on a single fact or occurrence
as always determinative.'" Escobar II, 136 S. Ct. at 2001 (quoting
Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 39 (2011)).
Because the materiality requirement in the Act descends from
"common-law antecedents," id. at 2002 (quoting Kungys v. United
States, 485 U.S. 759, 769 (1988)), under both the FCA and under

the common law, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 2002-03 (citing Williston on Contracts § 69:12 (4th ed. 2003) and the Restatement (Second) of Torts, § 538). Materiality is more likely to be found where the information at issue goes "to the very essence of the bargain," Escobar II, 136 S. Ct. at 2003, n. 5 (quoting Junius Constr. Co. v. Cohen, 257 N.Y. 393, 400 (1931) (Cardozo, C.J.))

"The materiality standard is demanding," as the False Claims Act is not "'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Id. at 2003 (internal citation omitted). Materiality "cannot be found where noncompliance is minor or insubstantial." Id. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." Id.

The Court then laid out several specific factors that might contribute to determining materiality:

> [p]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual

knowledge that certain requirements were violated, and
has signaled no change in position, that is strong
evidence that the requirements are not material.

Id. at 2003-04. In a case decided after (and citing) Escobar II,
this Court concluded that in assessing materiality in connection
with a different section of the False Claims Act, the fundamental
inquiry is "whether a piece of information is sufficiently
important to influence the behavior of the recipient." United
States ex rel. Winkelman et al. v. CVS Caremark Corp., 827 F.3d
201, 211 (1st Cir. 2016). These standards of materiality guide
this Court's analysis in Relators' case on remand.

## II. Analysis

Applying the holistic approach to determining
materiality laid out by the Supreme Court, we have little
difficulty in concluding that Relators have sufficiently alleged
that UHS's misrepresentations were material. We reach this
conclusion for three reasons. First, Relators have alleged in
their Second Amended Complaint that regulatory compliance was a
condition of payment -- itself a "relevant" though "not
dispositive" factor in determining materiality. Escobar II, 136
S. Ct. at 2001. Second, the centrality of the licensing and
supervision requirements in the MassHealth regulatory program,
which go to the "very essence of the bargain," id. at 2003, n. 5,
of MassHealth's contractual relationships with various healthcare

providers under the Medicaid program, is strong evidence that a failure to comply with the regulations would be "sufficiently important to influence the behavior" of the government in deciding whether to pay the claims. Winkelman, 827 F.3d at 211. And third, while the Supreme Court observed that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material," Escobar II, 136 S. Ct. at 2003-04, the Court did not state that such knowledge is dispositive. In any case, the factual allegations contained in Relators' Second Amended Complaint are limited to reimbursement claims filed by UHS during the course of their daughter's treatment and prior to the filing of the litigation in July of 2011, and there is no evidence in the record that MassHealth paid those claims to UHS despite knowing of the violations.

### A. The Regulatory Requirements

Looking "to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," id. at 2002, we first note that the government conditioned MassHealth's payments on compliance with the licensing and professionalism regulations. See 130 Mass Code Reg. § 429.441(A). While not automatically "dispositive," such a designation is "relevant to ... the materiality inquiry." Escobar II, 136 S. Ct. at 2001.

Additionally, in this case, regulatory compliance is not merely a condition of payment; rather, MassHealth's decision to have a series of regulations in place to ensure that clinical mental health counselors, psychiatrists and psychologists are of sufficient professional caliber to treat patients strongly counsels in favor of a finding that compliance with these regulations is central to the state's Medicaid program and thus material to the government's payment decision. In describing Relators' Second Amended Complaint, the Supreme Court noted that the Relators "have alleged that Universal Health misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations." Escobar II, 136 S. Ct. at 2004. The Supreme Court concluded that "[a]nyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements," Escobar II, 136 S. Ct. at 2000, and we suggested a similar conclusion in our first encounter with this case. See Escobar I, 780 F. 3d at 514 ("The express and absolute language of the regulation in question, in conjunction with the repeated references to supervision throughout the regulatory

scheme, 'constitute dispositive evidence of materiality.'") (internal citations omitted).

We reaffirm our previous conclusion on this score. MassHealth has made it clear in its regulations that it expects that individuals in the business of providing mental health services in the Commonwealth have adequate training and professional credentials. Compliance, or lack thereof, with these regulations seem to us the textbook example of representations that would "likely ... induce a reasonable person to manifest his assent," Escobar II, 136 S. Ct. at 2003 (citing Restatement (Second) of Contracts, § 162(2)), in determining whether to pay for the healthcare services. Indeed, we struggle to think of a misrepresentation-by-omission that would give rise to a breach more material to the government's decision to pay.

While we recognize that the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations," Escobar II, 136 S. Ct. at 2003, UHS's alleged misrepresentations were not garden-variety breaches. At the core of the MassHealth regulatory program in this area of medicine is the expectation that mental health services are to be performed by licensed professionals, not charlatans. To use the Civil War-era example cited at oral argument in Escobar II, UHS's violations in the instant case are as central to the bargain as the United States

- 18 -

ordering and paying for a shipment of guns, only to later discover that the guns were incapable of firing. Id. at 2001.

### B. The Government's Actions

The defendant's primary argument on remand is that the government continued to pay the claims at issue despite knowledge that UHS was not in compliance with the applicable regulations in the manner alleged. Citing the Supreme Court's ruling in the present dispute, they argue that, while not dispositive, such payment practices constitute "strong evidence" of non-materiality. Id. at 2004. We find defendant's argument to be unconvincing for two reasons.

First, reviewing the factual allegations in the Second Amended Complaint and accepting them as true, as we must for purposes of evaluating a 12(b)(6) motion, we see no evidence that MassHealth continued to pay claims despite actual knowledge of the violations. Relators' Second Amended Complaint only cites reimbursements paid up to "the filing of this litigation" on July 1, 2011. It would appear that DPH did not conclusively discover the extent of the violations until March of 2012, well after the commencement of the litigation. Even assuming, on the most generous reading of the Second Amended Complaint for UHS, that various state regulators had some notice of complaints against Arbour in late 2009 and 2010, mere awareness of allegations concerning noncompliance with regulations is different from

knowledge of actual noncompliance. Additionally, there is no evidence in the complaint that MassHealth, the entity paying Medicaid claims, had actual knowledge of any of these allegations (much less their veracity) as it paid UHS's claims. Because we find no evidence that MassHealth had actual knowledge of the violations at the time it paid the claims at issue, we need not decide whether actual knowledge of the violations would in fact be sufficiently strong evidence that the violations were not material to the government's payment decision so as to support a motion to dismiss in this case.

Second, the specific claims identified by Relators only pertain to Yarushka's treatment, which ended with her death in October 2009. Their allegations plausibly make out a claim that those payments, for the unlicensed and unsupervised treatment their daughter received, were fraudulent. We see no reason to require Relators at the Motion to Dismiss phase to learn, and then to allege, the government's payment practices for claims unrelated to services rendered to the deceased family member in order to establish the government's views on the materiality of the violation. Indeed, given applicable federal and state privacy regulations in the healthcare industry, it is highly questionable whether Relators could have even accessed such information.

### III. Conclusion

While it may be the case that MassHealth continued to pay claims to UHS despite becoming aware that they were not in compliance with the pertinent regulations at the Arbour facility, and this information may come to light during discovery, at this time Relators have stated a claim under the FCA sufficient to survive a Motion to Dismiss.  Applying the Supreme Court's holistic approach to determining materiality, we conclude that UHS's alleged misrepresentations were material when looking "to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Escobar II, 136 S. Ct. at 2002.

We therefore REVERSE the district court's grant of UHS's Motion to Dismiss the Second Amended Complaint and REMAND to the district court for further proceedings.